1  VALERIE VANAMAN, SBN 42406
   GEORGE D. CROOK, SBN 60889
2  **NEWMAN AARONSON VANAMAN**
   14001 Ventura Boulevard
3  Sherman Oaks, CA 91423
   Telephone: (818) 990-7722
4  Facsimile: (818) 501-1306

5  Attorneys for Plaintiffs
   H.B., by and through his Guardian
6  Ad Litem PENNY B.; PENNY B.

7

8                **UNITED STATES DISTRICT COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10                   **WESTERN DIVISION**

11

12

| | |
|---|---|
| 13  H.B., by and through his Guardian Ad Litem PENNY B.; PENNY B., | ) CASE NO. CV 04-8572 FMC (SSx) |
| 14  Plaintiffs, | ) **DECLARATION OF CAROL A.** ) **SOBEL IN SUPPORT OF** |
| 15  vs. | ) **PLAINTIFFS' NOTICE OF** ) **MOTION AND MOTION FOR** ) **ATTORNEYS' FEES AND** |
| 16 | ) **COSTS** |
| 17  LAS VIRGENES UNIFIED SCHOOL DISTRICT, ET AL., | ) DATE: May 12, 2008 ) TIME:  10:00 A.M. |
| 18 | ) CTRM: 750 |
| 19  Defendants. | ) |

20

21

22

23

24

25

26

27

28

---
Declaration of Carol A. Sobel in Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs

## DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1.      I am an attorney admitted to practice in the State of California and in the United States District Court for the Central District of California. I make this declaration in support of the concurrently filed motion for an award of attorneys' fees based on facts of which I have personal knowledge and if I were called to testify as a witness to these facts I could and would do so competently.

2.      I was admitted to the California Bar in December, 1978, following my graduation from law school in May of 1978. From January 1, 1977 until April 24, 1997, I was employed by the ACLU Foundation of Southern California. For the last seven years prior to my departure from the ACLU, I served as a Senior Staff Counsel. I resigned from the ACLU to begin a private civil rights practice in late April, 1997.

3.      I am informed that attorneys fees are being sought in this matter for six counsel. I am personally familiar with five of the attorneys, including Valerie Vanaman, George Crook, Henry Tovmassian, Robert M. Myers, and Sharon A. Robinson. I have co-counseled cases in the past with both Ms. Vanaman and Mr. Crook and know them to be extremely skilled and experienced in their field. I have also co-counseled fifteen cases with Robert M. Myers and several with Sharon A. Robinson and, in fact, am currently co-counseling three cases with Mr. Myers and three cases with Ms. Robinson. I have known Mr. Myers for approximately 28 years.

I have known Ms. Robinson from the time that she was in law school and volunteered as a law clerk at the ACLU Foundation, which was approximately 20 years ago. I know Mr. Tovmassian more by reputation as I have never directly worked with him, although I have talked with him about various litigation-related matters by telephone in the past. I am extremely familiar with the firm of Newman Aaronson Vanaman ("NAV"), having co-counseled over a dozen cases with members of the firm over the past several years, including one with Mr. Crook, one with Ms. Vanaman and several with Ms. Robinson and Mr. Myers. Based on my own experience and knowledge of the Los Angeles legal community, I am of the opinion that the NAV firm enjoys a reputation as a firm with extremely competent and skilled attorneys, particularly in the area of disability rights and education law. Ms. Vanaman, Mr. Crook, Mr. Tovmassian, Mr. Myers, and Ms. Robinson, along with the other attorneys at the firm, share in that reputation.

4.    I am informed that Valerie Vanaman, George Crook, and Robert Myers are seeking fees in this action at a rate of $575 per hour; Henry Tovmassian is seeking fees at the rate of $495.00 an hour, and Sharon Robinson is seeking fees at the rate of $430 an hour. Based on my experience preparing fee awards, I believe that each of these rates is far below market rate for attorneys of comparable skill and experience. By way of comparison, both Ms. Vanaman and Mr. Crook were graduated from law school ten years and four years, respectively, before I was

Declaration of Carol A. Sobel

graduated.  I am aware of this fact from my personal knowledge of each as an attorney and from reviewing the California State Bar website for attorney admission information.  The rate of $575 an hour they are seeking in this matter is nearly $100.00 below my billing rate for 2008.

5.      To illustrate why I am of the opinion that the rates sought in this instance are far below market rate, my current market rate is $675 an hour.  I negotiated fees in several cases at $590 an hour for 2006, which was higher than the rate Ms. Vanaman and Mr. Crook are seeking for 2008.  Most of the fee awards I have obtained are reached through settlement.  For example, in 2006 I settled a First Amendment case involving the Venice Boardwalk, in which the defendant was the City of Los Angeles, Venice Food Not Bombs v. City of Los Angeles, CV05-4988 DDP (SSx).  The settlement of fees was reached only after I submitted my total billing records and proposed rates.  The rates I sought were $590 an hour for me and $300 an hour for a 2004 graduate.  The City accepted those rates. The most recent court-approved fee award I obtained was in November 2006 in *Noe v. City of Los Angeles*, CV 05-08374 AG (SSx).  To facilitate a favorable and speedy settlement for my clients, all of whom were homeless individuals, I waived my own fees in the case, but the Court approved fees to my co-counsel, a 2001 law school graduate, at a rate of $325 an hour.

6. Attached to my declaration are several recent decisions in the Central

3

Declaration of Carol A. Sobel

District awarding attorney fees in civil rights litigation. The decision in *Comite de Jornaleros de Glendale v. City of Glendale,* CV 04-3521 SJO (Ex) was issued by Judge Otero in 2005 and awarded fees to Thomas Saenz, a 1991 graduate, at $450 an hour; to Belinda Escobosa Helzer, a 2001 graduate, at $305 an hour; and to Shaheena Ahmad Simons, a 2002 graduate, at $290 an hour. I know each of these individuals personally. I have only provided excerpts from a very long decision by Magistrate Judge Larson, awarding attorney fees to Barry Litt and others at his firm in *Karen Craft v. County of San Bernardino,* EDCV 05-00359, on April, 2008. I am familiar with all of the attorneys at that firm because I have worked with them either when they were at the Litt firm, or when they were at the ACLU earlier. For example, Paul Estuar is a 1993 law school graduate, with whom I have worked on several occasions. I am presently co-counseling litigation before Judge Matz arising from the events of May Day, 2007 in MacArthur Park when the Los Angeles Police Department disrupted an immigrants' rights rally. Nearly all of the attorneys involved in Craft are also counsel in the May Day case, as is Mr. Myers, and many were also counsel with me and Mr. Myers in the post-Democratic National Convention 2000 litigation, which was consolidated before this Court.

7.      The fee rates approved by Judge Larson in 2008 included $725 an hour for Barry Litt, who was graduated a year after Ms. Vanaman, $485 an hour for Mr. Estuar, a 1993 graduate, $650 an hour for Robert Mann, who graduated a year after

4

Mr. Litt, and $300 an hour for several 2004 graduates. I am aware of these rates as I submitted a fee declaration in support of the application for fees in *Craft*. A true and correct computer generated copy of my declaration in *Craft* is attached to my declaration, setting out all of the rates sought in that case. *Craft* involved a complex class-action and the rate awarded Mr. Litt in that case reflects a premium differential based on his recognition as a specialist in complex class-actions.

8.     I am aware that Ms. Robinson did not practice for several years while she raised her children, then returned to practicing law over the last several years. Had she practiced full time most of the time since her graduation, she would command a much higher hourly rate than is being sought here and would more closely reflect her skills and reputation in the community. In my estimation, had she practiced without significant interruption since her graduation in 1988, Ms. Robinson would be at a market rate well over $500 an hour at this point. Even with this absence, Ms. Robinson has skills that are comparable to an attorney such as Cynthia Anderson-Barker, a 1993 graduate, to whom Judge Larson awarded fees at a rate of $425 an hour based on a 2007 rate.

9.     Because I am a sole practitioner, I set my market rate by comparison to lawyers of comparable skill and experience at other firms in the Los Angeles area, as I did during the time that I was employed by the ACLU.  During the time that I was at the ACLU, I prepared numerous fee motions under federal and state fee-shifting

statutes for cases in which the ACLU represented the prevailing party.  I was responsible for preparing these motions in cases in which I was directly involved in the underlying litigation, as well as in cases brought by other staff attorneys and volunteer counsel for the ACLU.  As part of this responsibility, each year I would survey several law firms to obtain information on their current billing rates in order to establish rates for individuals of comparable experience to ACLU staff.  The private firms from which I most frequently sought such information included Loeb & Loeb, Litt & Associates, and Kaye, Scholer.  I sought information on billing rates from these firms because the partners at these offices were extremely familiar with the experience levels of the various ACLU attorneys and had co-counseled cases with the ACLU.  I have continued this practice in preparing fee motions for those cases in which I serve as ACLU cooperating counsel and for those cases in my private practice for which attorneys' fees may be recovered.  As part of my survey, I make it a point to consult with attorneys in both larger law firms engaged in complex litigation, such as Loeb & Loeb LLP and Kaye Scholer, as well as smaller boutique civil rights law firms, including Hadsell & Stormer, a private firm with four partners, and Litt, Estuar, Harrison, & Kitson, a private firm with four equity partners and just two or three associates at one time, depending on case demands.  The law firm of Schonbrun, DeSimone, Seplow, Harris & Hoffman is a five-partner civil rights law firm, which also usually has one or two associates. Based on the information I have obtained from

6

each of these firms, I have formed the opinion that there is little, if any, difference between the fees sought and awarded to smaller or solo civil rights firms and larger business firms which occasionally do pro bono civil rights and civil liberties work because the skill and experience of the attorneys in question is comparable.

10.     In establishing my market rate for 2008, I obtained current billing rates for partners and associates at Loeb & Loeb in several classes representing my year of graduation and those of the lawyers with whom I am presently co-counseling several cases.  For example, Douglas Mirell, who was graduated from law school three years after I was and nearly 17 years after Ms. Vanaman, is presently billing at approximately $675 an hour.

11.     The above rates, of course, are based on market rate compensations for attorneys who are paid directly for their services by their clients.  I also know from my experience as a lawyer that attorneys who accept cases on the basis of a contingency expect to receive at least twice their hourly rates in cases where their compensation is contingent on their success, particularly in hard fought cases where the result is uncertain.  This expectation of higher compensation is precisely because of the risk involved; that is, the clients in such matters are not paying the legal bills, much less legal bills on a monthly basis, and if I do not prevail in a contingent-fee representation case, I receive no fees.

12.     Based on discussions I have had with clients whose cases I accept and

those who call and ask for representation, I am aware that there is a dearth of lawyers, let alone skilled lawyers, willing to take on these types of civil rights cases on a contingent basis. For the past ten years, I have worked frequently with educational rights advocates and am familiar with the incredible demand for representation on these issues and the lack of competent lawyers to take on these cases. I also am aware from speaking with counsel and reviewing various decisions of the Ninth Circuit since 2001 that many of these types of education cases frequently result in "voluntary" agreements to provide the legally-mandated services, in which case there is no fee recovery because "catalyst" fees are not available following the decision in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001).

13.     In part because of the high risk of no recovery of fees after *Buckhannon*, there are very few attorneys who will take on the risk of doing special education law. Even before *Buckhannon,* the pool of lawyers who handled these types of cases was small because, like other civil rights litigation, it is generally not a very lucrative field compared to paying business litigation.  Further, under the Individuals with Disabilities Education Act, which is the statute pursuant to which counsel are seeking fees in this action, no bonus or multiplier may be used in calculating fees, no matter how successful the attorney has been. 20 USC § 1415(i)(3)(C). In view of such disincentives, it is even more important that those attorneys willing to take on this

risk receive their full lodestar for fee awards that truly reflect the market value of their services. I frequently receive calls asking for representation in this area of the law. I do not handle these types of cases and routinely refer the caller to several law firms, including the NAV firm.

14.    In summary, based on my knowledge of the skills and experience of the attorneys seeking fees in this action, as well as the reputation of the law firm of Newman Aaronson Vanaman, and based on my experience in establishing reasonable market rates for numerous attorneys engaged in a variety of civil rights litigation, it is my opinion that fees at the rates of $575.00 per hour for Ms. Vanaman, Mr. Myers, and Mr. Crook, $495.00 per hour for Mr. Tovmassian, and $430.00 per hour for Ms. Robinson are all well below the market rate in the Los Angeles legal community for lawyers of comparable skill, reputation and experience.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed this 8th day of April, 2008, at Linden, New Jersey.

Carol A. Sobel

CAROL A. SOBEL

*COMITE DE JORNALEROS DE GLENDALE V. CITY OF GLENDALE*
FEE AWARD

ORIGINAL



Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
CLERK, U.S. DISTRICT COURT
AUG 1 9 2005
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

SCAN

ENTERED
CLERK, U.S. DISTRICT COURT
AUG 2 2 2005
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Comite de Jornaleros de Glendale, *et al.,* | NO. CV 04-3521 SJO (Ex) |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTION FOR ATTORNEYS' FEES AND COSTS** |
| City of Glendale, | |
| Defendant. | |

This matter is before the Court on Plaintiffs Comite De Jornaleros de Glendale and National Day Laborer Organizing Network's (collectively, "Plaintiffs") Motion to Award Attorneys' Fees and Expenses. The Court deemed this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78. Having thoroughly considered all the arguments and admissible documents submitted, Plaintiffs Comite De Jornaleros de Glendale and National Day Laborer Organizing Network's Motion to Award Attorneys' Fees and Expenses is GRANTED.

I.    BACKGROUND

On May 19, 2004, Plaintiffs filed their complaint ("Complaint") against Defendant City of Glendale ("Defendant" or "the City") challenging the constitutionality of Glendale Municipal Code section 9.17.010. (Opinion & Order of 05/13/05, hereinafter "Order," at 1.)

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d)



1    On May 13, 2005, this Court permanently enjoined Defendant, its officers, agents, servants,

2  employees, and attorneys and those persons in active concert or participation with them from

3  enforcing section 9.17.030 of the Glendale Municipal Code (hereinafter, "the Anti-Solicitation

4  Ordinance" or "the Ordinance") or from undertaking other acts to discourage the speech the

5  Ordinance unlawfully prohibits. (Order at 1-2.)  This Court entered final judgment in favor of

6  Plaintiffs and granted Plaintiffs to recover from Defendant, under 42 U.S.C. § 1988, all of Plaintiffs'

7  reasonable attorneys' fees, costs, and expenses of this litigation.[1]  (Order at 11.)

8    Defendant concedes that Plaintiffs are the prevailing parties and are entitled to reasonable

9  attorneys' fees for their costs and expenses in this litigation.  However, Defendant challenges

10  Plaintiff's Motion to Award Attorneys' Fees for the following reasons:  (1) attorneys' fees and

11  hourly rates are unreasonable; and (2) some expenses are not recoverable under 28 U.S.C. §

12  1920.

13  II.    LEGAL STANDARD

14         A.    Authorization of Attorney's Fees in Civil Rights Cases Falls Within the Discretion of
                the District Court.

15

16    Under 42 U.S.C. § 1988, "the court, in its discretion, may allow the prevailing party, other

17  than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988 (West

18  2005).  A prevailing plaintiff will generally recover attorney's fees "unless special circumstances

19  would render an award unjust." *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1402 (9th Cir. 1994).

20  The district court has broad discretion in determining the appropriate attorney's fee award under

21  section 1988. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Under *Hensley*, "[t]he most useful

22  starting point for determining the amount of a reasonable fee is the number of hours reasonably

23  expended on the litigation multiplied by a reasonable hourly rate." *Id.*

24

25    [1] Plaintiffs seek to recover from Defendant reasonable attorneys' fees, costs, and expenses

26  of this litigation pursuant to 42 U.S.C. § 1988.  Subdivision (b) of section 1988 provides in
    pertinent part that "the court, in its discretion, may allow the prevailing party, other than the United

27  States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.  The purpose of §
    1988 is to ensure "effective access to the judicial process" for persons with civil rights grievances.

28  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citing H. R. Rep. No. 94-1558, p. 1 (1976)).

2

III.   DISCUSSION

A.   Plaintiffs' Hours Expended on Litigation are Reasonable.

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 435. The Ninth Circuit held "[t]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397-1398 (9th Cir. 1993). Additionally, the Ninth Circuit held that "the participation of more than one attorney does not necessarily constitute an unnecessary duplication of effort." *Kim v. Fujikawa*, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989).

As prevailing parties, Plaintiffs provided a detailed summary of billed hours for each attorney and paralegal. (Saenz Decl., Ex. 1.) Plaintiffs provided sufficient evidence of the number of hours billed and sufficient detail of the description of work provided to Plaintiffs. (*Id.*) Additionally, this Court has viewed the detail of each entry for billed hours and finds these hours reasonable. There is no specific evidence that supports Defendant's claim that Plaintiffs' billed hours are inefficient or unnecessary since Plaintiffs provided sufficient evidence of recording time. Additionally, the Court finds that two attorneys attending a settlement conference is not considered duplicative hours when both attorneys have been heavily involved in the litigation process prior to the settlement conference.

1.   *Johnson* Factors Support Plaintiffs' Attorneys' Hours to be Reasonable.

In determining what constitutes a reasonable fee, the district court should take into account the factors developed in *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974) (overruled on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87 (1989).). Such factors include the nature of the litigation, the difficulty, the amount involved, the skill required, the skill employed, the attention given, the success or failure, and other circumstances of the case. *Id.*

Some courts use *Johnson* factors to calculate upward or downward adjustments to the loadstar in a fee award. *See Johnson*, 488 F.2d 714. Defendant argues that the case is neither novel nor complex. In this case, no upward or downward adjustments are recommended. Instead, the lodestar is granted based on the complex nature of the case and qualifications of the attorneys.

3

1   This Court finds that Plaintiffs' attorneys' hours are reasonable considering the time and

2   experience needed to investigate the constitutionality of the Ordinance. Additionally, as skilled civil

3   rights attorneys, Plaintiffs' attorneys' billed hours are reasonable.

4        2.   Hours Billed Prior to Litigation Are Reasonable.

5        Reasonable work at all stages of litigation is compensable, including pre-filing work.

6   *Dowdell v. Apopka, Fla.*, 698 F.2d 1181, 1192 (11th Cir. 1983).

7        Agustin Corral, a paralegal for Plaintiffs, billed 16.3 hours prior to the retainer agreement

8   interviewing day laborers for investigative purposes. (Saenz Decl., Ex. 1.) This Court finds that

9   Mr. Corral's investigative work was important to the litigation. Mr. Corral's hours are not duplicated

10  or excessive. This Court finds Mr. Corral's billed hours are reasonable.

11       3.   Conference and Background Research Hours Are Reasonable.

12       In *Case v. Unified Sch. Dist. No. 233, Johnson County, Kan.*, the court reduced the hours

13  in "conference" and "background research" since the entries failed to show how much time was

14  spent and what happened during these hours, 157 F.3d 1243, 1252-1253 (10th Cir. 1998).

15       Unlike *Case*, Plaintiffs in this case have provided more detail than "conference" and

16  "background research." Each of Plaintiffs' "conference" entries provide the number of billed hours

17  and specific information as to why an attorney conferred. For example, on May 17, 2004,

18  Thomas Saenz "confer[red] with Escobosa re Glendale filing, possible added claims, interviews

19  with day laborers on selective enforcement." (Saenz Decl., Ex. 1.) The detail of each entry is

20  sufficient and reasonable.

21       Additionally, Plaintiffs' attorneys did not bill hours that are considered background research,

22  hours that are usually absorbed in the firm's overhead costs. *See Case*, 157 F.3d 1243, 1252-

23  1253. This Court finds Plaintiffs' attorneys' hours to be reasonable since the research entries are

24  justifiably necessary and important to the litigation.

25       B.   Plaintiffs' Requested Hourly Rates Are Reasonable.

26       A district court should calculate a reasonable hourly rate "according to the prevailing market

27  rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). "An attorney

28  specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his

                                                4

1  ability corresponds with his experience." *Johnson*, 488 F.2d at 719.  The Fourth Circuit granted

2  an hourly rate of $150 where defendants provided an affidavit demonstrating the usual hourly rate

3  for civil rights attorneys in South Carolina was between $50 to $75 due to counsel's "vast

4  experience and expertise." *Plyler v. Evatt*, 902 F.2d 273, 278 (4th Cir. 1990).  The court concluded

5  that  the appropriate rate in comparable complex litigation ranged from $100 to $250 in South

6  Carolina.  *Id.*

7       "The party opposing the fee application has a burden of rebuttal that requires submission

8  of evidence to the district court challenging the accuracy and reasonableness of the hours charged

9  or the facts asserted by the prevailing party in its submitted affidavits." *Gates*, 39 F.3d at 1449

10  (quoting *Gates*, 987 F.2d at 1397-1398).  In *McGrath v. County of Nev.*, the Ninth Circuit held that

11  the County of Nevada failed to meet its burden to challenge plaintiff's request for attorney fees,

12  67 F.3d 248, 256 (9th Cir. 1995).   The court held it was the County's burden to submit specific

13  evidence comparing the work invested in similar cases for the district court's consideration.  *Id.*

14       Although Defendant disagreed with Plaintiffs' evidence supporting attorneys' and paralegals'

15  hourly rates, Plaintiffs provided sufficient evidence that supports Plaintiffs' requested hourly rates.[2]

16  Thomas Saenz[3] billed $450 per hour; Belinda Escobosa Helzer billed $305 per hour; Shaheena

17  Ahmad Simons billed $290 per hour; and Agustin Corral and Fermin Rodriguez billed $160 per

18  hour each.  The hourly rates of the attorneys are comparable to other civil rights attorneys with

19  similar skill, experience, and practice in the Los Angeles area.  Plaintiffs provided evidence that

20  other Los Angeles firms such as Latham & Watkins and Gibson Dunn and Crutcher bill over

21  Plaintiffs' requested hourly rates. (Plaintiffs' Reply at 5.)  Accordingly, the Court finds the hourly

22  rates requested to be fair and reasonable.

23  ───────────────────

24       [2] Defendant objected to Plaintiffs' Declaration of E. Richard Larson in Support of Plaintiffs' Application of Attorneys' Fees and Expenses because Plaintiffs failed to provide this declaration

25  in a timely matter. This Court does not find Mr. Larson's declaration to be prejudicial since his declaration is an elaboration to Plaintiffs' submitted affidavits in their original request.

26

27       [3] It is not subject to reasonable dispute that Mr. Saenz is one of the best and most influential lawyers in California. He was named one of the 100 Most Influential Attorneys in California for

28  the year of 2000 by the California Law Business Journal and one of 26 "Lawyers of the Year" by California Lawyer.

5

C.   Plaintiffs' Expenses and Costs Are Reasonable.

Under section 1988, "out-of-pocket expenses incurred by an attorney which would normally be charged to a fee paying client are recoverable as attorney's fees." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1216 n. 7 (9th Cir. 1986) (citing *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 30 (D.C. Cir. 1984).). These out-of-pocket costs are reimbursable as part of the attorney's fee distinct from the costs already awarded to plaintiffs under 28 U.S.C. § 1920. *Id.*

Defendant requests the Court to deny Plaintiffs' expenses and costs without citing legal authority supporting its proposition. This Court finds Plaintiffs' expenses and costs are reasonable and reimbursable.

IV.   RULING

Having considered all admissible evidence in support of, or in opposition to, Plaintiffs' Motion to Award Attorneys' Fees and Expenses, the Court hereby ORDERS an award in favor of Plaintiffs Comite de Jornaleros de Glendale and National Day Laborer Organizing Network and against City of Glendale in the requested amount of $67,276.

IT IS SO ORDERED.

Dated this __19__ day of August, 2005.

S. JAMES OTERO
UNITED STATES DISTRICT JUDGE

6

PAGES 9-17 OF THE ORDER AWARDING ATTORNEY'S FEES AND COSTS
IN
*CRAFT v. COUNTY OF SAN BERNARDINO*

1   on the issue had been from a divided panel, with one judge dissenting and one

2   concurring based on established precedent). *See also Evans v. Stephens*, 407 F.3d

3   1272 (11th Cir.2005) (en banc) (suggesting in dicta that entry into the general

4   population may be a per se justification for a strip/visual body cavity search but not

5   deciding the issue in that case). The instability of the case law in this area is clearly

6   illustrated by the history of *Powell v. Barrett, supra*, 496 F.3d 1288 (11th Cir.

7   2007) (finding no qualified immunity for policies of routinely strip searching pre-

8   arraignment and post-release inmates). The Eleventh Circuit granted rehearing en

9   banc in the case on February 1, 2008, although no motion for rehearing was filed.

10   The Circuit's grant of en banc review in such circumstances suggests the

11   possibility that the Eleventh Circuit will adopt a markedly different analysis from

12   that of the Ninth and other Circuits in this complex and difficult area of the law.

13   This evidences the risk for Plaintiffs' counsel inherent in litigation of this type.

14       Declarations filed in support of Plaintiffs' motion for attorneys' fees from

15   experienced class and civil rights lawyers noted several particular difficulties in

16   litigation of this kind, including 1) particular challenges and expertise required to

17   establish a policy or custom under *Monell v. Dept. Soc. Serv.,* 436 U.S. 658, 690

18   (1978), 2) great deference is given to jails in addressing security issues, 3) the law

19   often differs from circuit to circuit, and 4) there is a greater risk than normal that

20   the whole legal landscape could change by virtue of a change in the law,

21   particularly if the Supreme Court addresses the issue (which it has not done in the

22   area of strip searches of pre-trial detainees since *Bell v. Wolfish*, 441 U.S. 520

23   (1979), almost 30 years ago. The Court agrees that all of these reflect risks for

24   Plaintiffs' counsel in pursuing litigation of this type.

25       In addition to the risk of establishing liability, class certification carries risks

26   and requires experienced class counsel. Whether to certify a class rests within the

27   sound discretion of the court. *See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 953

28   (9th Cir.2003). *Armstrong v. Davis,* 275 F.3d 849, 867 (9th Cir.2001) (district

1    court's decision to certify a class is subject to "very limited" review and will be

2    reversed "only upon a strong showing that the district court's decision was a clear

3    abuse of discretion") (citation omitted); *Gonzales v. Free Speech Coal.,* 408 F.3d

4    613, 618 (9th Cir.2005) ("[a]buse of discretion is 'a highly deferential standard';

5    review 'is limited to assuring that the district court's determination has a basis in

6    reason'") (citation omitted). Courts have declined class certification in strip search

7    cases. *See, e.g., Noon v. Sailor*, 2000 WL 684219, 1 (S.D.Ind. 2000) (denying

8    motion to reconsider denial of class certification, citing manageability and broad

9    district court discretion). Certifying damages classes where the damages are not

10   susceptible of mathematical calculation, as here, is also a challenge for plaintiffs'

11   counsel. *See, e.g., Allison v. Citgo,* 151 F.3d 402, 415 (5th Cir.1998) (damages in

12   Title VII case are too individualized to be incidental to injunctive relief;

13   suggesting, in upholding denial of certification of 23(b)(3) class, that

14   individualized damages determinations make it difficult if not impossible to meet

15   the superiority and manageability requirements of Rule 23(b)(3)).

16       Aside from the complexity of the legal issues, there are other complexities.

17   Data analysis in a case such as this is complex, requiring a high degree of

18   sophistication and background in such analyses. Analysis of the Defendant's data

19   is the basis of determining class membership and entails writing specialized code

20   to determine who belongs in each class, based on the particular facts and issues of

21   each case. Mediation requires reaching a mutual agreement on analyzing the data,

22   as well as issue involving the structure of the class fund, its administration and the

23   like.

24       All these considerations are factors in determining both the complexity of

25   the case and the degree of risk involved in the litigation. Even with the body of law

26   in areas clearer than most involved here, substantial uncertainty and risk exists in

27   pursuing any strip search claims against jails and in obtaining class certification,

28   and the quality of the representation makes a large difference. For the reasons

1   stated, plaintiffs' counsel brought to bear substantial expertise, addressed and

2   obtained favorable rulings on several complex issues, and faced substantial risk of

3   non-payment. The risk lay in establishing liability, in obtaining class certification –

4   both of which were vigorously contested – and in reaching a favorable settlement.

5        Class counsel declined substantial other work to pursue this case. Mr. Litt

6   and Mr. Estuar, who concentrate more or less exclusively on civil rights class

7   actions, handle only about 10-12 cases at a time, for each of which it is anticipated

8   that in the range of 1500-5000 hours or more will be required to see the case to

9   completion. In this case, by the conclusion of the case, well over 2000 hours will

10  have been expended on the case.

11       **B.    *Counsel's Experience***

12       Class counsel are highly experienced and highly regarded civil rights

13  lawyers, with extensive class action experience. Mr. Litt is a well known and

14  highly regarded civil rights lawyer specializing in civil rights class actions,

15  especially law enforcement class actions. He has been lead counsel in two other

16  eight figure strip search settlements aside from this one, and is lead counsel in

17  several other pending strip search class actions in California, Washington D.C.,

18  Maryland and Georgia. He has several seven figure, and one eight figure, civil

19  rights trial verdicts. With this case, he will have been lead counsel in three of the

20  four largest strip search cases, measured in terms of monetary recovery, in the

21  United States. Mr. Estuar has worked with Mr. Litt for many years and also

22  specializes in complex civil rights litigation, and has worked with him on the strip

23  search cases described above. The other class counsel in this case – Mr. Mann and

24  Mr. Cook – have long histories of working on law enforcement civil rights cases in

25  general, including several law enforcement civil rights class actions. They

26  specialize in police misconduct cases and have handled hundreds of such cases.

27

28

Case 2:04-cv-08572-CAS-SS   Document 82-4   Filed 04/21/08   Page 22 of 37   Page ID
#:712
Case 5:05-cv-00359-SGL-OP   Document 168   Filed 04/01/2008   Page 12 of 25

1    **C.    *The Effort Expended By Counsel.***

2        Counsel litigated this case to the eve of trial. This entailed the following

3    efforts by Class Counsel: 1) extensive investigation of the underlying

4    circumstances, including obtaining questionnaires and interviews with many class

5    members; 2) preparation of the complaint; 3) the Rule 26 conference and report; 4)

6    2 requests for production of documents; 5) extensive analysis of hard copy

7    documents produced  6) 1 set of interrogatories, 7) 14 depositions, 8) a stipulated

8    protective order, 9) a discovery motion, 10) extensive analysis of computerized jail

9    data; 11) successful motions for class certification and partial summary judgment,

10   12) extensive mediation efforts (including multiple mediation sessions), 13)

11   preparation of complex settlement documents, and 14) handling class

12   administration issues and class inquiries from the Preliminary Approval to the

13   Final Approval of the settlement. In summary, Class Counsel's efforts were

14   extensive, and involved all that occurs in a case that is litigated up to the eve of

15   trial.

16   **D.    *The Result Obtained For The Class***

17       This case was hard fought. Only after plaintiffs obtained partial summary

18   judgment on two of the key issues in the case did defendants change their practices

19   and open settlement discussions. The class members were paupers or low income

20   persons, and unable to pay Class Counsel for their time. The settlement was the

21   result of arm's length negotiations entered only after plaintiffs obtained class

22   certification and partial summary judgment. The settlement negotiations were

23   conducted with the assistance of an independent mediator. Due exclusively to

24   Class Counsel's efforts, the class fund was created in the estimated amount of

25   $25,500,000.

26       There were approximately 150,000 class members in the various classes

27   based on the County's data, and over 20,000 claims filed. Unlike most class

28   actions, plaintiffs were persons charged with crimes and, thus, not people generally

1  considered sympathetic or desirable by the public at large. *See, e.g., Battle v.*

2  *Anderson* 564 F.2d 388, 398 (10th Cir. 1977) (in prisoner civil rights class action,

3  "plaintiffs' class are generally a feared and despised class"); *Morales Feliciano v.*

4  *Hernandez Colon*, 697 F.Supp. 51, 60 (D.Puerto Rico 1988) ("The general

5  population's attitude toward those who commit or are accused of committing

6  crimes is understandably one bordering in despise. Many Puerto Ricans believe

7  that since plaintiffs are criminals, they deserve the conditions under which they

8  live in the prisons.").

9       According to Class Counsel, this settlement represents the second largest

10  total monetary settlement ever reached for strip searches in the United States.

11  There are two other comparable cases in terms of size. One is *Tyson v. City of New*

12  *York*, 97-CV-03762 (S.D.N.Y.), a case settled several years ago for an amount

13  ranging from $19.5 Million to approximately $51 Million, depending on the extent

14  of the claims made. That case, unlike this one, addressed only cases involving

15  settled law, i.e., traditional pre-arraignment strip searches conducted without

16  reasonable suspicion.

17       In this case, there were five groups ultimately settled, as discussed

18  previously. One involved pre-arraignment strip searches of those transferred from

19  other San Bernardino County jails; this class covered only a few thousand of the

20  approximately 150,000 class members. Unlike the New York case, even the law on

21  this issue was not settled because these were transferees, rather than direct

22  arrestees, as was the case in New York. The other issues in this case involve

23  considerably less settled law than in *Tyson*.

24       The second comparable case, also handled by the same counsel as here, is

25  *Williams v. Block, supra*, Case No. CV 97-03826-CW (C.D. Cal. 2001). That case

26  involved a $27 Million settlement, covering two classes – a class of inmates

27  overdetained after they became entitled to release, and a class of inmates strip

28  searched after they became entitled to release. The parties estimated for settlement

13

1   purposes that the two classes had approximately equal value, thus valuing the strip

2   search class at approximately $13.5 Million. In addition, in the LA case, the time

3   period covered was longer, the LA County jail is larger, and the number of

4   potential strip search class members was greater than here. See Declaration of

5   Barrett S. Litt. Thus, by contrast, the settlement here was both more substantial and

6   addressed several issues not involved in *Williams*.

7       Nor can the results in this case be judged solely by the monetary component

8   of the settlement. Due to the litigation, the County has stopped all of the strip

9   search practices addressed in this settlement. See Preliminary Approval Order,

10  ¶14. That is a major accomplishment, independently of the monetary settlement.

11  "Attorneys' fees [in class action cases] may be awarded even though the benefit

12  conferred is purely non-pecuniary in nature." *Merola v. Atlantic Richfield Co.,* 515

13  F.2d 165, 169-70 (3d. Cir.1975) (citing *Mills v. Elec.; see also Hall v. Cole*, 412

14  U.S. 1, 7 n.5 (1973) ("the rationale of …[the class fund doctrine] must logically

15  extend, not only to litigation that confers a monetary benefit on others, but also to

16  litigation 'which corrects or prevents an abuse which would be prejudicial to the

17  rights and interests' of those others.") (Citations omitted.). As a result of counsel's

18  efforts, hundreds of thousands of future inmates have been spared the

19  "embarrassing and humiliating experience", and "extensive intrusion on personal

20  privacy", that a strip search necessarily entails. *Hunter v. Auger,* 672 F.2d 668, 674

21  (8th Cir.1982).

22      **E.      The Reaction Of The Class**

23      Claim forms were mailed to 150,084 class members. There were 20,350

24  timely claim forms, and 781 late claims. There were 48 timely opt-outs, eight

25  people who timely filed opt-out notices and claims, and up to 13 timely objections.

26  The objections were addressed in the Order of Final Approval and Settlement; two

27  are likely not objections at all, and none raised any substantive issues regarding the

28  fairness of the settlement from a class perspective. This is a highly favorable

14

Case 2:04-cv-08572-CAS-SS  Document 82-4  Filed 04/21/08  Page 25 of 37  Page ID
#:715
Case 5:05-cv-00359-SGL-OP   Document 168   Filed 04/01/2008   Page 15 of 25

1   reaction by the class to the settlement. *Compare, e.g., Hughes v. Microsoft Corp.,*

2   2001 WL 34089697, 8 (W.D.Wash. 2001) (court found that the "class members

3   overwhelmingly support[ed] the settlement" where there were over 37,000 notices

4   sent out, 2,745 class members participated in the settlement, "only nine objections

5   were submitted", and there were 86 timely opt-outs and over 20 additional

6   defective or untimely opt-outs; "these indicia of the approval of the class of the

7   terms of the settlement support a finding of fairness under Rule 23"), citing *Hanlon*

8   *v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998) (despite vigorous objections

9   and appeal by objectors, "fact that the overwhelming majority of the class willingly

10   approved the offer and stayed in the class presents at least some objective positive

11   commentary as to its fairness"; court did not abuse its discretion in approving

12   settlement); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977)

13   (approximately 1% of 31,000 class members opted out; "the fact that the

14   overwhelming majority of the class willingly approved the offer and stayed in the

15   class presents at least some objective positive commentary as to its fairness").

16   Here, the opt-outs were less than 1/30[th] of 1% of the class, and there was only a

17   handful of objections, indicating overwhelmingly strong support by the class for

18   the settlement.

19         **F.**     ***Comparison With Counsel's Lodestar.***

20         A lodestar cross-check is not required in this circuit, and in some cases is not

21   a useful reference point. *See, e.g., Glass v. UBS Financial Services, Inc.,* 2007 WL

22   221862, 16 (N.D.Cal. 2007) (no lodestar cross check conducted in an early

23   settlement of the case, although 8 class members (out of 13,176) and the New York

24   attorney general objected to the settlement, 280 class members opted out, and the

25   New York attorney general and at least two of the class members objected to the

26   25% of the fund request as excessive; court awarded fees of $11,250,000 despite

27   the fact that the $45 Million fund was subject to a reversion for unclaimed funds).

28

Case 2:04-cv-08572-CAS-SS   Document 82-4   Filed 04/21/08   Page 26 of 37   Page ID
#:716
Case 5:05-cv-00359-SGL-OP   Document 168   Filed 04/01/2008   Page 16 of 25

1   Nonetheless, plaintiffs, without request by the Court, presented their lodestar to

2   allow it to do a lodestar check if it so wished.

3        The Court has conducted a lodestar cross-check. Plaintiffs provided detailed

4   documentation of their time. Plaintiffs established a lodestar of approximately $1.2

5   Million (including post-approval projected time). They submitted rates ranging

6   from a high of $725 per hour for Mr. Litt (an attorney with 38 years experience) to

7   a low of $275 for 2006 graduates, as well as law clerk rates of $200 per hour and

8   paralegal rates from a low of $110 to a high of $225 per hour. In addition, they

9   submitted documentation showing costs in the case amounted to $70,564.64, the

10  largest component of which was payment to their data consultants.

11       Plaintiffs' counsel are experienced civil rights litigators who are at the top of

12  their field of expertise – civil rights litigation with special expertise in civil rights

13  class actions. Plaintiffs' counsel's hourly rates are addressed and supported by

14  numerous declarations filed with this motion. These declarations establish that the

15  hourly rates set are similar to those for attorneys of comparable skill and

16  experience at the rates paid for complex federal litigation, which was Congress'

17  intent for civil rights cases. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-576

18  (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976,

19  p.5913, *supra*, (Congress intended civil rights fees to be comparable to that for

20  "other types of equally complex Federal litigation, such as antitrust cases").

21  Counsel established that the rates requested were their normal hourly rate for civil

22  rights litigation, that these are the rates they charge private clients on the rare

23  occasions that they do retained work, and that they have frequently been awarded

24  their current rates in civil rights cases in attorney fee motions. The Court finds that

25  the rates sought are reasonable and reflect the market for attorneys of comparable

26  skill, experience and expertise in complex federal litigation.

27       The Court further notes that plaintiffs' counsel's time in this case is likely as

28  low as it is due to plaintiffs' counsel exceptional experience in litigation of this

Case 2:04-cv-08572-CAS-SS   Document 82-4   Filed 04/21/08   Page 27 of 37   Page ID
#:717
Case 5:05-cv-00359-SGL-OP   Document 168   Filed 04/01/2008   Page 17 of 25

1   type. Without such expertise, it is likely that the hours would have been

2   significantly higher to achieve the same result. Other counsel, even those

3   experienced in civil rights litigation, would likely have had to expend considerably

4   more time to accomplish the same result.

5        The plaintiffs' request in this case for 25% of the class fund would result in a

6   fee of $6,375,000, which is a multiplier of approximately 5.2 times the $1.2

7   Million lodestar in this case. The Court has concluded that it will award Class

8   Counsel 25% of the class fund, and addresses the reasons for doing so below.

9   **III.     THE COURT AWARDS CLASS COUNSEL 25% OF THE CLASS**

10       **FUND.**

11       Although, as noted previously, it is well settled in the Ninth Circuit that a

12  court has discretion to award either a percentage of the class fund or a lodestar

13  award in a class fund attorney's fee, the "the primary basis of the fee award

14  remains the percentage method," *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043,

15  1050 (9th Cir. 2002), a reflection of the general trend towards the percentage of the

16  fund method to award class attorneys' fees. *See, e.g., Camden I Condominium*

17  *Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir.1991) ("percentage of the fund

18  approach is the better reasoned in a common fund case"); *In Re Rite Aid Corp.*

19  *Securities Litigation*, 396 F.3d 294, 307 (3rd Cir. 2005)) ("the lodestar cross-check

20  does not trump the primary reliance on the percentage of common fund method").

21  This method aligns the interests of counsel and the class by allowing class counsel

22  to directly benefit from increasing the size of the class fund. *See Swedish Hosp.*

23  *Corp. v. Shalala,* 1 F.3d 1261, 1266-67 & fn.3, 1271 (D.C.Cir.1993) (noting that

24  the lodestar approach "encourages significant elements of inefficiency", by giving

25  attorneys an "incentive to spend as many hours as possible" and "a strong incentive

26  against early settlement"; the percentage of the fund approach "more accurately

27  reflects the economics of litigation practice", and "the monetary amount of the

28  victory is often the true measure of success, and therefore it is most efficient that it

DECLARATION OF CAROL A. SOBEL IN SUPPORT OF
PLAINTIFFS' MOTION FOR ATTORNEYS FEES AND COSTS IN
*CRAFT v. COUNTY OF SAN BERNARDINO*

DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare and say:

1.      I am an attorney duly admitted to the practice of law in the State of California and before the United States District Court for the Central District of California. I have personal knowledge of the facts set forth below, except for those noted to be advanced on information and belief and which I believe to be true. I were called to testify as a witness to these facts, I could and would do so competently.

2.      I was admitted to the California Bar in December, 1978, following my graduation from law school in May, 1978. From January 1, 1977 until April 24, 1997, I was employed by the ACLU Foundation of Southern California. For the last seven years or so prior to leaving the ACLU, I served as a Senior Staff Counsel. I resigned from the ACLU in April 1997 to enter private practice as a civil rights attorney.

3.      I am submitting this declaration on behalf of the attorney fees sought by Barrett Litt and his firm in this action. I have known Mr. Litt for over 30 years. At the time that I first met him, Mr. Litt was part of a law office which was, even then, handling complex civil rights litigation. I have had continuing contact with Mr. Litt over the last 30 years and have co-counseled several cases with him. In addition, I have frequently contacted him to discuss strategy on other cases and have taken MCLE courses on civil rights litigation taught by Mr. Litt. One recent MCLE course involved a presentation by Mr. Litt of class-actions in over-detention and strip search cases. I am also familiar with Mr. Litt's skills as an attorney as Mr. Litt co-counseled several major class-actions with other lawyers at the ACLU while I worked there and I had occasion to participate in portions of those cases, as well, and work with Mr. Litt.   Based on my experience of working with Mr. Litt and discussions I have had about him with other civil rights attorneys in Los Angeles and nationally, including lawyers such as Constance Rice, former

1  Western Regional Director of the NAACP Legal Defense and Education Fund,
2  Inc., and Paul Hoffman, former legal director of the ACLU Foundation of
3  Southern California, I have formed the opinion that Mr. Litt is widely and
4  justifiably regarded as one of the preeminent civil rights lawyers in the entire
5  country, and an exceptional trial lawyer.  In particular, Mr. Litt specializes in the
6  handling of complex civil rights litigation, including large class-actions, for which
7  he is recognized nationally and has few peers.

8      4.    My current market billing rate is $650 per hour for civil rights and
9  civil liberties litigation.  I establish my rate by speaking with and obtaining
10  declarations from attorneys at law firms where the attorneys also handle complex
11  litigation and/or pro bono civil rights litigation.  Because I work almost
12  exclusively on a contingency basis, I set my hourly rate by comparison to lawyers
13  in the Los Angeles legal market of comparable skill and experience who have fee-
14  paying clients, as well as by comparison to court awards issued to other civil rights
15  lawyers of comparable skill, experience and reputation.

16      5.    For approximately six  years prior to 1997, I held the position of
17  Senior Staff Counsel in the legal department of the ACLU Foundation of Southern
18  California.   During the time that I was Senior Staff Counsel at the ACLU, I was
19  responsible for preparing many of the fee motions in cases where the ACLU
20  represented the prevailing party.  Because the ACLU does not bill clients on an
21  hourly basis for its services, I was required to obtain information to establish
22  reasonable market rates for the ACLU lawyers.  It was my practice to obtain
23  current billing rates for lawyers of comparable skill and experience at several
24  firms throughout the City.   I did this on an annual basis, telephoning partners who
25  were familiar with the ACLU lawyers in question so that they could make an
26  informed judgment about the comparable skill levels of the attorneys at their firms
27  whose rates were used to establish ACLU billing rates.  At the time that I
28  contacted these individuals, I was aware that the partners had been involved,

1   personally, in pro bono litigation with the ACLU.   Since these firms had worked
2   directly with the ACLU lawyers for whom I sought to establish a market billing
3   rates, they were able, based on personal knowledge, to assess the skill and
4   experience of the ACLU lawyers.

5         6.    Since entering private practice, I have continued to survey firms each
6   year to obtain relevant comparisons for billing rates.   I generally make this inquiry
7   the first time in each year I prepare a fee motion, or enter into settlement
8   discussions regarding fees.   Although many, if not most, of the firms I contact are
9   larger law firms such as Loeb & Loeb LLP and Kaye Scholer, others are not.   For
10  example, the law firm of Schonbrun, DeSimone, Seplow, Harris & Hoffman is a
11  five-partner civil rights law firm, which usually has one or two associates.   Based
12  on the information I have obtained from these firms, among others, I have formed
13  the opinion that there is little, if any, difference between the fees sought and
14  awarded to smaller or solo civil rights firms and larger business firms, which only
15  occasionally do pro bono civil rights and civil liberties work, because the skill and
16  experience of the attorneys in question in handling complex litigation is
17  comparable.   In fact, it is often the case that attorneys in the civil rights community
18  have far more developed skills than their classmates working at large law firms,
19  where less experienced attorneys are usually assigned less complicated legal tasks.

20        7.    In addition to speaking with partners at various law firms, I have also
21  become familiar with the market rates charged by attorneys in the Los Angeles
22  area by reviewing attorneys' fee applications and awards in other cases, as well as
23  by reading decisions awarding fees under fee-shifting statutes.   Specifically, I
24  regularly review fee applications submitted by the ACLU, MALDEF, the Western
25  Center on Law and Poverty and other public interest groups and private civil rights
26  law firms in Los Angeles to determine what rates are being sought.   I also then
27  read the subsequent court orders on these applications to familiarize myself with
28  the reasonable market rates being awarded for the lawyers from these public

1 | interest firms, including private pro bono counsel who work on the cases, as well
2 | as published decisions awarding statutory fees in civil rights cases.

3 |     8.    In most instances I settle attorney fees without the necessity of filing a
4 | noticed fee motion or as a contingency fee recovery in a global settlement of a
5 | case.   With the exception of one contested fee award in a SLAPP case in San
6 | Diego in early 2006, every fee award I obtained since approximately 2005 has
7 | been through a settlement, even though one settlement was reached only after I
8 | filed a motion for fees. The most recent fee settlement I negotiated in the Central
9 | District, which was in early 2006, resulted in an agreement by the City of Los
10 | Angeles to pay my fees at a rate of $590 an hour in a First Amendment case.  In
11 | that instance, the resolution of the attorneys fees had been pending since the end
12 | of 2005, so the prior year's rate was applied.

13 |     10.    I am advised that Mr. Litt's firm – Litt, Estuar, Harrison & Kitson
14 | ("LEHK") – charges $725 per hour for Mr. Litt's time, and that various other
15 | attorneys and timekeepers in the firm bill at comparable rates based on their
16 | experience.  I am personally familiar with the major time billers on this case, as
17 | reflected in the chart below.

18 |

| STAFF | |
|---|---|
| Attorneys | LEHMK Rate |
| Litt | $725 |
| Miller | $440 |
| Johnson | $275 |
| Julia White | $200 |
| Estuar | $485 |
| Kitson | $460 |
| Brown | $275 |
| McClure | $225 |

25 |     11.    I am also personally familiar with each of the attorneys and paralegals
26 | at Mann & Cook, who were co-counsel in this litigation.  I have and am presently
27 | working with several of them on a large class-action against the Los Angeles
28 | Police Department arising from the events of May 1, 2007 in MacArthur Park in

1 response to an immigrants' rights rally.  In addition, almost all of the counsel at
2 Mann & Cook were involved in a companion case to one I litigated arising from
3 the police response to protests during the Democratic National Convention in Los
4 Angeles in 2000.  I am advised that the rates being sought for attorneys with Mann
5 & Cook is as follows:

| | | |
|---|---|---|
| Robert Mann | $650 | |
| Donald Cook | $550 | |
| Samantha Koerner | | $425 |
| Cynthia Anderson-Barker | $425 | |
| Colleen Flynn | $300 | |
| Laura Lindley | $300 | |
| Bian Gormley | $200 | |
| Dinorah Pinelo | $175 | |

12.     Based on my knowledge of market rates set forth above, the rates for
LEHK and Mann & Cook are comparable to those charged by other private
attorneys specializing in complex litigation in the greater Los Angeles area for
comparable personnel.  Taking the foregoing into consideration, I find the rates
sought by plaintiffs' attorneys to be both reasonable and consistent with market
rates for the type of representation undertaken here. When the United States
Congress enacted the general attorney's fee statute, 42 U.S.C. § 1988, it indicated
"that the amount . . . (would) be governed by the same standards which prevail in
other types of equally complex Federal litigation such as antitrust cases". S.Rep.
No. 1011, 94th Cong., 2d Sess. 6 reprinted in (1976) U.S. Code Cong. & Admin.
News 5908, 5913; H.Rep. No. 1558, 94th Cong., 2d Sess. 9 (1976).

13.     As a civil rights litigator who works almost exclusively on a
contingency fee basis, including in the handling of class-actions, I believe it is
extremely important for civil rights attorneys to be compensated fully for their
time.   In most of my cases, I co-counsel with other civil rights litigators and, on
occasion, pro bono counsel from law firms that operate with fee-paying clients for

29

1 their commercial work. For most attorneys who do civil rights work, and in
2 particular for attorneys who do not have other fee-paying clients and large firms to
3 support them, cases are taken on a contingency basis and the attorney advances all
4 costs related to the litigation. Even though a claim may be meritorious, the civil
5 rights plaintiff does not always prevail. In many instances, it may be in the
6 client's best interest to agree to a settlement that results in the attorney obtaining
7 less than full compensation for his or her time and costs invested in the case. The
8 high risk of non-recovery in these cases and the time before any compensation
9 may be received in a case, means even many lawyers who will handle contingency
10 cases are extremely cautious in the cases that they take. The California Supreme
11 Court has also emphasized the importance of providing incentives to private
12 counsel to take on these types of cases by spreading the risk contingent attorneys
13 face over the course of their practice, not simply looking to the recovery in one
14 specific case. *See Ketchum v. Moses*, 24 Cal.4th 1122, 1132-1134 (2001).

15        14.    For these reasons, it would be appropriate to apply the customary
16 common fund fee award of 25% to this case. I understand that the lodestar in this
17 instance is approximately $1,000,000. Applying the ordinary common fund
18 percentage, the fee award would be nearly six times the lodestar. While that may
19 seem like a large multiplier, this case must be viewed in the overall context of the
20 civil rights practices of the attorneys involved in this case. Based on my personal
21 familiarity with their practices, I am aware that each of them takes on cases that
22 are not desirable to many in the Bar. Some of these cases involve cutting-edge
23 civil rights issues. Others involve smaller recoveries. Still others are cases that
24 take years to litigate. All that time, the attorneys have no income from these cases
25 and are advancing significant out-of-pocket costs. An award in a case such as
26 *Craft v. County of San Bernardino* enables these attorneys to litigate similar cases
27 and, specifically, to take cases with less promise of a recovery of substantial fees,
28

1 if any fees. Plaintiffs' counsel took on representation in this matter on a purely
2 contingent fee basis. Had they been unsuccesful, they would have received no
3 money and would have been out substantial costs.

4     15.    Based on my experience, most civil rights lawyers are in smaller
5 firms, if not sole practitioners, where the resources sharply limit the number of
6 clients they can represent. I know of only one or two long-term civil rights
7 litigators in San Bernardino. There are only a few attorneys in Los Angeles who
8 will take these cases on contingency. There are especially few who will do class
9 actions in the criminal justice area, as does Mr. Litt's firm, despite the possibility
10 of a common fund recovery in a case such as *Craft*. In my opinion and experience,
11 civil rights and public interest plaintiffs face substantial difficulties in obtaining
12 competent counsel to represent them, particularly counsel of Mr. Litt's and Mr.
13 Mann's caliber. It is my belief, based on my experience and discussions with
14 other civil rights lawyers, that an award of fees at the customary common fund
15 percentage, even though it produces a substantial risk multiplier here, is a
16 necessary and strong incentive to encourage other lawyers to take such cases.

17     16.    I have discussed this case on many occasions with Mr. Litt and
18 several of the other attorneys since it was filed. Most recently, I discussed several
19 of the issues in regard to a settlement in a case of mine in Miami involving strip
20 searches after mass arrests of protestors. I am aware that when this case was filed,
21 there was virtually no case law directly on point on several key issues in this case,
22 including pre-arraignment strip searches of intra-jail transfers, strip searches of jail
23 transfers from other jurisdictions, and otherwise permissible strip searches to
24 which the only objection was that the strip search was conducted in a group rather
25 than in private. My understanding is that the case was filed based solely on
26 anecdotal evidence of the challenged practices because the jail's written policies
27 were not available in advance of litigation. In my experience, there are often
28

factual inaccuracies in client's anecdotal reports of practices. In addition, at the time that this case was filed, the Eleventh Circuit had issued the en bank decision in *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005), which increased the risk for plaintiffs' counsel in any type of inmate strip search litigation. Based on these considerations, I believe that plaintiffs' counsel ran a substantial risk of loss of all or much of this case.

17. In addition to the risk of loss, plaintiffs' counsel engaged in full discovery in this case, both documentary and deposition. They were required to prepare thousands of computer records for analysis by outside experts. The County required plaintiffs' counsel to litigate the class certification issue as well as summary judgment motions. I am aware, too, that there were multiple and extensive mediations efforts. Had the case not been successfully mediated, plaintiffs' counsel would have been responsible to try the case, involving both a contested liability trial and a separate damages trial.

18. The success of plaintiffs in this case is clear. In preparation for my recent mediation in Miami I reviewed all available strip search cases for the past 10 years or so. To my knowledge, there is only one large-scale settlement that is arguably higher. That case, from New York, involved pre-arraignment strip searches, which is an issue on which the law is fully developed and has been for a long time. *Craft* is a cutting edge settlement for post-release strip searches, in particular. In addition, I understand that the litigation in *Craft* resulted in ending all of the practices challenged in this case. By any measure, this is an exceptional result.

19. In my view, had any other counsel brought this case, it is likely that the amount of work required to reach the same or even a lesser result would have been substantially greater due to the particularly high level of expertise this particular set of lawyers brought to this litigation.

32

1    20.    In my opinion, all of the facts discussed above demonstrate a

2  substantial level of risk associated with this litigation and an exceptional result.

3  These are two of the critical factors justifying applying the 25% common fund fee

4  award, even if it produces a very substantial multiplier in this instance.

5

6    I declare under penalty of perjury that the foregoing is true and correct.

7  Executed the 5th  day of December, 2007in Santa Monica, California.

8

9

10                              CAROL A. SOBEL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

33