1 | VALERIE VANAMAN, SBN 42406
2 | GEORGE D. CROOK, SBN 60889
    | **NEWMAN AARONSON VANAMAN**
3 | 14001 Ventura Boulevard
    | Sherman Oaks, CA 91423
4 | Telephone: (818) 990-7722
    | Facsimile: (818) 501-1306

5 | Attorneys for Plaintiffs
    | H.B., by and through his Guardian
6 | Ad Litem PENNY B.; PENNY B.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| H.B., by and through his Guardian Ad Litem PENNY B.; PENNY B., <br><br> Plaintiffs, <br><br> vs. <br><br> LAS VIRGENES UNIFIED SCHOOL DISTRICT, ET AL., <br><br> Defendants. | ) CASE NO. CV 04-8572 FMC (SSx) <br> ) <br> ) **DECLARATIONS OF PENNY B.,** <br> ) **VALERIE VANAMAN AND** <br> ) **ALICIA ELLIOTT IN SUPPORT** <br> ) **OF PLAINTIFFS' REPLY TO** <br> ) **DEFENDANT'S OPPOSITION** <br> ) **TO PLAINTIFFS' MOTION FOR** <br> ) **ATTORNEYS' FEES AND** <br> ) **COSTS** <br> ) <br> ) <br> ) DATE: May 12, 2008 <br> TIME: 10:00 A.M. <br> CTRM: 750 |

///
///
///
///
///
///

1

Declaration Penny B.

# DECLARATION OF PENNY B.

I, PENNY B., declare:

1. I am the Mother of H.B. The information contained herein is known to me of my own personal knowledge and if called to testify herein, I would and could testify competently thereto.

2. I understand that the Las Virgenes Unified School District claims that the problem my husband and I had with their refusing to take into account our views about what type of program and services are appropriate for H.B is not likely to happen again. I also understand that the District claims that we voluntarily agreed to H.B.'s current placement so the dispute that arose four years ago is not likely to happen again. None of this is accurate or true. I submit this Declaration to tell the real story of how H.B.'s current placement came about and also to explain why it looks to us very likely that the exact same problem we had four years ago is about to recur.

3. During the Spring of 2006, I had a series of medical concerns, some of which caused me to be hospitalized. Making two 114 mile round trips a day to take H. back and forth to Elliott was physically exhausting and extremely hard on my family. My husband is an accountant in his own practice and has to work long hours to support our family. All of my waking time is consumed with the needs of my two children, both of whom are children with autism. The program offered by the District for H. for the Fall of 2006 was in a middle school in what I thought I had been told by the District was a class solely for students with autism. Because in the summer of 2006 I was not physically well enough to continue making two round trips a day to take H. to and from Elliott, and because I thought the classroom would be better than the one that had been offered at Lupin Hill, my husband and I determined we had no choice for the 2006-2007 school year other than to try the program offered by the District. We understood we would have regular meetings with the team of individuals working with him at which our input would be sought and valued, weekly

notes of what was taking place, and that H. would be in a class with other children with autism and participating in various community activities. We did not have meetings with the regularity promised by the District.

4. Ms. Schillinger told me that if we wanted H. to attend the District's classroom in the Fall of 2006, we had to sign what she refers to as the 2006 IEP. Since we felt we had no alternative and I could not continue at that time to drive H. to and from Elliott, I had no choice other than to sign that IEP. When H. began the District's program in late August, 2006, we received a note on August 30, 2006 from his teacher that stated H. was "attentive," a "good listener," and "respectful." We were also told that H. "followed directions during the disaster drill. We went for a walk and he was the leader. When told to stop, he stopped, when asked questions about what was around him he answered them correctly." All of these were skills he had mastered at Elliott. At Elliott, he participated with his classroom in daily community walks, participated in the classroom with other students, and did so without a one-to-one aide or any need to remove him from the classroom.

5. However, by late February, 2007, after only about five months in the District's classroom, H. had lost all of these skills and behaviors. Apparently, contrary to what they had promised, the District staff treated H. like he was a preschool student and had him isolated for ever increasing lengths of time doing various types of one-to-one interventions with him. By April, 2007, H. had regressed to such an extent that we were told they could only permit him to leave the classroom if there were two staff people with him, one to be with H. and one to be at the end of the hallway or other area in the event he tried to run away.

6. At or about this time, we learned that H. had been running away from the District personnel on a regular basis and that, as a result, they regularly kept him by himself in a setting away from other students. He was not permitted to take community outings with other students, had to eat lunch by himself, was required to use the classroom bathroom and he was not permitted to leave the classroom except

with a heavy escort. He had none of these problems at Elliott.

7. In the Spring of 2007, I learned quite by accident that on at least two occasions H. ran into the parking lot and was on his way to walking out to the road when he was finally noticed and stopped by school personnel. I also learned by accident that he was not being taken on field trips and was, instead, left behind with a non-credentialed aide in a room by himself.

8. When I attempted to bring these matters to the attention of the "team" working with H., I was ignored. The District personnel continued to tell me, despite the fact that it was obvious that it was not true, that H. was receiving all sorts of instruction he was not receiving and that he was making progress. Although I was bringing up various matters of concern, the District personnel did not suggest that H. be assessed or that they take a further look at his program. They just ignored me.

9. No one at the District paid any attention to my concerns. An IEP meeting was begun on December 1, 2006 and continued on February 21, 2007 which the District called an annual review IEP. Ms. Vanaman, one of the attorneys representing H., came with me to that IEP meeting. Ms. Vanaman pointed out to the District members of the team, including Ms. Schillinger, all of the ways in which H. was regressing and asked that H. be provided with placement in a non-public school. Neither Ms. Schillinger or any other member of the team responded to Ms. Vanaman's comments. Instead, Ms. Schillinger did exactly what she had done in June, 2004 and stated that the District believed its program offered an appropriate program. No effort was made to discuss or otherwise address the concerns raised by Ms. Vanaman.

10. Another IEP meeting was held on April 16, 2007. Ms. Schillinger refused to consider our concerns regarding H.'s placement at the District and did not even try to answer those concerns. Instead, she simply repeated what had apparently already been written into the IEP, the offer of placement in the District's classroom.

11. Ms. Schillinger did say that the District wished to conduct a functional

behavioral assessment of H. Given what had taken place in the past, I requested that the assessment be done this time by an outside provider and also requested that there be an independent evaluation of the District's program. Ms. Schillinger quickly responded, "no" to both requests.

12. On April 30, 2007, while I was considering what to do with regard to the April 16, 2007 IEP, H. came home from school with marks at the top of both of his ears that were so apparent that adult finger nail marks were visible. They were the type of marks that would have been left if someone tried to control him by pinching the top of this ears. On May 1, 2007, I called the teacher to try to find out what had taken place. The teacher told me she had not been at school on April 30, 2007 but that she would try to find out if anyone knew anything about the marks. However, the teacher never called me back to report her findings.

13. On or about May 17, 2007, H. came home from school with pinch marks under his arms of the type that would be made if someone were trying to control his movements by holding tightly to his upper arms. He did not have the marks when he left for school that day and he had been no place other than school between leaving for school and arriving home.

14. On or about May 18, 2007, I called the teacher to try to find out about the marks and to obtain some assurance that H. was not being physically handled in a manner that left marks. During that call, I was unable to speak with the teacher but I was told by the person answering the phone that I did not need to worry because that day everyone but H. was on a field trip. I had never been informed of such a field trip and it was apparent that they just did not want to take H. on the trip and he was left behind. I am unclear as to who was responsible for him while he was at school that day.

15. I then tried to reach the Director of Special Education, Ms. Schillinger as well as the vice principal of the school H. was attending. I was told the Director of Special Education was out of town. Ms. Schillinger finally returned the call about

one week later. When I told her about the bruises, she refused to take my concerns seriously and told me that her staff knew nothing about the bruises. It was clear from her response that she either did not believe me or, if she did believe me, did not care to find out how the bruises had been given to H. She did not ask if there were any pictures, which there were, did not ask to interview me further, or in any other way indicate that she intended to investigate the complaint.

16. This refusal to believe me or to take the concerns seriously, coupled with the fact that H. had now come home on at least two occasions with bruises from physical handling, was running unsupervised into the parking lot and was being left out of community trips was the final straw. We had put up with the District's failure to hold the meetings they promised, failure to provide the data they had promised, failure to provide the daily and weekly notes they had promised and even put up with the regression. We could not, however, put up with H. being segregated from all other students and physically handled in a manner that left him bruised. We had no option at that point other than to remove him from the District.

17. We did so and, although we did not have the economic or physical resources to do so, we returned him to The Elliott Institute. While at the District's program he had become sullen and depressed and within three days of being back at Elliott, he was again smiling and happy and looking forward to going to school.

18. I wrote at least two letters to various District personnel in which I outlined all that H. had experienced at the hands of the District personnel during the time he was in the District program in 2006-2007, our desire to stop litigating with the District and to have the District stop using its money on attorneys and, instead, use it on students, and requesting that the District simply agree to fund H.'s placement at Elliott for the remainder of the 2006-2007 school year, the summer of 2007 and the 2007-2008 school year. We received no response of any type to those letters nor did the District call an IEP meeting.

19. Instead, on or about August 15, 2007, the District did exactly

what it had done in June, 2004, Mr. Weatherly filed a due process complaint against us in which he asserted that the District's program was everything we had found it not to be. Our resources, financial, emotional, and physical, have been substantially drained by the District's refusal to resolve this litigation with us and its insistence on forcing H. into a program it must know does not work for him. Because of this, we asked that our attorneys attempt to resolve the matter the District had filed against us without further litigation. The District refused to even consider a resolution short of total capitulation by us and so we were left with no alternative other than to answer the District's complaint and file our own due process complaint and assert that the IEP had been predetermined.

20. It is all we can do to care for our two children. Having to be in constant litigation with the District is not only destructive to our family's financial soundness and emotional health, it directly impacts the amount of time we can spend with our children. We once again requested that our attorneys attempt to resolve the complaints that had been filed. The District was willing to enter into a settlement, but on only very limited terms. We proposed a global settlement that would have resolved both the litigation arising from the June 4, 2004 IEP as well as the litigation as to the 2007-2008 school year, but the District refused to even consider such a settlement. The attorney for the District made it clear that the District wished to litigate the June 4, 2004 IEP at, apparently, all costs. The District was willing to settle the most recent due process filings but only if we gave up a great deal. Because we did not have the financial, emotional, or physical ability to go through another hearing and another federal court action with the District, we felt we had no option other than to accept the terms they demanded. Among those terms was a demand that the District do yet another assessment of H.

21. Since joining the District staff, the only time Ms. Schillinger has wanted to assess H. is when there is potential or real disagreement about his placement. She had no interest in assessing him when he was in the District program, even when she

was told he was regressing and he was being physically handled to a degree that he was left with bruises. The pattern she has followed makes it clear that she wants him assessed so she will have her witnesses for an administrative hearing to support the need for H. to be in a District program. At no time has she demonstrated an interest in having H. assessed for any other reason and she has soundly rejected the notion that an assessment should be done to determine if the program she insists on offering can meet his needs.

22. As the 2007-2008 school year comes to a close, the District is again assessing H. in preparation for the IEP meeting to offer him a placement for the 2008-2009 school year. Just as in the prior years, Dr. Mitch Taubman and Dr. B.J. Freeman have been brought in by the District to do these assessments and, with one exception, the District employees who are involved in the assessment are also individuals who have already made it known that they believe H. should be in a District program.

23. Based on my several dealings with Dr. Freeman and Dr. Taubman it appears to me that they are, once again, developing information about H. to support a decision to have him attend a District program. For example, but only as one example, when Dr. Freeman recently completed her assessment of H., she commented on how well H. had done in terms of paying attention and in performing the activities she asked him to do. When I responded by telling her it was because he was at Elliott and receiving the program he needed, she threw up her hands and made what I can only describe as a disgusted sound that I dared to suggest he was appropriately placed at Elliott. At no time did she ask me about H.'s program at Elliott, or how it was helping him or anything about what had taken place at the District's program. It was my strong impression that she has absolutely no interest in what I thought about his program or his needs and that she was upset that I was even suggesting that Elliott provided him with an appropriate program. Although Dr. Taubman did ask me how H. was doing, I also formed the strong impression that he was largely uninterested in anything I had to say. He did not ask me anything about H.'s experience at the

District program or why we had left the program.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4th day of May, 2008 at Sherman Oaks, California.

/s/ Penny B.
Penny B.

---

**Declaration of Penny B. in Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs**

Declaration Valerie Vanaman

## DECLARATION OF VALERIE VANAMAN

I, Valerie Vanaman, hereby declare:

1. I am attorney admitted to practice law in California, Ohio, and Massachusetts as well as before this Court and various other Federal Courts. I am one of the attorneys for H.B. and his family with regard to his educational program from the Las Virgenes Unified School District. The information contained herein is known to me of my own personal knowledge. If called to testify herein, I would and could testify competently thereto.

2. I write this Declaration in response to the District's assertions in its Opposition to the Motion for Attorney Fees and Costs that this case is moot and not likely to recur and that H.B. has not prevailed in this matter. Paragraphs three through five address various claims that were made in the District's Opposition papers with regard to the administrative hearing of June, 2004 and the prevailing party status. Paragraphs six through eleven address the circumstances surrounding H.B.'s return to and then leaving of the District and the agreement reached thereto and why the issue before this Court is likely to recur.

3. The administrative hearing from which this action arises took place in July of 2004. The District filed for due process against H.B. when by June 21, 2004 his parents had neither agreed nor disagreed with the IEP developed by the District for H.B. on June 4, 2004. The District insisted that the matter proceed to hearing at the earliest possible date. The District refused to resolve the matter on any terms other than the family's full and complete agreement to all items in the June 4, 2004 IEP. Immediately prior to the first day of the administrative hearing, the family offered to resolve the matter by trying out the District program if the District would agree to pay Dr. Alicia Elliott to come to the District classroom for a total of five hours over the first two months of school so that she could provide information as to her experience with how H.B. learned. As part of that offer, the family also offered to bear their own attorney fees and costs. The attorney for the District immediately

---

Declaration of Valerie Vanaman In Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs

responded to that offer with a "no" and he indicated that the District wished to proceed to the administrative hearing.

4. At the time of the administrative hearing in July, 2004, the family was not required by law to do so, and did not, file a due process complaint against the District as to the June 4, 2004 IEP nor did they file an answer to the District's complaint. At the time of the administrative hearing in the summer of 2004, the burden of proof in the Ninth Circuit was on the District and since it had filed the due process complaint, its burden was to both proceed first at the hearing and to prove that it had complied with all of the procedural and substantive elements of the Individuals With Disabilities Education Act in order to obtain an Order finding its program appropriate for H.B. The family had not filed a due process complaint and had no affirmative claims before the administrative hearing officer. The District's Opposition papers which state, without any citation to any part of the record, that H.B. had "55" claims before the hearing officer is in error. H.B. had not filed the complaint and he had no claims before the hearing officer, let alone "55" claims. H.B. was effectively the defendant seeking only to have a ruling that denied the District the relief it sought.

5. During the first day of the hearing, the Hearing Officer asked me to provide information as to what the family believed to be wrong with the District's IEP. I objected to that request based on the fact that the family was not the moving party and did not have the burden of proof. However, the Hearing Officer insisted that I provide her with some information as to why the family had not agreed with the IEP. I noted our objection to that manner of proceeding, but then complied with the directive of the Hearing Officer. In doing so, I made it clear that I was not providing an exhaustive list. Among the concerns I did list was the fact that the goals and objectives and program that had been developed did not take into account information from individuals who knew H.B. and his needs. The Hearing Officer then requested that I go through each of the goals and objectives the District personnel had

---

**Declaration of Valerie Vanaman In Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs**

developed and identify, before hearing any evidence from the District, whether or not we agreed with each of those goals and objectives. The inadequacy of the goals identified were not presented by H.B. as individual claims but, rather, only as evidence of the fact that the goals and objectives had been developed without regard to input from individuals familiar with H.B. and his actual needs. It remained the case that as the Respondent rather than the Petitioner, H.B. had no formal affirmative claims of any type before the hearing officer as to the June, 2004 IEP and was simply defending against the District's assertion that it had offered H.B. an appropriate program that complied with all the procedural and substantive provisions of federal and state law.

6. In the Spring of 2006, H.B.'s mother suffered a series of illnesses that made it increasingly difficult for her to transport H.B. to and from school. By the summer of 2006, she felt she had no option other than to try out the program in the District for the 2006-2007 school year. She did so out of necessity.

7. The program did not work out and by May, 2007, H.B.'s mother was reporting to me that H.B. was coming home with bruises on his ears and arms, that the District personnel were not responding to her concerns, and that he had regressed in many areas. She also reported that he was often left alone in the classroom and not taken on field trips or other classroom outings. She felt she had no option other than to remove him from school and place him back in the Elliott Institute.

8. The District's response to her decision to move him was to again file for due process against H.B. In the filing, the District claimed it was providing H.B. with an appropriate program and requested that the Office of Administrative Hearings enter an Order finding that its program was appropriate. Ms. B. asked that we respond to that complaint and that we file a complaint against the District asserting all of the reasons she believed the District's program and offer not to be appropriate. We did so and, among many other things, included in that complaint a description of the manner in which H.B. was treated by the District personnel while he was in its

---

**Declaration of Valerie Vanaman In Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs**

program and a claim of predetermination and asked that the Office of Administrative Hearings find the District's placement inappropriate. The two hearing requests were consolidated for hearing.

9. We attended a mediation on the consolidated matters but were unable to resolve the dispute. During this time, H.B.'s parents were paying the entire cost of Elliott and it was causing them substantial financial hardship. They asked that we try to resolve the matter without the need for a hearing because they did not have the emotional or physical strength to go through another hearing with the District at the same time they were involved in this litigation.

10. H.B.'s parents felt quite strongly that what had taken place with H.B. during the time he was in the District program would prove to any reasonable person that he was not only not benefitting from the District's program, he was also not physically safe in the program. However, they simply did not have the physical and emotional resources sufficient to be litigating two matters with the District at the same time and also providing care for their two children with autism. I did speak with the attorney with the District and we did work out an agreement which was dated January 14, 2008. That agreement specifically did not resolve anything with regard to this case nor did it resolve anything with regard to the 2008-2009 school year. It only provided that as to the 2008-2009 school year, should a disagreement arise between the parties, the family has no "stay put" rights as to the Elliott program while they pursue the disagreement. The family specifically did *not* give up the right to challenge the placement offered by the District for the 2008-2009 school year, did not give up their right to obtain reimbursement for any costs they incur to provide H.B. with a program during the 2008-2009 school year, and did not agree to automatically return H.B. to the District for the 2008-2009 school year.

11. An IEP meeting will be held within the next several weeks and before the end of the current school year to plan H.B.'s program for the 2008-2009 school year. The District has again engaged the services of Dr. B.J. Freeman and Dr.

1 | Mitchell Taubman to assess and observe H.B. in preparation for that meeting. I have had calls from Mr. Weatherly and placed calls to Mr. Weatherly with regard to that assessment process and it is clear that he is very much involved in preparing for the IEP meeting that will be held to plan H.B.'s program for the 2008-2009 school year. Given the assessments and observations taking place, the involvement of Dr. Freeman and Dr. Taubman, and Mr. Weatherly's involvement, nothing seems to have changed with regard to the manner in which the District intends to proceed in its planning of H.B.'s program that differs from the manner in which the District proceeded in June, 2004. To the detriment of my clients, if this case is dismissed as moot, it is likely that the District's pattern of behavior which necessarily involves holding a predetermined IEP meeting will repeat itself and the issue will be back before the Court with regard to the 2008-2009 school year.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 4th day of May, 2008 at Sherman Oaks, California.

*/s/ Valerie Vanaman*

Valerie Vanaman

---

Declaration of Valerie Vanaman In Support of Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Costs

Declaration Alicia Elliott

# DECLARATION OF ALICIA ELLIOTT

I, ALICIA ELLIOTT, declare:

1. I am the Executive Director of The Elliott Institute, a state certified non-public school serving children with autism who have severe language and behavioral needs. The facts stated herein are known to me of my own personal knowledge and if called to testify herein, I would and could testify competently thereto.

2. I have reviewed the billings The Elliott Institute sent to the Las Virgenes Unified School District for H. B. for the period between September, 2004 and August, 2006 for tuition and related services provided for him by The Elliott Institute during that period of time. I have also reviewed the payments made by the Las Virgenes Unified School District for those billings.

3. The Elliott Institute billed the Las Virgenes Unified School District for H.B.'s basic tuition and related services on a monthly basis. For the twenty-three month period between September, 2004 and August, 2006, the total amount billed for the tuition for H.B. was $124,266.00. For the twenty-three month period between September, 2004 and August, 2006, the total amount billed for related services was $22,827.50.

4. For the six month period between September, 2004 and February, 2005, the total billings of The Elliott Institute for tuition for H.B. were $33,892.25 and the total billings for related services for H.B. were $2,815.00. The Las Virgenes Unified

School District did not pay the September, 2004 through February, 2005 billings until March, 2005. As I understood the situation between the family and the Las Virgenes Unified School District, the school District was asserting that it was not required to do make payments for H.B.'s attendance at The Elliott Institute after September, 2004. We did receive full payment for the September, 2004 through February, 2005 billings sometime in March, 2005 after H.B.'s family filed an action in Court. Thereafter, the monthly billings were paid on a regular basis.

   I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   Executed this 3rd day of May, 2008 at La Crescenta, California.

*Alicia Elliott*
Alicia Elliott

Declaration of Alicia Elliott