1  VALERIE VANAMAN, SBN #42406
   vvanaman@navlaw.net
2  GEORGE D. CROOK, SBN #60889
   latrobonus@gmail.com; gcrook@navlaw.net
3  **NEWMAN.AARONSON.VANAMAN**
   14001 Ventura Boulevard
4  Sherman Oaks, CA 91423
   Tel. (818) 990-7722
5  Fax (818) 501-1306

6  RICHARD M. PEARL, SBN #46351
   rpearl@interx.net
7  **LAW OFFICES OF RICHARD M. PEARL**
   1816 Fifth Street
8  Berkeley, CA 94710
   Tel. (510) 649-0810
9  Fax (510) 548-5074

10 Attorneys for Plaintiffs

11
                **UNITED STATES DISTRICT COURT**
12
                **CENTRAL DISTRICT OF CALIFORNIA**
13

14 H.B., by and through his Guardian Ad     )  CASE NO. CV 04-8572 CAS (SSx)
   Litem PENNY B.; PENNY B.,                 )
15                                           )  **DECLARATION OF CAROL A.**
                            Plaintiffs,      )  **SOBEL IN SUPPORT OF**
16                                           )  **PLAINTIFFS' NOTICE OF**
   vs.                                       )  **MOTION AND MOTION FOR**
17                                           )  **LIFTING OF STAY AND FOR**
   LAS VIRGENES UNIFIED                      )  **DETERMINATION OF**
18 SCHOOL DISTRICT; CALIFORNIA              )  **PREVIOUSLY FILED MOTION**
   SPECIAL EDUCATION HEARING                 )  **FOR ATTORNEYS' FEES AND**
19 OFFICE,                                   )  **COSTS**
                                             )
20                          Defendants.      )  [Notice of Motion and Motion;
   _____  )  Memorandum of Points and
21                                              Authorities in Support Thereof filed
                                                concurrently herewith under separate
22                                              cover]

23                                              Date:   September 13, 2010
                                                Time:   10:00 a.m.
24                                              Courtroom: 5

   ///
25
   ///
26
   ///
27
   ///
28
   ///

I, CAROL A. SOBEL, declare:

1.      I am an attorney admitted to practice in the State of California and in the United States District Court for the Central District of California. I make this declaration in support of the concurrently filed motion for an award of attorneys' fees based on facts of which I have personal knowledge and if I were called to testify as a witness to these facts I could and would do so competently.

2.      I was admitted to the California Bar in December, 1978, following my graduation from law school in May of 1978. From January 1, 1977 until April 24, 1997, I was employed by the ACLU Foundation of Southern California.  For the last seven years prior to my departure from the ACLU, I served as a Senior Staff Counsel. I resigned from the ACLU to begin a private civil rights practice in late April, 1997. A copy of my resumé is attached as Exhibit 1.

3.      I am informed that attorneys fees are being sought in this matter for four counsel. I am personally familiar with each of the attorneys: Valerie Vanaman, George D. Crook, Richard Pearl, Henry Tovmassian and Sharon Robinson.  I have co-counseled cases in the past with both Ms. Vanaman and Mr. Crook and know them to be extremely skilled and experienced in their field.  Mr. Pearl and I successfully argued companion cases before the California Supreme Court in 2004, establishing the continued and independent vitality of the catalyst doctrine in attorney fees under California law after the United States Supreme Court rejected this basis for recovery of fees in federal fee-shifting statutes.  Mr. Pearl is the preeminent attorney in California regarding attorney fees litigation, literally having written the CEB treatise on this subject.   I have consulted with him about attorney fees litigation on other occasions.  If Mr. Pearl were practicing in Southern California routinely, I believe that his market rate would be the same as Barry Litt's, which was approved by Judge Matz last year in the *MIWON* case at $800 an hour.  *See* Ex. 5.  I know Mr. Tovmassian by reputation and I have talked with him by telephone on several occasions over the past seven years about various litigation related matters.  I am

most familiar with Sharon Robinson, with whom I have had the opportunity to work together on cases over the course of the last 20 years, since her graduation from Loyola Law School.   Immediately after her graduation and before beginning a clerkship with the Central District court, Ms. Robinson clerked at the ACLU Foundation of Southern California, where I was then a staff attorney.  Since her entry into private practice, we have co-counseled several civil rights cases.

4.     I am also extremely familiar with the firm of Newman Aaronson Vanaman ("NAV"), having co-counseled over a dozen cases with members of the firm over the past several years.  Based on my own experience and knowledge of the Los Angeles legal community, I am of the opinion that the NAV firm enjoys a reputation as a firm with extremely competent and skilled attorneys, particularly in the area of disability rights and education law.  Ms. Vanaman, Mr. Crook, Mr. Tovmassian and Ms. Robinson, along with the other attorneys at the firm, share in that reputation.

5.     I am informed that Valerie Vanaman, George Crook and Richard Pearl are seeking fees in this action at a rate of $650 per hour, Henry Tovmassian at the rate of $550.00 an hour and Sharon Robinson at the rate of $500 an hour.  Based on my experience preparing fee applications and reviewing fee awards over the course of nearly 30 years, I believe that each of these rates is far below market rate for attorneys of comparable skill and experience.  By way of comparison, Ms. Vanaman and Mr. Crook were graduated from law school ten years and four years, respectively, before I was graduated.  I am aware of this fact from my personal knowledge of each as an attorney and from reviewing the California State Bar website for attorney admission information.  The rate of $650 an hour they are seeking in this matter is $75 an hour below my 2010 rate of $725 an hour, which is the hourly rate at which I was recently awarded attorney fees by Judge Otero in *Long Beach Area Peace Network v. City of Long Beach,* cv 04-08510 SJO.  It is $60 less than the rate of $710 an hour at which I was awarded fees by two Central District judges last year.  A true and correct copy

of the order granting fees in the Long Beach case is attached as Exhibit 2.

6.     Attached to my declaration as Exhibits 3, 4 and 5 are several recent decisions in the Central District awarding attorney fees in civil rights litigation.   I have relied in significant part of these decisions to form the basis for my opinion that the rates sought in this instance are at the low end of the Los Angeles legal market in civil rights litigation.  I was counsel in three of the cases, *Jones v. City of Los Angeles* (Ex. 3), *Fitzgerald v. City of Los Angeles* (Ex. 4), and *MIWON v. City of Los Angeles* (Ex. 5)*,* in which I served as one of three class counsel appointed by the federal court. I set the rates sought for all of the counsel in each of these cases either by myself or in consultation with co-counsel.  Also attached as Exhibits 6 and 7, respectively, are the court decisions in *Atkins v. Miller*, a 2007 decision from the federal court in Los Angeles*,* and *Lauderdale v. City of Long Beach*, a 2010 decision by Chief Judge Collins.

7.     In the *Jones* case, Judge Real awarded fees in 2008 to Mark Rosenbaum at $725 an hour, to me at $695 an hour, and to Peter Eliasberg, the managing attorney at the ACLU Foundation of Southern California and a 1994 graduate of Harvard Law School, at $490 an hour.  I worked with Mr. Rosenbaum at the ACLU for 20 years and first met him in 1971 when he was a law student and we both worked on the case commonly referred to as the Pentagon Papers trial, involving criminal prosecutions of Daniel Ellsberg and Anthony Russo.   Based on having worked with Mr. Rosenbaum for nearly 30 years, I know him to be a 1974 graduate of Harvard Law School.  In *Fitzgerald v. City of Los Angeles*, Judge Pregerson awarded fees to Mark Rosenbaum of the ACLU at the 2009 rate of $740 an hour, to me at $710 an hour and to Peter Eliasberg at $525 an hour.   In 2009 in the *MIWON* case, Judge Matz approved a class fund fee based on a rate of $800 an hour to Barry Litt (1970 UCLA), $725 an hour to Paul Hoffman (1976 NYU Law School), $710 an hour to me, $490 an hour to Cynthia Anderson Barker (1994 Loyola Law School), and $425 an hour to Rebecca Thornton (2001 University of San Francisco). In the *Herman Atkins* case,

Judge Pregerson approved 2007 market rates of $675 an hour for Peter Neufeld, a 1975 graduate, and $400 an hour for Debi Cornwell, a 2000 graduate.  Finally, in *Lauderdale, et al v. City of Long Beach, et al*, CV 08-979 ABC (CD CA Jan. 11, 2010), Chief Judge Collins awarded fees to Shawna Parks, a 1999 graduate, at $525 an hour based on 2009 market rates.  Each of these rates from 2007 through 2010 is well above the rates now sought by counsel in this case.

8.    Because I am a sole practitioner, I set my market rate by comparison to lawyers of comparable skill and experience at other firms in the Los Angeles area, as I did during the time that I was employed by the ACLU.  During the time that I was at the ACLU, I prepared numerous fee motions under federal and state fee-shifting statutes for cases in which the ACLU represented the prevailing party.  I was responsible for preparing these motions in cases in which I was directly involved in the underlying litigation, as well as in cases brought by other staff attorneys and volunteer counsel for the ACLU.  As part of this responsibility, each year I would survey several law firms to obtain information on their current billing rates in order to establish rates for individuals of comparable experience to ACLU staff.

9.    The private firms from which I most frequently sought such information included Loeb & Loeb, Litt & Associates, and Kaye, Scholer.  I sought information on billing rates from these firms because the partners at these offices were extremely familiar with the experience levels of the various ACLU attorneys and had co-counseled cases with the ACLU.  I have continued this practice in preparing fee motions for those cases in which I serve as ACLU cooperating counsel and for those cases in my private practice for which attorneys' fees may be recovered.  As part of my survey, I make it a point to consult with attorneys in both larger law firms engaged in complex litigation, such as Loeb & Loeb LLP and Kaye Scholer, as well as smaller boutique civil rights law firms, including Hadsell, Stormer, Keeny, Richardson & Renick, a private firm with five partners and approximately five associates, and Litt, Estuar, Harrison, & Kitson, a private firm with four equity

partners and two or three associates at one time, depending on case demands.  The law firm of Schonbrun, DeSimone, Seplow, Harris & Hoffman is a five-partner civil rights law firm, which also usually has several associates.

10.    Based on the information I have obtained from each of these firms, I have formed the opinion that there is a growing differential between the fees sought and awarded to smaller or solo civil rights firms and larger business firms which occasionally do pro bono civil rights and civil liberties work even though the skill and experience of the attorneys in question is comparable.  By way of comparison, I am also providing the rates sought by O'Melveny & Myers ("OMM") in a recent case. I obtained a copy of the attached declaration as Exhibit 8 by downloading it from the on-line federal court system's Public Access to the Court Electronic Records (PACER).  The O'Melveny rates are now several years old, but they present a stark illustration of the difference between the private civil rights bar and large firms.  For example, in Exhibit 7, Alejandro Mayorkas, the former United States Attorney for the Central District of California, was billed in 2008 at $770 an hour when he was a partner at O'Melveny.  This is considerably higher than the rate sought for Ms. Vanaman and Mr. Crook in this motion, both of whom have been practicing law far longer than Mr. Mayorkas.  Mr. Mayorkas is a 1985 graduate of Loyola Law School and is listed on both the State Bar website and the O'Melveny fee application as being admitted to practice in California in January,1986.

11.    To give another example of the growing disparity between civil rights rates and large firms, I am providing a declaration submitted in 2009 by Wayne Barsky, a partner at Gibson Dunn, in a case the firm litigated pro bono with Public Counsel and other public interest attorneys and firms.  The rate at which Gibson Dunn billed a 1977 graduate was $840 an hour, nearly $200 above the rate sought for Ms. Vanaman (1968) and Mr. Crook (1974) in this action.  A 1988 graduate in the same case was billed at $785 an hour, $235 above the rate sought here by Mr. Tovmassian.

12.    In establishing my market rate for 2010, I obtained current billing rates

for partners and associates at Loeb & Loeb in several classes representing my year of graduation and those of the lawyers with whom I am presently co-counseling several cases.  I also obtained and reviewed the 2010 billing rates for Hadsell, Stormer, Keeny, Richardson & Resnick and the rates to be charged by the ACLU Foundation of Southern California.  I also reviewed the rates awarded in the decisions cited above for 2009.

13.    The above rates, of course, are based on market rate compensations for attorneys who are paid directly for their services by their clients.  I also know from my experience as a lawyer that attorneys who accept cases on the basis of a contingency expect to receive at least twice their hourly rates in cases where their compensation is contingent on their success, particularly in hard fought cases where the result is uncertain.  This expectation of higher compensation is precisely because of the risk involved; that is, the clients in such matters are not paying the legal bills, much less legal bills on a monthly basis, and if I do not prevail in a contingent-fee representation case, I receive no fees.

14.    Based on discussions I have had with clients whose cases I accept and those who call and ask for representation, I am aware that there is a dearth of lawyers, let alone skilled lawyers, willing to take on these types of civil rights cases on a contingent basis.  For the past ten years, I have worked frequently with educational rights advocates and am familiar with the incredible demand for representation on these issues and the lack of competent lawyers to take on these cases.  I also am aware from speaking with counsel and reviewing various decisions of the Ninth Circuit in recent years that many of these types of education cases frequently result in "voluntary" agreements to provide the legally-mandated services, in which case there is no fee recovery because "catalyst" fees are not available following the decision in *Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598 (2001).

15.    In part because of the high risk of no recovery of fees after *Buckhannon*,

there are very few attorneys who will take on the risk of doing special education law. Even before *Buckhannon*, the pool of lawyers who handled these types of cases was small because, like other civil rights litigation, it is generally not a very lucrative field compared to paying business litigation. Further, under the Individuals with Disabilities Education Act, which is the statute pursuant to which counsel are seeking fees in this action, no bonus or multiplier may be used in calculating fees, no matter how successful the attorney has been. 20 USC §1415(i)(3)(c).So, while I may still have the option of obtaining "catalyst" fees in civil rights cases under a state law theory of recovery,in view of such disincentives for federal litigation in this area, it is even more important that those attorneys willing to take on this risk receive their full lodestar for fee awards that truly reflect the market value of their services. I frequently receive calls asking for representation in this area of the law. I do not handle these types of cases and routinely refer the caller to several law firms, including the NAV firm.

16.    In summary, based on my knowledge of the skills and experience of the attorneys seeking fees in this action, as well as the reputation of the law firm of Newman Aaronson Vanaman, and based on my experience in establishing market rates for numerous attorneys engaged in a variety of civil rights litigation over the course of the last 30 years, it is my opinion that fees at the rates of $650.00 per hour for Ms. Vanaman, Mr. Crook and Mr. Pearl,$550.00 per hour for Mr. Tovmassian, and $500 an hour for Ms. Robinson are all well below the market rate in the Los Angeles legal community for lawyers of comparable skill, reputation and experience.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct. Executed this 15th day of July, 2010, at Santa Monica, California.

*Carol A. Sobel*
CAROL A. SOBEL

**EXHIBIT 1**

## CAROL A. SOBEL
*429 Santa Monica Boulevard, Suite 550 • Santa Monica, CA 90401-3439 •*
*Tel. 310 393-3055 • Fax. 310 393-3605 • Email carolsobel@aol.com*

## Employment:

LAW OFFICE OF CAROL A. SOBEL                                          APRIL, 1997 TO PRESENT
Solo civil rights law firm.

SENIOR STAFF COUNSEL                                                1990 TO APRIL, 1997
*ACLU Foundation of Southern California*

Responsible for conducting civil rights and civil liberties litigation in state and federal courts in California;
supervise litigation by ACLU volunteer counsel and other ACLU legal staff.

STAFF ATTORNEY                                                        1985 TO 1990
*ACLU Foundation of Southern Califonria*

Civil liberties litigation, primarily in the areas of Establishment Clause and Free Exercise violations, as well as other
First Amendment rights.

ASSOCIATE DIRECTOR                                                    1979 TO 1985
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Under the direction of the Executive Director, responsible for administration of two non-profit organizations,
including working with Boards of Directors on development of policy on civil liberties issues. Engaged in litigation
and assisted Legal Director in coordination and supervision of pro bono attorneys.

DEVELOPMENT DIRECTOR                                                  1977 TO 1979
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Responsible for conducting a variety of fundraising efforts to meet a million-dollar plus annual budget for a
501(c)(3) and a 501(c)(4).

ADMINISTRATIVE ASSISTANT                                              1971 TO 1976
*Stanley K. Sheinbaum*

Administrative assistant to an individual active as an economist, political activist and philanthropist. Responsible
for all office support, organizing various fundraising events, involved in fundraising and speaker scheduling for the
Pentagon Papers trial on behalf of Daniel Ellsberg.

## Admitted to Practice:

California Supreme Court                                              November, 1978

United States Supreme Court                                          September, 1991

Ninth Circuit Court of Appeals                                       August, 1986

U.S.D.C. Central District of California                              February, 1986

U.S.D.C. Eastern District of California                              June, 1990

EXHIBIT 1    8

## Litigation Experience:

### Federal courts:   (Partial listing of published opinions and significant cases)

*Long Beach Area Peace Network v. City of Long Beach*
2009 U.S. App. LEXIS 16556 (July 24 2009); amending 522 F.3d 1010 (9th Cir. 2008)

Upholidng and reversing in part on appeal a decision of the district court granting Plaintiffs' request for a preliminary injunction to enjoin a municipal parade ordinance that included vague permit standards setting, *inter alia*, advance-notice requirements  police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance. (Lead counsel)

*Fitzgerald v. City of Los Angeles*
485 F.Supp.2d 1137 (CD CA 2008)

Extending injunction against police sweeps of homeless persons on Los Angeles' Skid Row on the grounds of searching for parole and probation violations.  See below for discussion of permanent injunction in 2003. (Co-Counsel)

*Edward Jones, et al., v. City of Los Angeles,*
444 F.3d 1118 (9th Cir. 2006)

Challenge to City of Los Angeles Municipal Code §41.18(d), prohibiting sitting, lying or sleeping on any street or sidewalk anywhere in the City at any time of day or night.  Plaintiffs, all of whom are homeless persons, brought an 8th Amendment as-applied challenge to their arrests and citations for violating the ordinance when their was no available adequate shelter. (Lead counsel in district court, lead co-counsel on appeal)

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
316 F.3d 1059 (9thCir. 2003)

Challenge by City of Los Angeles to interim fee award granting plaintiffs' fees as "catalysts" under state civil rights fee shifting statutes.  Following oral argument, the Ninth Circuit certified issue of continued availability of "catalyst" fees under California law after adverse decision by the United States Supreme Court rejecting catalyst fee doctrine under federal law absent express legislative authorization.  Certified for hearing before the California Supreme Court and ultimately decided by that Court to uphold the catalyst fee doctrine under California law. (Argued in Ninth Circuit)

*Fitzgerald v. City of Los Angeles*
2003 U.S. Dist. LEXIS 27382 (CD CA 2003)

Permanent injunction enjoining Fourth Amendment violations by the Los Angeles Police Department (LAPD). The injunction prevents the LAPD  from engaging in stops of homeless persons for parole and probation sweeps on Skid Row without reasonable suspicion to believe that specific individuals are on parole or probation and subject to a search condition, or that the individual has engaged in, or is about to commit a crime. (Lead counsel)

*Khademi v. South Orange County Community College District*
194 F.Supp.2d 1011 (C.D. CA 2002)

First Amendment facial challenge invalidating college policy  regulating time, place and manner of student speech on campus. (Lead counsel)

*Mardi Gras of San Luis Obispo v. City of San Luis Obispo*
189 F. Supp.2d 1018 (C.D. Cal. 2002)

Preliminary injunction to enjoin a municipal parade ordinance that required lengthy advance-notice requirement and permitted high insurance and police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.

*Bauer v. Sampson*
261 F.3d 775 (9th Cir. 2001)

First Amendment challenge to disciplinary action against college professor for publication of an alternative newsletter criticizing elected and appointed public officials and disclosing wrongdoing by college officials and personnel.  The college sought to discipline the professor for violating the district's policies on discrimination and work-place violence.  The polices were declared unconstitutional as applied to the professor's speech.

Page 2

EXHIBIT 1   9

*H.C. v. Koppel*
203 F.3d 610 (9th Cir. 2000)

Dismissal of federal civil rights action filed in federal court against state court judge and appointed counsel for minor in family law matter. Circuit held that Younger Abstention applied and non-custodial parent had adequate state court remedy.

*Justin v. City of Los Angeles*
2000 U.S. Dist. LEXIS (CD Cal. 2000)
Class action to enjoin police sweeps of homeless population on Los Angeles' Skid Row. Permanent injunction stipulated to in settlement following certification of the injunctive relief class.  (Lead counsel)

*Los Angeles Alliance for Survival, et al. v. City of Los Angeles*
987 F. Supp. 819 (1997); 157 F.3d 1162 (9th Cir. 1998); on certification to the California Supreme Court, 22 Cal.4th 352 (2000); 224 F.3d 1076 (9th Cir. 2000)

Injunction issued in challenge to municipal ordinance barring so-called "aggressive solicitation" in broad areas of traditional public fora.  Preliminary injunction entered by district court based on California Constitution.  On appeal, the Ninth Circuit certified the California Constitution question to the California Supreme Court. Following decision by the California Supreme Court, the Ninth Circuit upheld the original injunction. (Lead counsel in district court;  Co-counsel on appeal)

*Service Employees International Union 660 v. City of Los Angeles*
114 F. Supp.2d 966 (C.D. Cal. 2000)

Challenge to the "no-protest zone" at the Democratic National Convention in Los Angeles in 2000, as well as a preliminary injunction to enjoin the City of Los Angeles parade ordinance.

*United States v. Wunsch*
54 F.3d 579 (9th Cir. 1995);84 F.3d 1110 (9th Cir. 1996) (reargument)

First Amendment challenge to discipline of male attorney for "gender bias" in sending note to female Asst. U.S. Attorney after she successfully moved to disqualify him as defense counsel in a criminal case.  Ninth Circuit invalidated the penalty and declared unconstitutional California's "offensive personality" regulation on attorneys' professional conduct.  (Argued and briefed on appeal).

*American Jewish Congress v. City of Beverly Hills*
65 F.3d 1539 (9th Cir. 1995);90 F.3d 379 (9th Cir. 1996) (en banc)

First Amendment challenge to display of a religious symbol on public property and to permit scheme for expressive activities in public fora in the City of Beverly Hills.  The en banc panel held the permit scheme unconstitutional and found that a preference had occurred for the display of a particular religious symbol.  The en banc decision was unanimous.

*Baca v. Moreno Valley Unified School District*
936 F. Supp. 719 (C.D. Cal. 1996)
First Amendment challenge to school board regulations preventing speakers from making disparaging remarks about public employees during public board meetings.

*National Abortion Federation v. Operation Rescue*
8 F.3d 680 (9th Cir. 1993)

Class-action state-wide injunction against blockades of women's health care clinics by anti-abortion activists. First case decided under the "frustrate and hinder" clause of 42 U.S.C. § 1985(3), the 1871 Ku Klux Klan Act. Appeals court held cause of action under "frustrate and hinder" clause was properly plead and reversed 12(b)(6) ruling on that claim.  (Co-lead counsel throughout; argued on appeal)

*Hewitt v. Joyner*
940 F.2d 1561 (9th Cir. 1991)

Establishment Clause challenge to Christian  theme park, Desert Christ Park, owned and operated by San Bernardino County.  Ninth Circuit held County ownership and operation of the park violated the Establishment Clause.  (Lead counsel throughout litigation; argued on appeal).

*Standing Deer v. Carlson*
831 F.2d 1525 (9th Cir. 1986)

EXHIBIT 1    10

First Amendment challenge for Native Americans at Lompoc Federal Penitentiary to regulation barring religious headbands in the dining facilities for purported health reasons. (Argued and briefed on appeal)
*Burbridge v. Sampson*
*74 F.Supp.2d 940 (C.D. Ca. 1999)*

First Amendment challenge to community college policy regulating student speech in public fora on campus. Court issued a preliminary injunction, declaring the college's speech regulations unconstitutional.

*Rubin v. City of Santa Monica*
*823 F.Supp. 709 (C.D. Ca. 1993)*

First Amendment challenge to city permit scheme limiting access to public parks for protected expressive activities. Court issued a preliminary injunction and declared the permit scheme unconstitutionally on vagueness grounds and procedural due process grounds.  (Lead counsel)

## State Court

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
34 Cal.4th 604 (2002)

California continues to recognize "catalyst" fee awards to prevailing parties under the private attorney-general statute (Cal. Code of Civ. Proc, §1021.5) and Fair Employment and Housing Act (FEHA) despite change in federal civil rights fee-shifting law.  Under California law, there is no requirement of a judicial determination establishing a change in the legal obligations of the parties. (Co-counsel and argued at California Supreme Court)

*Los Angeles Alliance for Survival v. City of Los Angeles*
22 Cal.4th 352 (2000)

Ordinance restricting certain activity as "aggressive solicitation" was not content-based under California Constitution
(co-counsel)

*Williams v. Garcetti*
5 Cal.4th 561 (1993)
*Williams v. Reiner*
13 Cal.App.4th 392 (1991)

Challenge on due process grounds to portion of STEPP law which imposed a criminal penalty  on parents of minor children engaged in or at risk of delinquent conduct.
(Argued and brief on appeal to California Supreme Court)

*Sands v. Morongo Unified School District*
53 Cal.3d 863 , *cert denied*, 112 U.S. 3026 (1991)
225 Cal.App.3d 1385 (1989)

Establishment Clause challenge to practice of holding prayers at public high-school graduations.
(Argued and briefed as lead counsel throughout litigation)

*Walker v. Superior Court of Sacramento*
47 Cal.3d 112 (1988)

Establishment Clause/Free Exercise/Due Process challenge to criminal prosecution of Christian Science parents for death resulting from use of prayer instead of traditional medicine in treatment of ill child.  (Wrote amicus brief on due process issues).

*Irvine Valley College Academic Senate, et al. v. South Orange County Community College District*
129 Cal.App.4th 1482 (2005)

Statutory construction of plain language of Education Code §87360, bolstered by legislative intent, requires actual joint agreement and mutual development of revisions to faculty hiring policies.
(co-counsel, drafted final briefs on appeal)

*Fashion 21, et al. v. Coalition for Humane Immigrant Rights (CHIRLA), et al.*
111 Cal.App.4th 1128 (2004)

Special motion to strike defamation complaint by retainer against garment worker advocates must be granted as

Page 4

EXHIBIT 1    11

the plaintiff retailer could not establish a probability of prevailing on the merits of their claims. Garment worker advocates properly relied on draft labor commission regulations suggesting retailer could be liable for sweatshop conditions of manufacturing of its retail goods.
(lead counsel at all stages)

*Gonzalez v. Superior Court*
33 Cal.App.4th 1539 (1995)

Challenge to discovery order in sexual harassment case requiring plaintiff to disclose name of confidential informant who provided her with photographic evidence of harassment. "After-acquired evidence" rule applied to require disclosure.
(Lead counsel in trial court and appeal)

*Lantz. v. Superior Court of Kern County*
28 Cal.App.4th 1839 (1994)

Privacy rights challenge to interpretation of Consumer Personnel Records Statute (CCP § 1985(3), requiring strict adherence to statutory procedures and limiting exemption of local government agencies from adhering to statutory requirements.
(Lead counsel throughout litigation)

*Rudnick v. McMillan*
25 Cal.App.4th 1183 (1994)

Defamation verdict involving public figure plaintiff and local environmentalist author of letter to editor overturned on basis that letter was protected opinion and public figure subject to constitutional malice proof burden. Wrote amicus brief which formed basis of appellate ruling.

*Westside Sane/Freeze v. Hahn*
224 Cal.App.3d 546 (1990)

Challenge to restrictions on First Amendment petition activities in shopping center.
(Co-counsel, co-wrote appeal)

*City of Glendale v. Robert George*
208 Cal.App.3d 1394 (1989)

Reversal of trial court order imposing prior restraints on speech of "Presidential Santa" on the basis that he constituted a public nuisance to his neighbors in a residential area.
(Argued and briefed on appeal)

*McCarthy v. Fletcher*
207 Cal.App.3d 130 (1989)

Challenge to removal of textbooks from school reading list based on community-based religious objections. Court of Appeal reversed summary judgment decision, holding that there was sufficient evidence of constitutionally impermissible factors in evaluation of appropriateness of class-room reading materials.
(Argued and brief on appeal)

*Fiske v. Gillespie*
200 Cal.App.3d 130 (1988)
Challenge to sex-based actuarial presumptions in insurance industry rate for particular types of life insurance and annuity benefits.
(Argued on appeal)


## Publications:
## (Partial listing)

*Catalyst Fees After Buckhannon*
Civil Rights Litigation and Attorney Fees Annual Handbook
(January 2006)

*Free Speech and Harassment: An Overview*
*in the Public Employee Sector*
CPER: CALIFORNIA PUBLIC EMPLOYEE RELATIONS

Page 5

EXHIBIT 1    12

Institute of Industrial Relations - UC Berkeley
June 1999 No. 136

*Defeating Employer Defenses to Supervisor Liability
After* Ellerth *and* Faragher
ADVOCATE, October 1998

*Student Expression Under California Law*
UCLA Journal of Education
Volume 3, pp. 127-137 (1989)

*Should Attorneys Be Disciplined For Gender Bias*
Point/Counterpoint ABA Journal   August, 1995

*Fight Illegal Police Practices in State Court*
Los Angeles Daily Journal
March 6, 1992

*Judicial Oversight Limited by Supreme Court*
Los Angeles Daily Journal
May 6, 1991

*Jury Nullification is Conscience of Community*
Los Angeles Daily Journal
August 31, 1990

*A Basic Right Merits Shield From The Mob*
Los Angeles Times
August 11, 1991 p.M5

*Prop 115 revisited: Police charged with crimes
deserve fair trials too*
Los Angeles Daily News
May 7, 1991

*Prayer Doesn't Belong at Graduation*
USA Today
May 15, 1991 p. A10

*Killea Tactic Can Only Hurt the Church in the Long Run*
Los Angeles Times (San Diego)
November 20, 1989 p.B7

*The Fifth is a Shield for All*
Los Angeles Times
August 6, 1988   II8
(authored for Exec. Dir. ACLU)

*Which Way Will Rehnquist Court Turn?*
Los Angeles Daily News
June 18, 1986 p.21

*Constitution Exacts Cost for Religious Freedom*
Los Angeles Daily News
June 8, 1986 FOCUS   p.3

Education:

Peoples College of Law                                              J.D.  May, 1978

Douglass College For Women, Rutgers University          B.A.  June, 1968

EXHIBIT 1     13

## Professional and Community Activities:

| | |
|---|---|
| Adjunct Professor - Loyola Law School "Civil Rights Advocacy" Seminar | 2007-2009 |
| Blue Ribbon Panel on Rampart Inquiry, Member | 2004-2006 |
| Ninth Circuit Gender Bias Task Force Convenor, Advisory Committee on Employment Law | 1992-1993 |
| Ninth Circuit Conference on "Ethnicity, Race, and Religion in the Ninth Circuit" Member, Working Subcommittee | 1993 |
| National Police Accountability Project Member, Advisory Board | 2006-present |
| National Lawyers Guild, Los Angeles - President | 2001-2008 |
| National Lawyers Guild Far West Regional Vice-President | 2003-2005 |
| National Lawyers Guild, National Executive Committee | 2003-present |
| NLG National Mass Defense Committee, Co-chair | 2003-present |
| Women Lawyers Association of Los Angeles Member, ProChoice Committee | 1985-2002 |
| The California Anti-SLAPP Project Member, Board of Directors | 1995-present |

## Awards:
## (Partial listing)

| | |
|---|---|
| PEN Freedom to Write Award | 1991 |
| American Jewish Congress Tzedek Award | 1992 |
| Planned Parenthood Los Angeles, Distinguished Service Award | 1990 |
| Freethought Heroine Award | 1992 |
| National Lawyers Guild - Los Angeles | 1999 |
| ACLU of Southern California Pro Bono Attorney Award | 2001 |
| Asian Pacific American Legal Center Pro Bono Award | 2003 |
| California Lawyer: Super Lawyer -Civil Rights/Constitutional Law | 2004-2009 |
| ACLU of Southern California Freedom of Expression Award | 2007 |
| Daily Journal Top 100 Most Influential Lawyers in California | 2007 |
| National Lawyers Guild - Ernie Goodman Award | 2007 |
| Angel Award - California Lawyer Magazine Award for pro bono work | 2007 |
| CLAY Award (California Lawyer of the Year - civil rights) - California Lawyer Magazine | 2008 |
| Top 75 Women Litigators in California - Daily Journal | 2008 |

EXHIBIT 1    14

**EXHIBIT 2**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LONG BEACH AREA PEACE NETWORK, et al., | NO. CV 04-08510 SJO (SSx) |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS AGAINST DEFENDANT** |
| v. | [Docket No. 56] |
| CITY OF LONG BEACH, | |
| Defendant. | |

This matter is before the Court on Plaintiffs Long Beach Area Peace Network and Diana Mann's (collectively, "Plaintiffs") Motion for Award of Attorneys' Fees and Costs, filed April 15, 2010. Defendant City of Long Beach ("Defendant") filed an Opposition to which Plaintiffs replied. The Court found this matter suitable for disposition without oral argument and vacated the hearing set for May 24, 2010. *See* Fed. R. Civ. P. 78(b). Because of the following reasons, Plaintiffs' Motion is GRANTED.

I.   <u>BACKGROUND</u>

Defendant adopted an ordinance, codified in §§ 5.60 *et seq.*, of the Long Beach Municipal Code ("LBMC"), that established a permit scheme for parades and assemblies held in the City of Long Beach (the "Ordinance"). Plaintiffs filed a "facial challenge" to the Ordinance, seeking: (1) declaratory and injunctive relief; (2) compensatory damages; and (3) attorneys' fees. On November 15, 2004, the Court permanently enjoined Defendant from enforcing the Ordinance

EXHIBIT 2    15

1  on the grounds that the Ordinance constituted an unconstitutional restraint on speech and

2  assembly.  Defendant subsequently appealed the Court's Order to the Ninth Circuit.

3       In *Long Beach Area Peace Network v. City of Long Beach,* 574 F.3d 1011 (9th Cir. 2009),

4  the Ninth Circuit affirmed in part and reversed in part, and remanded the issue of whether the four

5  unconstitutional provisions could be severed.  Defendant filed a petition for rehearing *en banc*,

6  which was denied.  Defendant then petitioned for a Writ of Certiorari with the United States

7  Supreme Court, which was also denied.

8       On March 15, 2010, the Court heard argument on whether the unconstitutional provisions

9  of the Ordinance were severable and concluded on April 1, 2010, that the provisions were not

10  severable and thus the entire Ordinance was invalid.  (Docket ("Dkt.") No. 43.)  Plaintiffs now

11  move for attorneys' fees and costs.  (*See generally* Pls.' Mot. for an Order Awarding Attorneys'

12  Fees and Costs Pursuant to 42 U.S.C. § 1983 and California Code of Civil Procedure § 1021.5

13  ("Pls.' Mot.").)

14  II.  <u>DISCUSSION</u>

15      A.  <u>Attorneys' Fees</u>

16       42 U.S.C. § 1988 states that "[i]n any action or proceeding to enforce a provision of [section

17  1983] . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney[s']

18  fee as part of the costs . . . ."  42 U.S.C. § 1988.  In determining the amount of attorneys' fees to

19  be awarded, the court must first determine the lodestar figure, which is calculated by multiplying

20  the number of hours reasonably expended on the litigation by a reasonable hourly rate.  *See*

21  *Hensley v. Eckerhart*, 461 U.S. 424, 434-35 (1983).  The lodestar figure is presumptively

22  reasonable.  *See Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988).  Hours are not

23  reasonably expended if they are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461

24  U.S. at 434.  The reasonable hourly rate is the rate "prevailing in the community for similar work

25  performed by attorneys of reasonably comparable skill, experience, and reputation."  *Blum*

26  *v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  Once calculated, the court may then adjust the

27  lodestar amount up or down based on a number of factors, including:

28

EXHIBIT 2   16

(1) [t]he time and labor required; (2) [t]he novelty and difficulty of the questions; (3) [t]he skill requisite to perform the legal services properly; (4) [t]he preclusion of other employment due to acceptance of the case; (5) [t]he customary fee; (6) [t]he contingent or fixed nature of the fee; (7) [t]he limitations imposed by the client or the case; (8) the amount involved and the results obtained; (9) [t]he experience, reputation, and ability of the attorneys; (10) [t]he undesirability of the case; (11) [t]he nature of the professional relationship with the client; and (12) [a]wards in similar cases.

*Intel Corp. v. Terabyte Int'l*, 6 F.3d 614, 622 (9th Cir. 1993). In seeking attorneys' fees under this method, "the fee applicant has the burden of producing satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services . . . and that the claimed number of hours is reasonable . . . ." *Id.* at 622-23.

Plaintiffs allege that they are entitled to attorneys' fees and costs as prevailing parties under 42 U.S.C. § 1983. (Pls.' Mot. 2:13-16.)

### 1. Reasonableness of Hourly Rate

As established in *Blum v. Stenson*, the reasonableness of an hourly rate is "calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel . . . . [T]he rates should be in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 896 n.11. Plaintiffs have submitted affidavits and cases in support of the reasonableness of the hourly rate charged by Plaintiffs' attorneys. (Pls.' Mot., Ex. 3-8; Pls.' Mot., Decl. of Barrett Litt in Support of Plaintiffs' Motion for an Order Awarding Attorneys' Fees and Costs.) Accordingly, the rates are presumed to be reasonable unless Defendant can show that the rates are not in line with those prevailing in the community. *See Blum*, 465 U.S. at 896 n.11.

Defendant has not presented sufficient evidence to refute the figures provided by Plaintiffs, instead relying on references to the United States Attorney's Office ("USAO") *Laffey* Matrix and

EXHIBIT 2    17

1    the Altman Weil Survey of Law Firm Economics.[1]  (*See generally* Mem. of P. & A. in Opp'n to Pls.'

2    Mot. for Attorneys' Fees ("Def.'s Opp'n").)  However, neither alternative is representative of the

3    "prevailing market rates in the relevant community" of Los Angeles.  *Blum*, 465 U.S. at 896 n.11.

4    Since neither the *Laffey* Matrix nor the Altman Weil Survey are applicable, Defendant has failed

5    to rebut the presumption of reasonableness of Plaintiffs' claimed rates.  *See id.*

6       After review of the evidence presented by the parties in support of fees, the Court finds that

7    the requested rates are reasonable for each of the attorneys, clerks, and paralegals.

8                 2.    <u>Reasonableness of Claimed Number of Hours</u>

9       Hours are not reasonably expended if they are "excessive, redundant, or otherwise

10    unnecessary."  *Hensley*, 461 U.S. at 434.  Moreover, the "fee applicant bears the burden of

11    documenting the appropriate hours expended in the litigation and must submit evidence in support

12    of these hours worked."  *Gates v. Deukmejian*, 987 F.2d 1392, 1397 (9th Cir. 1992).  Once the fee

13    applicant has met that burden, the opposing party "has a burden of rebuttal that requires

14    submission of evidence to the district court challenging the accuracy and reasonableness of the

15    hours charged."  *Id.* at 1397-98.

16       Plaintiffs have submitted a sufficiently detailed breakdown of time spent on various levels

17    of the litigation.  (Pls.' Mot. 6:3-25.)  Plaintiffs allege that they have exercised billing judgment by

18    excluding the time spent preparing briefs in Small Claims Court and for issues that were ultimately

19    unsuccessful.  *See Hensley*, 461 U.S. at 434; Pls.' Mot. 5:10-20.  In total, Plaintiffs contend that

20    they have already eliminated 46 hours from Ms. Thornton's time and 41 hours from Ms. Sobel's

21    hours.  (Pls.' Mot. 5:10-20.)

22       However, Defendant argues that the hours billed are still unreasonable and must be

23    reduced.  The Court will address each of Defendant's arguments separately.

24

25

26

27      [1] The USAO *Laffey* Matrix is a publication based on District of Columbia averages of hourly

28 rates charged by attorneys, whereas the Altman Weil Survey is a national average of hourly rates charged by attorneys in the United States.  The Court notes that Defendant failed to provide the *Laffey* Matrix, as well as the pertinent portions of the Altman Weil Survey.

EXHIBIT 2     4     18

1          a.    Ms. Sobel's Use of an Associate

2          Defendant wishes to exclude all of Ms. Thornton's involvement in the appellate process

3    when calculating attorneys' fees.  (Opp'n to Appellees' Application for Attorneys' Fees attached

4    as Ex. 1 to Def.'s Opp'n ("Ex. 1").)  However, Defendant's request implies that Defendant would

5    have preferred Ms. Sobel to conduct the same basic research and drafting tasks done by

6    Ms. Thornton, but at more than three times the billing rate.  (Pls.' Reply to the Opp'n to Attorneys'

7    Fees and Costs ("Pls.' Reply") 6:13-24.)  Had Ms. Sobel completed all of the work done by

8    Ms. Thornton, Plaintiffs' fees would be even higher.  Accordingly, the Court finds that Plaintiffs' use

9    of an associate was neither excessive nor unwarranted.

10          b.    Ninth Circuit Appeal

11          Defendant alleges that Ms. Sobel's general experience in First Amendment law and her

12   involvement as lead attorney in *Santa Monica Food Not Bombs v. Santa Monica*, 450 F.3d 1022

13   (9th Cir. 2006), necessarily resulted in duplicitous research. (Def.'s Opp'n 2:24-25.) However, the

14   Court finds that any duplicitous work was done out of necessity, especially given the fact that

15   litigation occurred over several years.  (Pls.' Reply 2:9-10.)

16          Defendant also contends that a reduction in attorneys' fees is warranted because Plaintiffs

17   were only successful on four out of nine issues. (Ex. 1.)  This is irrelevant because Plaintiffs were

18   ultimately successful in invalidating the entire Ordinance.  (*See generally* Pls.' Reply.)

19   Accordingly, the Court finds this argument is without merit.

20          Alternatively, Defendant contends that Plaintiffs' failure to follow Ninth Circuit Rule 28-2.6[2]

21   resulted in unnecessary supplemental briefing in the present case because the "matters could

22   have potentially been consolidated and the necessity and expense of supplemental briefing could

23   have been avoided." (Ex. 1.)  There is no evidence that the Ninth Circuit would have consolidated

24   the matters.  Accordingly, the Court finds that this argument lacks merit.  After reviewing the

25   evidence presented by both parties, the Court finds no reduction in attorneys' fees is necessary

26   ──────────────────

27          [2] Ninth Circuit Rule 28-2.6 states in pertinent part: "[e]ach party shall identify in a statement
     . . . any known related case pending in [the Ninth Circuit] . . . . Cases are deemed related if they

28   . . . raise the same or closely related issues . . . ."  Fed. R. App. P. 28-2.6.

EXHIBIT 2    5    19

for the appellate process.  Accordingly, Plaintiffs are awarded $119,082.50 in attorneys' fees for work done during the appeals process.

### c.    United States Supreme Court Briefing

Defendant alleges that spending 141.1 hours on Plaintiffs' Brief in opposition to Defendant's Petition for Writ of Certiorari is excessive because Plaintiffs merely quoted and paraphrased liberally from the Ninth Circuit opinion and provided little independent legal analysis. (Def.'s Opp'n 4.) However, Plaintiffs allege that it had to research numerous new cases and issues. (Pls.' Reply 6:25-28.) Furthermore, Plaintiffs argue that 19 months passed between the time Plaintiffs filed their Opposition to the petition for rehearing *en banc* in May 2008 to the time they filed their Response to the Petition for Certiorari in December 2009.  (Pls.' Reply 7:22-24.)  Thus, although the work may have been duplicitous, given the time lapse between actions, the Court finds that any duplication was necessary.  The Court finds that no reduction in attorneys' fees is necessary. Accordingly, the Court finds the sum of $71,322.50 to be appropriate, and thus awards such an amount for matters related to the Petition for Certiorari.

### d.    District Court Proceedings

Defendant alleges that Plaintiffs are not entitled to collect attorneys' fees for the original district court proceedings because they failed to file a timely application for attorneys' fees pursuant to Federal Rule of Civil Procedure ("Rule") 54(d)(2)(B)(i).[3]  *See* Fed. R. Civ. P. 54(d)(2)(B)(i). However, Local Rule 54-12 permits the filing of a motion for attorneys' fees fourteen days after any final order is issued.  *See* Local Rule 54-12.[4]  Plaintiffs contend that the term "final order" means after the time for filing an appeal has expired "such that there is no longer any possibility that the district court's judgment is open to attack."  *Al-Harbi v. Immigration and Naturalization Serv.*, 284 F.3d 1080, 1082 (9th Cir. 2002).  The Court issued its Order denying

---

[3]  Rule 54(d)(2)(B)(i) states that a motion for attorneys' fees must "be filed no later than 14 days after the entry of judgment[.]" Fed. R. Civ. P. 54(d)(2)(B)(i).

[4]  Local Rule 54-12 states that "[a]ny motion or application for attorneys' fees shall be served and filed within fourteen (14) days after the entry or judgment or other final order, unless otherwise ordered by the Court."

EXHIBIT 2    6    20

severability on April 1, 2010, and the instant Motion for attorneys' fees was filed on April 14, 2010. (*See* Dkt. No. 55; Dkt. No. 56.)  Since the instant Motion was filed within 14 days from the final Order denying severability, Plaintiffs are not precluded from seeking attorneys' fees for the original district court proceedings.  Accordingly, Plaintiffs are awarded $67,405.00 for work done for the original district court proceedings.

### e.   Severability and Post-Appellate Proceedings

Defendant alleges that Ms. Sobel's involvement in *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 17 Cal. Rptr. 2d 861 (Cal. App. 1993), a case dealing with a prior version of the same city ordinance as the instant case, necessarily means that some hours expended working on the severability hearings in the instant case are duplicitous.  (Def.'s Opp'n 5:3-12.)  *Long Beach Lesbian & Gay Pride, Inc.* was decided in 1993, almost two decades ago and a whole decade before the commencement of the instant litigation.  Over such a long period of time, laws may change and work product may become stale.  *See Moreno v. City of Sacramento*, 534 F.3d 1006, 1112 (9th Cir. 2008).  At a bare minimum, an attorney "needs to get up to speed with the research previously performed."  *Id.*  Thus, the Court finds Defendant's argument without merit.  Accordingly, the Court finds the sum of $19,690.00 to be a reasonable sum of attorneys' fees for the severability hearing and post-appeal proceedings.

### f.   Work on the Motion for Attorneys' Fees and Costs

Defendant argues that the hours billed for the instant Motion are excessive because Plaintiffs only had to include a minor amount of additional information and thus much of the work was duplicative.  (Def.'s Opp'n 5:20-24.)  Plaintiffs initially sought 17.9 hours, but request an additional 18.4 hours for time spent on the Reply.  Plaintiffs are not required to travel to, appear at, or prepare for a hearing regarding this matter.  Accordingly, Plaintiffs' request for fees for 4.5 hours of time for such matters is denied.  As such, total hours billable for work done regarding the instant Motion is 31.8 hours at $725 per hour for a total of $23,055.

### B.   Costs

The Court is unable to locate the Bill of Costs that Plaintiffs allegedly transferred from the Ninth Circuit, as it is not attached as Exhibit 15 to the Declaration of Ms. Sobel as Plaintiffs claim.

EXHIBIT 2   21

1 (Decl. of Carol A. Sobel in Support of Mot. for an Order Awarding Attorneys' Fees and Costs ¶ 20.)

2 The only enumerated costs that can be found are in Ms. Sobel's Supplemental Declaration

3 attached to Plaintiffs' Reply. (Pls.' Reply, Supplemental Decl. of Carol A. Sobel ¶ 12.)

4 Accordingly, Plaintiffs are awarded $190.68 for out-of-pocket costs. (Pls.' Reply, Supplemental

5 Decl. of Carol A. Sobel ¶ 12.)

6 III.   RULING

7 　　　For the foregoing reasons, Plaintiffs' Motion for an Order Awarding Attorneys' Fees and

8 Costs is GRANTED. Accordingly, the Court awards Plaintiffs attorneys' fees and costs in the

9 amount of $300,745.68.

10

11 　　　IT IS SO ORDERED.

12 Dated: July 2, 2010.

13

14 　　　　　　　　　　　　　　　　　　　　　　　　_____

15 　　　　　　　　　　　　　　　　　　　　　　　　　　　S. JAMES OTERO
　　　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 2   8   22

**EXHIBIT 3**

1   MARK D. ROSENBAUM, SBN 59940
    mrosenbaum@aclu-sc.org
2   PETER J. ELIASBERG, SBN 189110
    ACLU FOUNDATION OF
3    SOUTHERN CALIFORNIA
    1313 W. 8th Street
4   Los Angeles, CA 90017
    Telephone: (213) 977-9500 x 224
5   Facsimile: (213) 977-5297

6   CAROL A. SOBEL, SBN 84483
    carolsobel@aol.com
7   LAW OFFICES OF CAROL A. SOBEL
    429 Santa Monica Blvd., Suite 550
8   Santa Monica, CA 90401
    Telephone: (310) 393-3055
9   Facsimile: (310) 393-3605

10  Attorneys for Plaintiffs

11

12                    UNITED STATES DISTRICT COURT

13          FOR THE CENTRAL DISTRICT OF CALIFORNIA

14

15  EDWARD JONES, et al.,            )   Case No. CV 03-1142 R (RNBx)
                                      )
16                                    )
                   Plaintiffs,        )   [PROPOSED] ORDER GRANTING
17         vs.                        )   PLAINTIFFS' NOTICE OF MOTION
                                      )   AND MOTION FOR ATTORNEYS'
18  CITY OF LOS ANGELES, et al.,      )   FEES AND COSTS
                                      )
19                 Defendants.        )   Date: December 8, 2008
                                      )   Time: 10:00 a.m.
20                                    )   Ctrm: 8

21

22

23

24

25

26

27

28

EXHIBIT 3    23

1      This Court has read Plaintiffs' motion for attorneys fees, Defendants'

2  opposition, and heard argument on the matter on December 8, 2008.  The Court

3  concludes that Plaintiffs are the prevailing party under both California Code of

4  Civil Procedure § 1021.5 and 42 U.S.C. § 1988.  The Court further concludes that

5  Plaintiffs satisfy the three other elements of CCP § 1021.5 and that both the rates

6  and hours sought by Plaintiffs' counsel are reasonable.  The Court further

7  concludes that Plaintiffs have satisfied the test for a multiplier under both state and

8  federal law because of the contingent nature of the representation, the novelty and

9  difficulty of the issues presented, the skill demonstrated by Plaintiffs' attorneys,

10  and the exceptional success Plaintiffs achieved.

11      Accordingly, the Court hereby ORDERS that Defendants pay to Plaintiffs

12  $ 697,413.00 in attorneys' fees for time spent on the matter through the filing of

13  the motion, and for time spent preparing for and appearing at argument.

14  ~~The Court further finds that Plaintiffs' counsel demonstrated exceptional~~

15  ~~skill in prosecuting this case and that the case involved difficult and complex~~

16  ~~factual and legal claims.  Accordingly, the Court orders that the amount of fees be~~

17  ~~subject to a 2.0 multiplier for a total of $ _____.~~

18      The Court further ORDERS that Defendants pay to Plaintiffs $7,046.00 in

19  reasonable out-of-pocket expenses.

21  Dated: December 8, 2008

23                    Manuel L. Real
                      United States District Judge

24  Lodged by:

25     /s/

26  Carol A. Sobel
     Attorney for Plaintiffs

-1-

EXHIBIT 3   24

**Computation of Plaintiffs' Attorneys Fees and Expenses in *Jones v. City of Los Angeles***

| Firm & Timekeepers | Hours | Market Rate | Initial Lodestar | 2.0 Upward Enhancement | Adjusted Lodestar |
|---|---|---|---|---|---|
| **Law Office of Carol A. Sobel** | | | | | |
| Carol Sobel (1978) | 461.5 | $695 | $320,742.50 | $320,742.50 | $641,485.00 |
| Yvonne Simon (1994) | 71.8 | $480 | $ 34,464.00 | $ 34,464.00 | $ 68,928.00 |
| Negin Mirmirani (2000) | 21.0 | $425 | $ 8,925.00 | $ 8,925.00 | $ 17,850.00 |
| Wyeth McAdam (2000) | 17.2 | $390 | $ 6,708.00 | $ 6,708.00 | $ 13,416.00 |
| David Saldana (2001) | 16.3 | $380 | $ 6,194.00 | $ 6,194.00 | $ 12,388.00 |
| Leah Greenwald (law student) | 29.1 | $200 | $ 5,820.00 | $ 5,820.00 | $ 11,640.00 |
| Jina Tedmori (law student) | 18.2 | $200 | $ 3,640.00 | $ 3,640.00 | $ 7,280.00 |
| | | | $386.493.50 | | $772,987.00 |

1

EXHIBIT 3    25

| Firm & Timekeepers | Hours | Market Rate | Initial Lodestar | 2.0 Upward Enhancement | Adjusted Lodestar |
|---|---|---|---|---|---|
| **ACLU Foundation of Southern California** | | | | | |
| Mark Rosenbaum (1974) | 238.0 | $725 | $172,550.00 | $172,550.00 | $345,100.00 |
| Peter Eliasberg (1994) | 11.4 | $490 | $ 5,586.00 | $ 5,586.00 | $ 11,172.00 |
| Catherine Lhamon (1996) | 61.8 | $455 | $ 28,119.00 | $ 28119.00 | $ 56,238.00 |
| Arulanantham Ahilan (1999) | 14.4 | $400 | $ 5,760.00 | $ 5,760.00 | $ 11,520.00 |
| Ben Wizner (2000) | 112.5 | $380 | $ 42,750.00 | $ 42,750.00 | $ 85,500.00 |
| Adam Wolfe (2001) | 31.0 | $365 | $ 11,315.00 | $ 11,315.00 | $ 22,630.00 |
| Jennifer Stark (law student) | 31.0 | $200 | $ 6,200.00 | $ 6,200.00 | $ 12,400.00 |
| Stuart Allen (law student) | 18.4 | $200 | $ 3,680.00 | $ 3,680.00 | $ 7,360.00 |
| Joyce Bradberg (paralegal) | 11.8 | $175 | $ 2,065.00 | $ 2,065.00 | $ 4,130.00 |
| | | | $278,250.00 | | $556,050.00 |

2

EXHIBIT 3   26

**EXHIBIT 4**



14 of 66 DOCUMENTS

**DONALD FITZGERALD, DELBERT EUGENE HUDSON, DILWORTH MENEFELE and MARIO YOUNGBLOOD, as individual plaintiffs and as representatives of the classes, Plaintiffs, v. CITY OF LOS ANGELES, CHIEF OF POLICE WILLIAM BRATTON and CAPTAIN CHARLIE BECK, in their individual and official capacities, and DOES 1-10, in their individual and official capacities, Defendants.**

**Case No. CV 03-01876 DDP (RZx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2009 U.S. Dist. LEXIS 34803*

**April 7, 2009, Decided**
**April 7, 2009, Filed**

**PRIOR HISTORY:** *Fitzgerald v. City of Los Angeles, 485 F. Supp. 2d 1137, 2007 U.S. Dist. LEXIS 30915 (C.D. Cal., 2007)*

**COUNSEL:** [*1] For Donald Fitzgerald, Plaintiff: Carol A Sobel, LEAD ATTORNEY, Carol A Sobel Law Offices, Santa Monica, CA; Mark D Rosenbaum, Peter Bibring, Peter J Eliasberg, LEAD ATTORNEYS, ACLU Foundation of Southern California, Los Angeles, CA.

For Delbert Eugene Hudson, as individual plaintiffs and as representatives of the classes, Dilworth Menefee, as individual plaintiffs and as representatives of the classes, Mario Youngblood, as individual plaintiffs and as representatives of the classes, Plaintiffs: Carol A Sobel, Yvonne Tania Simon, LEAD ATTORNEYS, Carol A Sobel Law Offices, Santa Monica, CA; Mark D Rosenbaum, Peter Bibring, Peter J Eliasberg, LEAD ATTORNEYS, ACLU Foundation of Southern California, Los Angeles, CA; Negin Mirmirani, LEAD ATTORNEY, Loeb & Loeb, Los Angeles, CA.

For City of Los Angeles, Defendant: Bruce Monroe, LEAD ATTORNEY, Los Angeles City Attorney's Offfice, Police Employment Law Sec, Los Angeles, CA; Cory M Brente, Kelly N Kades, Wendy C Shapero, LEAD ATTORNEYS, Los Angeles City Attorney's Office, City Hall E - Police Litigation, Los Angeles, CA.

**JUDGES:** DEAN D. PREGERSON, United States District Judge.

**OPINION BY:** DEAN D. PREGERSON

**OPINION**

**ORDER GRANTING MOTION FOR ATTORNEYS' FEES**

[Motion filed on March [*2] 6, 2009]

This matter comes before the Court on Plaintiffs' Motion for Attorneys' Fees. Plaintiffs seek attorneys' fees for time spent on their motion to extend the injunction issued in this case and for time spent between the extension of the injunction and the entry of the enforceable settlement agreement on February 17, 2009. Defendant City argues that Plaintiffs have waived any claim to attorneys' fees for this work, that Plaintiffs do not meet the standard for attorneys' fees, and that their fee requests are unreasonable. After reviewing the materials submitted by the parties and hearing oral argument, the Court grants Plaintiffs' motion.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiffs, who are persons living in the area of Los Angeles commonly known as "Skid Row," filed their Complaint on March 10, 2003. Plaintiffs filed their suit pursuant to *42 U.S.C. § 1983*, alleging that a Los Angeles Police Department search and seizure policy violated the *Fourth Amendment* and seeking injunctive and declaratory relief. This case was assigned to the

EXHIBIT 4    27

Honorable Nora Manella. On March 31, 2003, the Court granted a temporary restraining order. The Court granted a preliminary injunction on April 14, [*3] 2003.

## A. The Settlement Agreement

On December 8, 2003, the Court approved a settlement between the parties. The Settlement Agreement stated the parties' "desire to resolve this matter without further litigation" and that they "therefore intend with this Settlement Agreement to resolve all issues pertaining to case number CV03-1876 upon the terms and conditions set forth in this Agreement." Def. Ex. 7 at P E. The Settlement Agreement provided for a stipulated three-year permanent injunction. Id. at §§ I-II. The permanent injunction enjoined the City of Los Angeles as follows: (1) officers were prohibited from conducting detentions or "Terry" stops without reasonable suspicion that the person is involved in criminal activity or has committed a crime or violated parole or probation, but were not prohibited from engaging in consensual encounters; (2) officers would not search the persons/possessions of those stopped on the public streets and sidewalks of the Skid Row area without probable cause or reasonable suspicion that the person has committed a crime or violated parole or probation, though officers were not prohibited from performing "pat-down" searches in accordance with law; and (3) [*4] officers would not search the residences of those on Skid Row except in certain circumstances. The Settlement Agreement provided that the plaintiffs could move for an extension of the injunction for a period of up to 36 months. Id. at § II.

The Settlement Agreement further provided for a payment to plaintiffs and attorneys fees and costs. Specifically, section IV of the Settlement Agreement, titled "Attorney's Fees and Costs" provided:

> Within 60 days after this Agreement is executed by all parties, Defendants City of Los Angeles will pay plaintiffs the amount of $ 75,000 and plaintiffs' attorneys fees and cost [sic] in the amount of $ 94,720. Plaintiffs accept this amount as full payment for any all monetary amounts owed in connection with Case Number CV03-1876, and, on behalf of themselves, hereby release all defendants, as well as all other employees and entities of the City of Los Angeles, from any further obligations to pay any further amounts.

Id. at § IV. Section V, titled "Release of Defendants," stated: "Except as provided for in this Agreement, plaintiffs hereby release Defendants . . . from any an all

obligations and liabilities in connection with the injunctive relief claims [*5] in case number CV03-1876 and the allegations made therein."

On the same day, Judge Manella also granted plaintiffs' application for attorneys' fees. Plaintiffs requested $ 94,720 in fees and costs, and presented documentation showing that this number reflected billable hours up to that point. See Order Granting Plaintiffs' Application for Attorneys' Fees, at 4-5 (Docket No. 42) (December 8, 2003). Overall, the Court granted $ 93,091 in attorneys' fees and $ 1,258.19 for costs, for a total of $ 94,393.19. Id. at 6.

## B. Extension of the Injunction

Plaintiffs filed a motion to extend the original injunction on December 8, 2006. The Court extended the injunction until it could decide the motion. On April 20, 2007, the Court granted the motion to extend the injunction for a period of four months (120 days) from the issuance of the order because "even viewing the evidence in the light most favorable to Defendants, they have admitted to an unconstitutional policy." See Order Granting Motion to Extend Injunction (Docket No. 64) (April 20, 2007) at 32-33. The Court posited that the four-month period "should provide the LAPD with ample time to review its policies and practices to ensure that they [*6] comply with current *Fourth Amendment* law." Id. at 32.

On July 11, 2007, Defendants filed a motion to vacate the injunction. This motion was noticed for hearing on August 6, 2007. Plaintiffs opposed the motion on the grounds that Defendants were still not abiding by the terms of the injunction and had not satisfied the legal standard for vacating it. On August 20, 2007, Plaintiffs filed a second motion to extend the injunction, alleging that Defendants were continuing to violate its terms. Prior to the hearing on the motion, the parties initiated settlement negotiations. These negotiations eventually resulted in the parties' reaching a settlement agreement, which the Court signed on February 17, 2009. See Docket Entry Nos. 113 (February 3, 2009) and 117 (February 17, 2009). The agreement provides that (1) searches incident to arrest are not permissible when a person is cited for an infraction or misdemeanor and released, (2) that the police may not compel persons to answer whether they are on probation or parole, and (3) that the time for a warrant check may not exceed the time reasonably required for an officer to complete his or her other duties. Settlement and Order (Docket Entry [*7] No. 117), at PP 6, 13, 17. [1] The February 17, 2009 Settlement and Order noted the parties' disagreement over the issue of attorneys' fees. Id. at P 21.

1   On February 17, 2009, the Court also granted Plaintiffs' request to substitute an attorney, filed

EXHIBIT 4   28

on February 3, 2009. In particular, Plaintiffs sought to substitute the ACLU of Southern California and the Law Offices of Carol Sobel as attorneys of record for plaintiffs in place of Hadsell Stormer Keeny Richardson & Renick LLP ("Hadsell Stormer"). Plaintiffs explained that one of Hadsell Stormer's associates, who did no work on this case, married one of the Court's law clerks in August 2008. Defendants did not oppose Plaintiff's request.

Plaintiffs are seeking attorneys' fees for Hadsell Stormer through this motion. Although the subject associate has not worked on this case, Hadsell Stormer is not seeking fees for any time after July 2008. Richardson Decl., P 23. The Court also notes that the subject law clerk, who started his term in September 2008, is not assigned this case. Additionally, the Court notes that it has an extern who formerly worked for Hadsell Stormer. That extern has assured the Court that she did not work on this case.

Plaintiffs [*8] filed this Motion on March 6, 2009. Plaintiffs seek attorneys' fees incurred (1) in litigating the motion to extend the injunction in 2006 and 2007 and (2) for time spent between the extension of the injunction and the entry of the enforceable settlement agreement on February 17, 2009.

## II. LEGAL STANDARD

Pursuant to *42 U.S.C. § 1988*, a district court in its discretion may award a reasonable attorney's fee to the prevailing party in § 1983 litigation. *42 U.S.C. § 1988(b)*. Under *§ 1988*, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)* (internal quotation marks omitted). A plaintiff "prevails" when there is a material alteration of the legal relationship between the parties that modifies the defendant's behavior in a way that directly benefits the plaintiff. See *Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)*. Settlement agreements enforced through consent decrees can form the basis of an attorneys' fee award. *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Resources, 532 U.S. 598, 603-04, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001)*; *Maher v. Gagne, 448 U.S. 122, 129, 100 S. Ct. 2570, 65 L. Ed. 2d 653 (1980)*. Additionally, [*9] a district court has the discretion to award fees to a prevailing party in consent decree litigation for work reasonably spent to monitor and enforce compliance with the decree. *Keith v. Volpe, 833 F.2d 850, 855-57 (9th Cir. 1987)*; *N.A.A.C.P. v. San Francisco Unified Sch. Dist., 284 F.3d 1163, 1166 (9th Cir. 2002)* (citing Volpe and noting that this principle is "settled law" in the Ninth

Circuit). Attorneys' fees may be waived as part of the settlement process. *Evans v. Jeff D., 475 U.S. 717, 737-38, 106 S. Ct. 1531, 89 L. Ed. 2d 747 (1986)*.

California law also provides a basis for attorneys' fees in some actions. [2] Pursuant to *California Code of Civil Procedure § 1021.5*, "a court may award attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest," where certain requirements are met. *Cal. Civ. Proc. Code § 1021.5*. Attorneys' fees will be appropriate if (a) a significant benefit has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement make the award appropriate, and (c) such fees are not paid out of the recovery. Id. Although the section "is phrased in permissive [*10] terms . . ., the discretion to deny fees to a party that meets its terms is quite limited," and generally requires a full fee award unless special circumstances would render such an award unjust. *Lyons v. Chinese Hospital Ass'n, 136 Cal. App. 4th 1331, 1344, 39 Cal. Rptr. 3d 550 (2006)*.

> 2  The Complaint in this matter also had a claim under *California Civil Code § 52.1*. "[W]hen state statutes authorize fee awards to litigants in a particular class of cases, the statutes are substantive for *Erie [v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)]* purposes if there is no 'direct collision' with the Federal Rules." *CRST Van Expedited, Inc. v. Werner Enters., Inc., 479 F.3d 1099, 1111 (9th Cir. 2007)*; see *In re Larry's Apartment, L.L.C., 249 F.3d 832, 837-38 (9th Cir. 2001)*.

Where a plaintiff is entitled to attorneys' fees, a district court must determine the amount of a reasonable fee. The "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley, 461 U.S. at 433*. The Court should exclude from the initial fee calculation hours that were not reasonably expended. *Id. at 434*. There is a strong presumption that the lodestar [*11] figure represents a reasonable fee. *Jordan v. Multnomah County, 815 F.2d 1258, 1262 (9th Cir. 1987)*. After calculating the "lodestar," other considerations "may lead the district court to adjust the fee upward or downward." Id. Among those other considerations is "the important factor of the 'results obtained.'" Id.; see also id. at n.9 (suggesting that the factors identified in *Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)*, may be particularly helpful, but also noting that "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate").

## III. DISCUSSION

EXHIBIT 4    29

2009 U.S. Dist. LEXIS 34803, *

Defendant City of Los Angeles ("City" or "Defendant") argues that Plaintiffs are not entitled to the fees they request. First, and primarily, Defendant argues that Plaintiffs are entitled to no fees because the 2003 Settlement Agreement waived any rights to attorneys' fees for work performed in the future. Second, in the alternative, Defendant attacks the fees Plaintiffs request and asks the Court to award less.

## A. Waiver

As a threshold matter, Defendant argues that Plaintiffs waived their right to attorneys' fees through the December [*12] 2003 Settlement Agreement. [3] As mentioned above, the general rule is that a prevailing party in a civil rights action - including one concluded through settlement - is entitled to attorneys' fees. Where parties in a civil rights action resolve the action by settlement, the availability of attorneys' fees for successful plaintiffs may be waived as part of the settlement process. *Evans v. Jeff D., 475 U.S. 717, 737-38, 106 S. Ct. 1531, 89 L. Ed. 2d 747 (1986)*. In the Ninth Circuit, however, a waiver of attorneys' fees must be clear: "a prevailing plaintiff may sue for reasonable attorneys' fees unless the defendant shows that the plaintiff clearly waived fees as part of the settlement." *Muckleshoot Tribe v. Puget Sound Power & Light Co., 875 F.2d 695, 697 (9th Cir. 1989)*; see *Wakefield v. Mathews, 852 F.2d 482 (9th Cir. 1988)*. A defendant may demonstrate a waiver of attorneys' fees in two ways. The basic rule is that the court focuses on "the language in the settlement agreement." *Id. at 698*. "[A] waiver of attorneys' fees may be established by clear language in the release," either because it "contains an explicit reference to fees" or because "the breadth of the release is so 'sweeping' that it necessarily includes [*13] attorneys' fees." *Id.* Alternatively, "if the language in the release is unclear or ambiguous, surrounding circumstances may clearly manifest the intent of the parties that attorneys' fees be waived." *Id.* Generally, "waiver of attorneys' fees should not be presumed from a silent record." *Wakefield, 852 F.2d at 484*. Ultimately, "any waiver or limitation of attorney fees in settlements of [civil rights] cases must be clear and unambiguous." *Holland v. Roeser, 37 F.3d 501, 503-04 (9th Cir. 1994)*. [4]

3 City does not appear to distinguish between the extension of the injunction in April 2007 and the second settlement entered in February 2009. Rather, City refers to these efforts collectively.

4 In *Wakefield*, the Ninth Circuit held that the release at issue was so sweeping as to cover attorneys' fees, even though it did not provide those fees by name. That release provided that it applied to

any and all manner of action or

actions, causes or causes of action, in law or in equity, suit, debts, liens, contracts, agreements, promises, liabilities, claims, rights, obligations, demands, damages, including punitive damages, injuries, debts, losses, costs or expenses of any nature whatsoever, known or [*14] unknown, fixed or contingent ..., which [plaintiffs] now [have] or may hereafter have against each or any of the [defendants] arising out of, or what might be considered to arise out of or in any way connected with the aforementioned lawsuit or the conduct of [defendants] to date.

852 F.2d at 483.

The Court begins with an analysis of whether the language in the agreement clearly waives attorneys' fees for work performed in connection with the extension of the injunction. The critical section is subsection IV. Titled "Attorney's Fees and Costs," the section provides the following payment: (1) a payment to plaintiffs in the amount of $ 75,000 and (2) attorneys' fees and costs in the amount of $ 94,720. The section then contains language releasing the defendant as follows: "Plaintiffs accept this amount as *full payment for any and all monetary amounts owed in connection with Case Number CV03-1876*, and . . . *release all defendants* . . . from *any further obligations to pay any further amounts.*" Def. Ex. 7 at § IV (emphasis added). The parties focus on different portions of this section. Plaintiffs emphasize the past-tense nature of the word "owed," and distinguish that language from the language [*15] used in Wakefield, which more expressly contemplated sums for a future amount. Defendant argues that the section also contemplates future obligations, through its release of defendants from "any further obligations to pay any further amounts." Plaintiffs argue that the better way of reading the agreement is that "the scope of the release is . . . simply coextensive with the scope of the payment. In other words, in exchange for the payments of $ 75,000 and $ 94,720, Plaintiffs were only agreeing to release defendants from their obligations to pay any more for harms already suffered and attorneys work already performed." Reply at 1:24-28.

The Court agrees with Plaintiffs. Although the term "further" could take on the meaning Defendants suggest, it does not clearly do so. Section IV does *not* say, for example, that Plaintiffs accept the amount as full payment for all monetary amounts owed, now or in the future. See *Wakefield, 852 F.2d at 483* (waiving claims

EXHIBIT 4   30

which plaintiffs now have or may hereafter have against the defendants). The only indication that future liabilities or fees *might* be covered is the use of the word "further." In context, however, the use of that term is not clear. It [*16] could mean that the plaintiffs would not later claim they were owed something for which they were not compensated - either damages or attorneys' fees - in December 2003 (i.e., Defendants owe nothing further as of December 2003). Or it could mean that the amount was meant to cover all future work by the plaintiffs in, for example, extending and enforcing the injunction (i.e., Defendants will owe nothing for any further work performed on the case).

Other provisions in the Settlement Agreement do not clarify this issue. Defendant argues that additional language supports its reading. In particular, Defendant argues that other provisions show that the City of Los Angeles paid attorneys' fees in part as consideration for the waiver of additional attorneys' fees and costs in the event Plaintiffs sought to extend the injunction in the future. Defendant points to the integrative language in the agreement, i.e., paragraph 3 of the "Background", which suggests that the agreement was intended to resolve "all issues pertaining to case number CV03-1876 upon the terms and conditions set forth in this Agreement." Additionally, Defendant emphasizes that the Agreement expressly contemplated a motion [*17] to extend. Taking these different parts of the agreement together, Defendant argues, attorneys' fees in conjunction with a motion to extend must have been covered. The Court is not persuaded by this reading. The fact that the parties specifically contemplated a motion to extend and yet did not expressly include language that stated an intent for the settlement amount to cover fees not yet incurred or fees in connection with the motion to extend - but instead only included the ambiguous term "further" - mitigates the force of Defendants' argument. Cf. *Wakefield, 852 F.2d at 484* ("[W]aiver of attorneys' fees should not be presumed from a silent record.").

Defendant's reliance on section V is likewise unavailing. Defendant argues that section V serves to emphasize the breadth of Plaintiffs' waiver. The Court finds Plaintiffs' reading of section V more plausible: while section IV talks about payment in connection with the case, section V specifically mentions injunctive claims in connection with the case. The Court is hesitant to read the terms "obligations and liabilities" to include attorneys' fees. While Defendants correctly note that the Wakefield release deemed sweeping enough to waive [*18] attorneys' fees did include the terms "obligations" and "liabilities," it also included the terms "costs or expenses of any nature whatsoever." See *Wakefield, 852 F.2d at 483*. Courts have tended to consider attorneys' fees to be *costs*, not *liabilities* in this context. See, e.g., *42 U.S.C. § 1988(b)* (attorneys fees will be included as costs); *Parker v. Metropolitan Water Reclamation Dist.*

*of Greater Chicago, 782 F. Supp. 387 (N.D. Ill. 1992)* ("liability, claims, and demands" is not broad enough to include attorneys' fees where release failed to mention the term or even costs).

While the Court finds Defendant's reading of the agreement to be reasonable, the Court cannot find that the language of the agreement betrays a clear waiver or a waiver so sweeping as to necessarily encompass attorneys' fees. See *Muckleshoot Tribe, 875 F.2d at 698*. Rather, the structure of section IV and the use of "further" instead of "future," "not yet incurred," or something that clearly indicated these fees were not yet "owed" suggest that the payment of attorneys' fees was only for the liabilities incurred up to that point. Accordingly, the Court finds that the language is ambiguous.

Ambiguous language is not [*19] necessarily the end of a waiver story in all cases, but it is here. As the Ninth Circuit explained in Muckleshoot Tribe, where "the language in the release is unclear or ambiguous, surrounding circumstances may clearly manifest the intent of the parties that attorneys' fees be waived." *875 F.2d at 698*. Although Defendant has made reasonable arguments as to its intent - i.e., that the payment of attorneys' fees was in part consideration for the option to extend - Defendant has presented no evidence of the surrounding circumstances that would indicate such an approach was in fact the intent or understanding of the parties. [5] Plaintiffs, who do not have the burden to show waiver, have highlighted why Defendant's proffered mutual intent would not make sense: it seems less likely that Plaintiffs would waive any right to seek payment for future fees when (1) they do not know how the City would respond to the injunction once it is issued (and therefore how intense enforcement or a motion to extend would be), (2) they do know they would be entitled to attorneys' fees for monitoring and enforcing the injunction under Volpe, and (3) they are cognizant of the broad nature of the injunction (and, [*20] thus, the likelihood that it will need monitoring).

> 5   For example, City has presented no evidence (or argument devoid of evidence) that would suggest the amount of fees in the Settlement Agreement - nearly $ 95,000 - would have been an unreasonable estimate of fees and costs for *only* the work performed up to December 2003. If it had, such evidence might support City's argument that the amount paid included the possibility of additional legal work. In fact, Judge Manella's December 8, 2003 order granting the application for attorneys' fees shows that nearly $ 94,000 of this amount was for actual hours billed and costs incurred.

Because the language of the Settlement Agreement

EXHIBIT 4    31

does not clearly waive the right to seek attorneys' fees for the motion to extend or for the work leading up to the 2009 Settlement and Order, and because the City has presented no evidence that its reading of the ambiguous language reflects the intent of the parties, City has not met its burden to show that Plaintiffs have "clearly waived" attorneys' fees in this matter.

## B. Entitlement to Fees

Plaintiffs seeks attorneys' fees for two general endeavors: the time they spent on the motion to extend the injunction and  [*21]  the work done between the Court's order extending the injunction and the entry of the judicially enforceable settlement agreement. Although Defendant argues that Plaintiffs do not seek reasonable fees, Defendant does not appear to argue that, even if Plaintiffs have not waived a claim to fees, they are entitled to no fees.

### 1. Motion to Extend Injunction

Plaintiffs seek fees for time spent on the motion to extend the injunction, which the Court granted in April 2007. [6] Plaintiffs argue that the order extending the injunction, like the initial order granting a permanent injunction, altered the legal relationship between the parties. Additionally, Plaintiffs argue that they are entitled to fees for that time because it was time spent to monitor and enforce compliance with the decree. While Defendant argues that Plaintiffs' fee award should be reduced because of the hours claimed and the results reached, Defendant does not appear to argue that Plaintiffs may not recover at all for this work (except for the reasons discussed above). The Court finds that the successful motion to extend the injunction entitles Plaintiffs to fees for the hours reasonably spent enforcing the injunction. See *Volpe, 833 F.2d at 855-57*.

> [6]    The  [*22]  standard for extending the injunction, "good cause," was "less than that needed for a permanent injunction." Order Granting Motion to Extend Injunction, at 7:23-27.

### 2. Time Between Extension of Injunction and Entry of Enforceable Settlement Agreement

Plaintiffs also seek reasonable attorneys' fees for the time spent between the entry of the Court's order extending the injunction and the Settlement & Order that was approved by the Court in February 2009. Again, while Defendant contests the amount of fees, Defendant does not contest entitlement to fees at all, except through its "waiver" argument. For the reasons stated in Plaintiffs' Motion, see Pl.'s Mem. at 3:21-8:24, and in light of no argument to the contrary (except for waiver), the Court also finds that Plaintiffs are entitled to reasonable fees for this work under federal and state law.

## C. Amount of Fees

The Court next addresses the amount of a reasonable fee. "In determining a reasonable attorney's fee, the district court's first step is to calculate a 'lodestar' by multiplying the number of hours it finds the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *McGrath v. County of Nevada, 67 F.3d 248, 252 (9th Cir. 1995)*. [*23] In calculating the lodestar, "the district court should take in to account the factors set forth in *Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 69-70 (9th Cir. 1975)*, . . . that it finds to be relevant." *McGrath, 67 F.3d at 252*. [7] Once the court has calculated the lodestar, the "second step . . . is to assess whether the presumptively reasonable lodestar figure should be adjusted on the basis of Kerr factors not already subsumed in the initial calculation." *Id.*

> [7]    The Kerr factors include: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *526 F.2d at 70*.

"The fee applicant bears the burden of documenting the  [*24]  appropriate hours expended in the litigation and must submit evidence in support of these hours worked." *Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th Cir. 1992)*. Once the fee applicant has met that burden, the opposing party "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Id. at 1397-98*.

### 1. Lodestar

#### a. Hours Reasonably Expended

The court must examine the amount of hours claimed by the moving party and "in order to award fees based on them, [must] find that the time actually spent was reasonably necessary." *Carson v. Billings Police Dep't, 470 F.3d 889, 893 (9th Cir. 2006)*.

Plaintiffs seek compensation for a total of 862.50 hours expended on interviewing declarants, briefing for the first motion to extend the injunction and the reply,

EXHIBIT 4    32

preparing for and doing oral argument, briefing the second motion to extend the injunction and reply, briefing the opposition to Defendants' motion to vacate the injunction, negotiating the settlement agreement entered in February 2009, and communicating with co-counsel. Those 862.50 [*25] hours reflect work by attorneys Mark Rosenbaum, Carol Sobel, Anne Richardson, Peter Bibring, Peter Eliasberg, and Sanjukta Paul; legal assistant Joyce Bradberg; and Teresa Virgen-Torres and law students who helped gather declarations in connection with the motions to extend and the motion to vacate.

In determining the amount of hours for which compensation is sought, Plaintiffs exercised billing judgment. See *Hensley, 461 U.S. at 434.* The ACLU is not seeking compensation for more than 72 hours spent on the matter up to the Court's extension of the injunction or for an additional approximately 50 hours spent on the matter between the time of the Court's extension of the injunction and the entry of the settlement agreement. See Eliasberg Decl. PP 14-15. In addition to reducing the hours of certain individuals, the ACLU is not seeking compensation for anyone who billed less than 10 hours on the matter. Id. at P 15. Ms. Sobel reduced the time spent on briefing and research by a total of 44 hours. Hadsell Stormer is not seeking compensation for about 8% of the firm's total billing. Finally, Plaintiffs have taken the total amount after the exercise of billing judgment and reduced it by an additional [*26] 5% to ensure that no excessive or duplicative time is being sought. Plaintiffs have submitted evidence as to the calculation of billing rates and the hours actually expended. See Eliasberg Decl.; Richardson Decl.; Sobel Decl.; Litt Decl; Thorland Decl. This evidence is sufficient to meet their burden "of documenting the appropriate hours expended in the litigation and . . . submit[ting] evidence in support of these hours worked." *Gates v. Deukmejian, 987 F.2d 1392, 1397 (9th Cir. 1992).*

Defendant argues that the hours billed are unreasonable and must be reduced in a number of ways. The Court finds that reductions for duplication and the interviews and declarations are appropriate.

i. Block Billing

First, Defendant argues that Plaintiffs block-billed their hours spent on litigation, and therefore that the Court should reduce the amount by 25%. Block billing is "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metropolitan Life Ins. Co., 480 F.3d 942, 945 n.2 (9th Cir. 2007).* It can be appropriate to take a reduction of 20% on hours due to block billing. [*27] *Welch, 480 F.3d at 948.* However, "the use of block billing does not justify an across-the-board reduction or rejection of *all* hours," but only those that are block-billed. *Mendez v. County of San Bernardino, 540 F.3d 1109, 1129 (9th Cir. 2008).*

Defendant identifies 162.4 hours ($ 89,922.00) that are alleged to be block-billed. Knapton Decl. P 24. Plaintiffs argue that many of the entries identified as block-billed actually list in significant detail the tasks performed during those hours. Plaintiffs emphasize that the important thing is that "sufficient detail has been provided so that [the Court] can evaluate what the lawyers were doing and the reasonableness of the number of hours spent on those tasks." *Smith v. District of Columbia, 466 F. Supp. 2d 151, 158 (D.D.C. 2006).* The Court has reviewed the entries identified as block-billed by Defendant's consultant. See Knapton Decl., Ex. 3. After this careful review, the Court concludes that a reduction for block billing is not necessary. All of the entries are detailed enough for the Court to compare the hours expended against the tasks and assess the reasonableness of those tasks. Many of entries identified as block-billing are actually [*28] different parts of the same task, and many of the entries identified as block-billing identify a total of a few hours.

ii. Duplicative Internal Conferences and Multiple Attendance by Attorneys

Second, Defendant argues that Plaintiffs seek fees for 238.35 unnecessarily duplicative hours, totaling $ 106,240.50. Knapton Decl. P 26 & Ex. 4. "The court may reduce the number of hours awarded because the lawyer performed unnecessarily duplicative work." *Moreno v. City of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008).* "[D]etermining whether work is inherently duplicative is no easy task," because some duplication is "inherent in the process of litigating over time." Id. Concerns about overstaffing are a relevant consideration, but determining whether there has been unnecessary duplication requires the exercise of "judgment and discretion, considering the circumstances of the individual case." *Democratic Party of Washington State v. Reed, 388 F.3d 1281, 1286-87 (9th Cir. 2004).*

Defendant argues that the hours identified are duplicative because they begin when "it is clear that both sides wanted to agree on a plan" and use multiple, very experienced litigators to attend hearings and settlement [*29] conferences. Plaintiffs note that with respect to a number of identified entries, Defendant's expert does not separate duplicative time from non-duplicative time within an entry. The Court does not find the presence of lawyers at court meetings to be excessive or unnecessarily duplicative in this case: Plaintiffs typically only seek fees for two or three lawyers at those meetings, a number comparable to the lawyers present for the City at such meetings. Additionally, the Court finds that Plaintiffs did not bill excessively for drafting or reviewing documents.

EXHIBIT 4    33

2009 U.S. Dist. LEXIS 34803, *

The Court does note, however, that there are a significant number of very experienced civil rights litigators on this case, which did not have especially complex legal issues. The Court notes that such experience may have been necessary in light of the nature of this action, which involved the civil rights of thousands of Skid Row residents as affected by a significant City of Los Angeles initiative. However, the Court expresses some concern, looking at the hours billed, that the number of attorneys on this case perhaps produced an excessive amount of conferencing. To compensate, the Court will cut 50% of the time billed for conference [*30] calls and/or cross-firm team meetings. According to the Court's independent review of the records (including estimations where necessary due to how hours were recorded), this will reduce attorneys' hours in the following amounts: Rosenbaum by 2; Eliasburg by 3.8; Bibring by 9.3; Sobel by 7.1; Richardson by 7.3; Paul by 5.4.

iii. Interviewing and Collecting Declarations

Defendant also argues that the time spent interviewing and collecting declaration is excessive. Defendant notes that Plaintiffs request a total of 170.75 hours (fees of $ 55,607.50) for interviewing and collecting approximately 40 declarations of Skid Row residents. See Knapton Decl. at P 30. Defendant compares the time spent by City on declarations (about .3 hours per declaration) to the time spent by Plaintiffs per declaration (about 4.37 hours).

The Court agrees that the time spent for collecting declarations was excessive in this case. While the Court does not expect Plaintiffs to spend an equal amount of time to the City on each declaration, the Court finds that an average of around four hours per declaration is excessive under the circumstances, even considering the

time it might take to review those documents and [*31] the burden plaintiffs may have had on the motion to extend the injunction. [8] Accordingly, the Court will reduce the time billed for interviewing and taking declarations by two-thirds. On the Court's review of the billing records, [9] this will reduce the respective hours by the following amounts: Rosenbaum by 4.7, Bibring by 17.5, Richardson by 1.6, Paul by 7, paralegals by 13.7, and law students by 27.7 hours.

8   For example, it seems less than efficient for an attorney billing at a rate of $ 740 per hour to spend seven hours - or almost twenty percent of the attorney's time billed for this case - on this type of fact-gathering. The Court recognizes the importance of understanding the facts of one's case, but notes that, in conjunction with the significant additional fact-gathering, this amount is excessive.

9   Plaintiffs note that much of the time interviewing and drafting declarations has been wrongly classified by Defendants' expert. In calculating the reduction in time, the Court used only that billed time that was spent interviewing or preparing declarations.

iii. Reasonable Hours

The Court has also reviewed the remainder of the hours billed, as well as the Knapton Declaration, for reasonableness, [*32] and has found that the remaining hours, with the 5% across-the-board reduction to account for potential excessive time or duplication not already considered, are properly charged. [10] Thus, in light of the adjustments above, the Court finds that the following hours (plus the 5% across-the-board reduction to account for potential excessive time) are reasonable:

| Name | Requested Hours | With Court's Reductions | With 5% Across-the-Board Reduction |
|------|-----------------|-------------------------|-------------------------------------|
| Sobel | 175.7 | 168.6 | 160.17 |
| Rosenbaum | 40.1 | 33.4 | 31.73 |
| Eliasberg | 88.6 | 84.8 | 80.56 |
| Bibring | 345.1 | 318.3 | 302.385 |
| Rastegar | 18.8 | 18.8 | 17.86 |
| Law students | 41.5 | 13.8 | 13.11 |
| Paralegals | 37.7 | 24.0 | 22.8 |
| Richardson | 69.4 | 60.5 | 57.475 |
| Paul | 77.8 | 65.4 | 62.13 |

10   The Court has included the fees requested for the Reply into the requested hours, above.

b. Reasonable Hourly Rate

Next, the Court addresses a reasonable hourly rate

EXHIBIT 4   34

for each of the individuals for which Plaintiffs seek compensation. For the purposes of attorneys' fee motions, courts look to the "prevailing market rate[] in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum v. Stenson, 465 U.S. 886, 895-96, 104 S. Ct. 1541, 79 L. Ed. 2d 891 & n.11.* "[T]he relevant community is the forum in which the district court sits." *Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997).* [*33] The established standard for determining the reasonable hourly rate is the "rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Id. at 502* (internal quotation marks omitted). In determining an appropriate rate, a district court may make reference to the factors in Kerr, which "include the novelty and difficulty of the issues involved in a case, the skill required to litigate those issues, the preclusion of other employment, the customary fee, relevant time constraints, the amount at stake and the results obtained, the experience, reputation, and ability of the attorneys, the nature and length of their professional relationship with the client, the 'undesirability' of a case, and awards in similar suits." *Davis v. City and County of S.F., 976 F.2d 1536, 1546 (9th Cir. 1992),* vacated in part on other grounds by *984 F.2d 345 (9th Cir. 1993).* [11]

    11   Determining a prevailing market rate can be especially difficult in situations where an attorney takes cases on a contingency or nonprofit basis.

Plaintiffs seek to the following hourly rates for the lawyers in this case:

| Name | J.D. | Requested Rate |
|------|------|----------------|
| Sobel | 1978 | $ 710 |
| Rosenbaum | 1974 | $ 740 |
| Eliasberg | 1994 | $ 525 |
| Bibring | 2002 | $ 375 |
| Rastegar | 2007 | $ 240 |
| Richardson | 1989 | $ 575 |
| Paul | 2003 | $ 350 |

Additionally, [*34] Plaintiffs seek fees for the work of law students in the amount of $ 200 per hour, and for paralegals at the rate of $ 175 per hour.

Plaintiffs have presented evidence in support of each of these rates. See Eliasberg Decl. (discussing experience of ACLU personnel); Sobel Decl. (discussing rates awarded in other cases); Litt Decl. (discussing rates granted in other cases and civil rights litigation in Southern California); Richardson Decl. (discussing rates for Hadsell Stormer personnel); Thorland Decl. (discussing rates for attorneys at Loeb & Loeb in Los Angeles). [12] In response, Defendants' expert has discussed the Laffey Matrix, a publication based on District of Columbia averages that can be adjusted for different regions. Defendants have not otherwise presented argument or evidence as to reasonable market rates in the field. In particular, with the exception of offering the Laffey Matrix as an alternative, Defendants have not explained why Plaintiffs rates are not within the reasonable range of rates. While Knapton suggests that rates for commercial law firms are not completely helpful, he does not undercut the testimony from Richardson as to the rates charged by Hadsell Stormer [*35] lawyers or the declarations from others who have testified to the rates at which they were awarded fees in previous years. The Court is not persuaded that the Laffey Matrix, even adjusted for Los Angeles, is more helpful than the rates actually used by other courts or the rates of law firms. The Court recognizes that many of the attorneys in this case are experienced, renowned civil rights litigators. Defendants have not explained why the rates suggested by Plaintiffs are not reasonable.

    12   The Court is satisfied with the rate sought for Ms. Virgen Torres, which is equivalent to that of a paralegal. See Reply at 5; Lhamon Decl.; Torres Decl.

After a review of the evidence presented by the parties in support of fees, the Court finds that these requested rates are reasonable for each of the attorneys and paralegals.

    c. Lodestar

Based on the hours and rates presented above, the lodestar amount is as follows.

EXHIBIT 4   35

2009 U.S. Dist. LEXIS 34803, *

| Name | Firm | Hours | Rate | Lodestar |
|------|------|-------|------|----------|
| Sobel | Law Office of Carol Sobel | 160.17 | $ 710 | $ 113,720.70 |
| Rosenbaum | ACLU | 31.73 | $ 740 | $ 23,480.20 |
| Eliasberg | ACLU | 80.56 | $ 525 | $ 42,294.00 |
| Bibring | ACLU | 302.385 | $ 375 | $ 113,394.37 |
| Rastegar | ACLU | 17.86 | $ 240 | $ 4,286.40 |
| Law students | ACLU | 13.11 | $ 200 | $ 2,622.00 |
| Paralegals | ACLU | 22.8 | $ 175 | $ 3,990.00 |
| Richardson | HS/HSKRR | 57.475 | $ 575 | $ 33,048.12 |
| Paul | HS/HSKRR | 62.13 | $ 350 | $ 21,745.50 |
| | | | Total | $ 358,581.29 |

## 2. [*36] Adjustment of Lodestar

While the lodestar figure presumptively represents a reasonable amount of attorneys' fees, "other considerations . . . may lead the district court to adjust the fee upward or downward." *Hensley, 461 U.S. at 433;* see *McGrath, 67 F.3d at 252.* The Supreme Court has highlighted the "results obtained" as a particularly important factor in determining whether the fees should be adjusted. *Hensley, 461 U.S. at 433.* Hensley noted that "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," while the lodestar figure may be excessive for a plaintiff who "has achieved only partial or limited success." *Id. at 435-36.* [13]

> 13    Plaintiffs argue that an analysis of their results is irrelevant because they are entitled to fees for hours "reasonably spent" for monitoring and enforcing the a consent decree, "even as to matters in which [they] did not prevail" under N.A.A.C.P. v. San Francisco Unified School District. The Court does not read this quote as holding inapplicable the normal, two-step fee-assessment approach. Rather, the *Volpe* and *N.A.A.C.P* courts addressed whether the normal *§ 1988* fee calculations apply at all to time spent [*37] monitoring a consent decree. See *Volpe, 833 F.2d at 855-57, 859.*

City argues that the lodestar figure should be reduced because the results obtained were not "excellent." In particular, City notes that the extension of the injunction did not require especially difficult legal issues or complicated facts, and that the injunctions essentially adopted the legal standard. Moreover, City notes that Plaintiffs did not meet the normal permanent injunction standard, but rather were only required to institute "good cause," which the Court interpreted as

akin to a summary judgment standard. Plaintiffs emphasize that they succeeded in securing exactly what they sought: an extension of the injunction in April 2007 and a new injunction and order.

The Court imposes a downward adjustment of 10% here. The Court finds that the ten percent downward adjustment properly reflects the significant success on important issues that Plaintiffs had in this litigation and respects the presumptive reasonableness of the lodestar calculation, while also recognizing that Plaintiffs did not prevail on every point, either in the motion to extend or the final settlement. While important, the legal and factual issues presented [*38] in the motions to extend the injunction were akin to prior arguments before the Court. Additionally, the Court did not extend the injunction on the theories set forth by the Plaintiffs, and did so for a limited time. The February 2009 Settlement and Order represents at least some compromise in Plaintiffs' position (of course, it also represents some compromise in City's position). At the same time, although Plaintiffs did not need to meet the normal permanent injunction standard, they largely succeeded in what they sought, i.e., an extension of the injunction, over opposition by Defendant. Additionally, the February 2009 Settlement and Order included a number of different terms than the 2003 injunction, and specified that certain practices defendants had defended as lawful activity are enjoined. E.g., Settlement & Order (February 17, 2009), at PP 6-8; Def.'s Opp. to Second Mot. to Extend Injunction at 14-15. Accordingly, the Court finds that the reasonable attorneys' fees in this case are $ 322,723.16.

## D. Costs

Pursuant to Plaintiffs' request, the Court grants costs in the amount of $ 1,546.14. See Eliasberg Decl. at P 17 & Ex. 2.

EXHIBIT 4    36

2009 U.S. Dist. LEXIS 34803, *

**IV. CONCLUSION**

For the foregoing reasons, the Court grants [*39] Plaintiffs' Motion for Attorneys' Fees and awards Plaintiffs $ 322,723.16 in attorneys' fees and $ 1,546.14 in costs.

IT IS SO ORDERED.

Dated: April 7, 2009

/s/ Dean D. Pregerson

DEAN D. PREGERSON

United States District Judge

EXHIBIT 4    37

**EXHIBIT 5**

1   BARRETT S. LITT, SBN 45527
    E: blitt@littlaw.com
2   LITT, ESTUAR, HARRISON &
    KITSON, LLP
3   1055 Wilshire Boulevard, Suite 1880
    Los Angeles, California 90017
4   T: (213) 386-3114; F: (213) 380-4585
5
6   CAROL A. SOBEL, SBN 84483
    E: carolsobel@aol.com
7   LAW OFFICE OF CAROL A. SOBEL
    429 Santa Monica Boulevard, Suite 550
8   Santa Monica, California 90401
    T: (310) 393-3055; F: (310) 393-3605
9
10  PAUL L. HOFFMAN, SBN 71244
    BENJAMIN SCHONBRUN, SBN
11  118323
    JAMES DeSIMONE, SBN 119668
12  E: hoffpaul@aol.com
    SCHONBRUN, DE SIMONE, et al.
13  723 Ocean Front Walk
    Venice, California 90291
14  T: (310) 396-0731; F: (310) 399-7040
15
16  On Behalf of all MIWON Counsel

17  Attorneys for Plaintiffs

18              UNITED STATES DISTRICT COURT
19       FOR THE CENTRAL DISTRICT OF CALIFORNIA
20
21  MULTI-ETHNIC IMMIGRANT        Case No.: CV 07-3072 AHM (FMMx)
    WORKERS ORGANIZING
22  NETWORK, et al.               [Honorable A. Howard Matz]

23     Plaintiffs,               ORDER AWARDING CLASS
                                 COUNSEL FEES AND COSTS
24     vs.
25  CITY OF LOS ANGELES, et al.,  DATE:        June 22, 2009
                                 TIME:        10:00 A.M.
26     Defendants.               COURTROOM:   14
27
28



JUN 24 2009

1

EXHIBIT 5    38

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 45 of 76   Page ID
#:1528
Case 2:07-cv-03072-AHM-FFM   Document 111   Filed 06/24/2009   Page 2 of 15

## I.   INTRODUCTION

This case is a class action on behalf of those whose First and Fourth Amendment rights were alleged to have been violated at the May 1, 2007, protest rally at MacArthur Park. The case was settled on terms spelled out in the Preliminary Approval Order and documents attached thereto, and those terms will not be repeated here.

As a result of the lawsuit, a Consent Judgment will be entered embodying the terms of the settlement. Included in these terms is an order entered by the Court requiring certain guidelines and actions by the LAPD and the City of Los Angeles in its future handling of rallies, demonstrations and marches. Thus, this case definitively altered practices that had been an issue within the LAPD for many years.

This case settled for a total monetary award of $12,850,000, after extensive mediation efforts, to be divided among 297 individual class members represented individually by various MIWON or other counsel, and a residual class fund. From this, the Court was to be requested to award $3,455,000 plus $258,000 in medical liens and litigation costs, for a total of $3,713,000, to MIWON Counsel (as well as to approve the arrangement under which the non-MIWON counsel received approximately $500,000 in statutory fees negotiated between them and MIWON Counsel, as part of the division of the settlement.)

Plaintiffs filed a motion for attorneys' fees seeking the foregoing agreed to fees and costs, based on both a class fund theory and a lodestar theory. For the reasons stated below, the Court awards Plaintiffs' counsel $3,713,000 in attorneys' fees and costs.

Defendants did not object to, or challenge, Class Counsel's request for fees and costs.

2

EXHIBIT 5   39

## II.   THE STANDARDS FOR AWARDING CLASS FUND ATTORNEYS' FEES.

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007.

The Court will analyze the requested fees under both the percentage of the fund and the lodestar tests.

## III.   THE REQUESTED FEE IS REASONABLE UNDER THE PERCENTAGE OF THE FUND TEST.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's loadstar. *See, e.g., In re Heritage Bond Litigation*, 2005 WL 1594403 at 18*; In re Quintus Sec. Litig.*, 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). The Court will address each factor below.

In this case, the Court finds that most of the factors enunciated above exists in this case.

### A.   *THE COMPLEXITY OF THE ISSUES, COUNSEL'S SKILL AND EXPERIENCE, AND THE EFFORT INVOLVED.*

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced

3

EXHIBIT 5   40

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 47 of 76   Page ID
#:1530
Case 2:07-cv-03072-AHM-FFM     Document 111     Filed 06/24/2009     Page 4 of 15

1   because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011,

2   1976 U.S.Code Cong. & Admin.News at 5913.

3          While the legal issues in this case are not particularly novel, the factual

4   issues were complex, and management of the process required a high level of skill

5   and effort.  Because this was a hybrid individual and class case, Plaintiffs' counsel

6   and their staffs represented nearly 300 individuals. Defendants insisted that, in

7   order to settle the case, they needed independent verification (video, photos, third

8   party witnesses, medical reports) for the vast majority of the Represented

9   Individuals, even though the case was a class action.

10         Counsel litigated this case aggressively. The work performed included: 1)

11  extensive investigation of the underlying circumstances, including interviewing

12  each of the approximately 300 Represented Individuals at length, and many

13  witnesses as well; 2) reviewing LAPD reports and investigations, as well as

14  hundreds of hours of videos to locate photos of Represented Individuals; 3)

15  preparation of the complaint; 4) the Rule 26 conference and report; 5) obtaining the

16  medical records for the Represented Individuals; 6) preparing mediation write-ups

17  regarding the specifics of each Represented Individual, and then preparing a

18  mediation package with photographic and video evidence to support each of the

19  300 individual claims of presence in the park, and injury; 7) filing the class

20  certification motion and related papers; 8) engaging counsel for all the Represented

21  Individuals in a common process of valuing cases, after MIWON Counsel

22  established and refined a system for assessing the cases, as a result of which all

23  counsel in all case agreed to the approach; 9) preparing lengthy mediation papers;

24  10) attending six mediation sessions; 11) working out a series of individual

25  problem cases, with the participation of Class Counsel, the individual counsel

26  representing the client, and Judge Woehrle; and 12) preparing and negotiating the

27  settlement documents with the defendants.

28

4

EXHIBIT 5    41

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 48 of 76   Page ID
#:1531
Case 2:07-cv-03072-AHM-FFM    Document 111    Filed 06/24/2009    Page 5 of 15

1       Class Counsel have represented that the monetary terms of the settlement

2   represent, to their knowledge, the largest total settlement in the country for a

3   demonstration case, and the largest average per person damages recovery in any

4   mass demonstration case to date. In addition, the settlement encompasses

5   comprehensive structural relief.

6       The appointed MIWON Class Counsel – Barry Litt, Carol Sobel and Paul

7   Hoffman – are highly skilled civil rights and civil rights class action litigators.

8   Each has outstanding reputations as exceptional civil right attorneys.

9       **B.**    *THE RISKS OF NON-PAYMENT ASSUMED BY COUNSEL*

10      While there may not have been a great risk of lack of proof of liability in the

11  case, , there was substantial risk that the cost of litigating it could outstrip the

12  damages in the case, particularly if the Class were not certified. Those risks

13  included: 1) a potentially very difficult discovery process, requiring thousands of

14  additional hours for the case; 2) a requirement (asserted by the City at the class

15  certification hearing) that Plaintiffs prove lack of probable cause on an individual

16  basis; 3) in the current economic climate, the risks of non or delayed payment are

17  substantial (a form of which has occurred in that payment is delayed until sale of a

18  judgment bond to fund the settlement).

19      Other risks included class certification, settling the case expeditiously,

20  managing the factual complexities of the case effectively, receiving an adequate

21  fee award commensurate with the work involved, the disproportionate

22  responsibility of the MIWON counsel to carry the case.

23      While risk is normally tied to the right to receive a multiplier above the

24  ordinary hourly rate to compensate for contingent risk, in this case, the opposite is

25  true, i.e., counsel seek an award that actually represents a discount from lodestar,

26  as is discussed in the lodestar section.

27

28

5

EXHIBIT 5    42

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 49 of 76   Page ID
#:1532
Case 2:07-cv-03072-AHM-FFM   Document 111   Filed 06/24/2009   Page 6 of 15

1    ***C.    THE RESULT OBTAINED FOR THE CLASS AND THE CLASS' REACTION.***

2        As discussed, this settlement represents the largest financial settlement of a

3    demonstration case Class Counsel know of, with a residual class fund. In addition,

4    in the past, the LAPD had privately agreed to changes, but had not implemented

5    those agreements. The current settlement incorporates a Consent Judgment under

6    which the City and the LAPD agree to a series of policies and procedures, as well

7    as the continued jurisdiction of the Court to enforce the Consent Judgment as part

8    of the Court's order approving the final settlement.

9        There was only one objection to the settlement itself or to the award of

10   attorney's fees, and there were no opt-outs. This is a highly favorable reaction by

11   the class to the settlement. *Compare, e.g., Hughes v. Microsoft Corp.,* 2001 WL

12   34089697, 8 (W.D.Wash. 2001) (court found that the "class members

13   overwhelmingly support[ed] the settlement" where there were over 37,000 notices

14   sent out, 2,745 class members participated in the settlement, "only nine objections

15   were submitted", and there were 86 timely opt-outs and over 20 additional

16   defective or untimely opt-outs; "these indicia of the approval of the class of the

17   terms of the settlement support a finding of fairness under Rule 23"), citing *Hanlon*

18   *v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998) (despite vigorous objections

19   and appeal by objectors, "fact that the overwhelming majority of the class willingly

20   approved the offer and stayed in the class presents at least some objective positive

21   commentary as to its fairness"; court did not abuse its discretion in approving

22   settlement); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977)

23   (approximately 1% of 31,000 class members opted out; "the fact that the

24   overwhelming majority of the class willingly approved the offer and stayed in the

25   class presents at least some objective positive commentary as to its fairness").

26   ***D.    THIRTY-ONE PERCENT IS A REASONABLE CLASS FUND AWARD IN
     THIS CASE.***

27

28

6

EXHIBIT 5    43

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 50 of 76   Page ID
#:1533
Case 2:07-cv-03072-AHM-FFM   Document 111   Filed 06/24/2009   Page 7 of 15

1    Where the percentage of the fund award is employed, the Ninth Circuit has

2    "established 25% of the common fund as the 'benchmark' award for attorney

3    fees." *E.g., Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993).

4    Although 25% is the benchmark, the Ninth Circuit has recognized that a variety of

5    factors may lead to an upward adjustment of the percentage. *E.g., In re Pac. Enter.*

6    *Sec. Litig.,* 47 F.3d 373, 379 (9th Cir.1995) (district court "may adjust the

7    benchmark when special circumstances indicate a higher or lower percentage

8    would be indicated"). The percentage amount can be adjusted upward or

9    downward, or replaced by a lodestar calculation, to account for any unusual

10   circumstances involved in the case, which, for example, would indicate that the

11   percentage recovery would be either too small or too large in light of the hours

12   devoted to the case. *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d

13   1301, 1311 (9th Cir.1990). When making an adjustment, the district court should

14   identify "how it arrives at the figure ultimately awarded." *Paul, Johnson, Alston &*

15   *Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989); see also *Six Mexican Workers,*

16   *supra.*

17         Nationally, the average percentage of the fund award in class actions is

18   approximately one-third. The Federal Judicial Center published a report in 1996,

19   entitled "Empirical Study of Class Actions in Four Federal District Courts: Final

20   Report to the Advisory Committee on Civil Rules" ("FJC Report"). The study is

21   based on 407 class action lawsuits that either settled or went to verdict in the two

22   year period from July 1, 1992, through June 30, 1994, in four federal district

23   courts: the Eastern District of Pennsylvania (Philadelphia); the Southern District of

24   Florida (Miami), the Northern District of Illinois (Chicago); and the Northern

25   District of California (San Francisco). (FJC Report, pp. 3-4, 7-8.) The Empirical

26   Study found that "the fee-recovery rate infrequently exceeded the traditional 33.3%

27   contingency fee rate. Median rates ranged from 27% to 30%. Most fee awards in

28

7

EXHIBIT 5     44

1    the study were between 20% and 40% of gross monetary settlement." (*Id.* at pp.

2    68-69; citation and footnote omitted.). The Report concluded that "attorneys' fees

3    were generally in the traditional range of approximately one-third of the total

4    settlement." (*Id.* at p. 90.)

5        Another study, cited by Silber and Goodrich, *Common Funds and Common*

6    *Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534

7    (1998), was done by National Economic Research Associates, an economics

8    consulting firm, in 1994. It found that attorneys' fees in class actions averaged

9    approximately 32% of the recovery, regardless of the case size, and averaged

10   34.74% when the fees and expenses were added together. Silber and Goodrich,

11   *supra* at 545-546. Silber and Goodrich conclude with the observation that a 33%

12   fee award is both reasonable, and in line with the general market for contingent fee

13   work. *Id.* at 546-549. This is the general percentage that they recommend. *See also*

14   *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing

15   three studies ("[O]ne study of securities class action settlements over $10 million ...

16   found an average percentage fee recovery of 31%; a second study by the Federal

17   Judicial Center of all class actions resolved or settled over a four-year period ...

18   found a median percentage recovery range of 27-30%; and a third study of class

19   action settlements between $100 million and $200 million ... found recoveries in

20   the 25-30% range were 'fairly standard.'") (citations omitted).

21       In this case, based on a fee of $3,955,000 (the requested MIWON statutory

22   fees plus the non-MIWON statutory fees), Plaintiffs would receive, as a percentage

23   of the fund, a 31% award. This is well within the reasonable range of percentage of

24   the fund awards, just at what most studies and commentators have characterized as

25   the median nationally.

26       The Ninth Circuit has recognized that many cases result in a higher

27   percentage than the benchmark. See, e.g., *Vizcaino v. Microsoft Corp.,* 290 F3d

28

8

EXHIBIT 5    45

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 52 of 76   Page ID
#:1535
Case 2:07-cv-03072-AHM-FFM   Document 111   Filed 06/24/2009   Page 9 of 15

1   1043 (9th Cir. 2002) (affirming a 28% award, resulting in a multiplier for

2   Plaintiffs' counsel of 3.65, based on 1) an exceptional result, 2) litigation risk, 3)

3   benefits generated beyond the cash settlement, 4) the 28% figure was at or below

4   market rate, and 5) the lengthy time period of the litigation and foregoing other

5   work). Most , if not all of these factors are present here, but the biggest difference

6   is that there is no multiplier above lodestar, but a discount, a factor favoring an

7   upward adjustment.

8          In addition, because there was a statutory attorney's fee available, it was an

9   independent factor in the settlement negotiations and significantly increased the

10  recovery. The settlement agreement, ¶24, states that "Plaintiffs' potential claim for

11  statutory attorney's fees was a substantial factor in arriving upon the final

12  settlement amount of $12,850,000" and that "the statutory attorney's fee claim

13  materially and substantially increased the final settlement amount from what it

14  otherwise would have been." In such a situation, and where the lodestar exceeds

15  the benchmark percentage of the fund amount, it is appropriate to consider the

16  lodestar in determining a reasonable upward adjustment of a percentage fee award.

17  Various factors support this conclusion, including that 1) the amount requested was

18  factored in by Class Counsel in determining the reasonableness of the settlement;

19  2) the MIWON Plaintiffs agreed to post-fee amounts, i.e., the amount they would

20  actually receive, and the award requested here does not affect any of those

21  amounts; and 3) the MIWON Counsel – in contrast to the non-MIWON counsel –

22  waived their right to any percentage of the recovery beyond what the Court

23  awarded with any of their individual clients.

## IV.   THE REQUESTED FEE IS REASONABLE UNDER THE LODESTAR TEST.

### A.   *LODESTAR STANDARDS.*

Lodestar is defined generally as the number of hours reasonably expended
on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461

9

EXHIBIT 5   46

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 53 of 76   Page ID
#:1536
Case 2:07-cv-03072-AHM-FFM   Document 111   Filed 06/24/2009   Page 10 of 15

1  U.S. 424, 433 (1983). Where a plaintiff has obtained excellent results, his or her

2  attorney should recover a fully compensatory fee. *See Hensley, supra,* 461 U.S. at

3  435. Full compensation normally encompasses all hours reasonably expended on

4  the litigation. *Id.*

5      In *Blum v. Stenson,* 465 U.S. 886, 895, n.11 (1984), the United States

6  Supreme Court explained that "'reasonable fees' ... are to be calculated according

7  to the prevailing market rates in the relevant community." The Court should pay

8  "close attention" to "the fees charged by 'lawyers of reasonably comparable skill,

9  experience and reputation.' " *Davis v. City and County of San Francisco,* 976 F.2d

10  1536, 1545-1546 (9th Cir. 1992). Subsequently, in *City of Riverside v. Rivera,* 477

11  U.S. 561, 575-576 (1986), the Supreme Court elaborated that rates for civil rights

12  litigation should be based on the market for complex federal litigation, citing

13  Congress intent in enacting Section 1988 that it "intended that the amount of fees

14  awarded under [§1988] [sic] be governed by the same standards which prevail in

15  other types of equally complex Federal litigation, such as antitrust cases."

16      **B.   *THE REQUESTED RATES ARE REASONABLE***

17      Exhibit "J" to Plaintiffs' Motion for Attorney's Fees is a summary chart of

18  the number of hours expended by each person being billed as well as detail of time

19  billed. For the attorneys involved, the chart includes their year of law school

20  graduation. The chart below provides, in order of hours worked, the graduation

21  year, hourly rate, hours and totals for the six MIWON attorneys who were most

22  active in the litigation (which represents over 50% of the total bill).

| NAME | GRADUATED | HOURS | RATE | TOTAL |
|------|-----------|-------|------|-------|
| Carol Sobel | 1978 | 867.3 | $710 | $624,456.00 |
| Barry Litt | 1969 | 668.1 | $800 | $534,480.00 |
| Robert Myers | 1975 | 522.1 | $710 | $362,859.50 |
| Cynthia Anderson-Barker | 1994 | 497.2 | $490 | $236,170.00 |
| Rebecca Thornton | 2001 | 465.3 | $425 | $181,467.00 |

10

EXHIBIT 5    47

| NAME | GRADUATED | HOURS | RATE | TOTAL |
|------|-----------|-------|------|-------|
| Paul Hoffman | 1976 | 307.3 | $750 | $230,475.00 |
| | | | | $2,169,907.50 |

The rates used here are reasonable and are supported by abundant evidence demonstrating that attorneys of lesser years handling complex litigation have comparable or higher billing rates, and that several courts have awarded comparable rates to these and other counsel. The Court finds that the rates requested by the MIWON counsel are reasonable.

**C.   *THE HOURS EXPENDED ARE REASONABLE***

While the hours expended by MIWON Counsel are substantial, they are not unexpected in light of the character of the case. MIWON Counsel represented nearly 200 individuals, and there was a total of 297 Represented Individuals, including those represented by non-MIWON counsel. MIWON counsel took the lead on all fronts of the case.

MIWON Counsel assigned each attorney or law firm a group of clients for which they were responsible. The interaction with that client throughout the case, the documentation, client assessment, medical workups where needed, and written summary were the responsibility of that attorney. A handful of full client meetings were held, in which all the MIWON clients and Counsel were invited to participate. In those meetings, there were presentations on general questions applicable to all clients (e.g., how a class action works, mediation plans, and the like), discussions of the progress of the case and the Police Department investigation of complaints, with a time set at the end of each meeting for the larger group of clients to break into the smaller assigned groups to meet with the individual attorneys assigned to each group of clients. This was a reasonable means of communication with clients, and an effective means of investing them in the

11

EXHIBIT 5   48

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 55 of 76   Page ID
#:1538
Case 2:07-cv-03072-AHM-FFM   Document 111   Filed 06/24/2009   Page 12 of 15

1  case as a whole – a necessity for a case that, at best would take two to three years

2  and, if it did not settle, far longer.

3      MIWON Counsel worked with the non-MIWON counsel to agree to a

4  common approach to settlement, reviewed the write-up for each non-MIWON

5  Plaintiff, recommending changes, conforming its format, evaluating the individual

6  rating and damages for that individual, and then meeting with each of the non-

7  MIWON counsel so as to ensure uniformity. This occurred with the non-MIWON

8  counsel after the same process had been completed for the MIWON counsel. In

9  addition, MIWON Counsel prepared all the pleadings and early discovery, all the

10  negotiations with the City and Judge Woehrle (in some of which some of the non-

11  MIWON counsel participated), all of the negotiations to reach the structural relief

12  agreement, and the vast majority of the review of the demonstration documentation

13  to locate participants and respond in concrete form to the City's requirement that

14  Plaintiffs provide some form of verification of their presence in MacArthur Park at

15  the date and time of the police action..

16      In order to ensure uniformity of each case assessment – essential if a

17  settlement were to be reached – MIWON Counsel established a committee of

18  several MIWON Counsel responsible to evaluate every case uniformly – both

19  those represented by MIWON and non-MIWON counsel. They developed a

20  uniform scoring system; reviewed each Plaintiff, his/her facts, documentation and

21  medical records; and scored the Plaintiff.

22      MIWON counsel met with the non-MIWON counsel primarily responsible

23  for the particular client, and used the same methodology used for the MIWON

24  clients to come to an agreement about the valuation of their clients' claims. They

25  reviewed all the documents for the non-MIWON as well as the MIWON clients.

26  Further, MIWON Counsel participated directly in meeting with reluctant clients of

27  other counsel – generally in conjunction with Judge Woehrle – to work out ways of

28

12

EXHIBIT 5   49

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 56 of 76   Page ID
#:1539
Case 2:07-cv-03072-AHM-FFM   Document 111   Filed 06/24/2009   Page 13 of 15

1   resolving this issue so that it would not stymie the settlement process. Dozens of

2   hours were spent by MIWON Counsel in just this effort.

3       All settlement documents were prepared by MIWON Counsel and the City.

4       It was generally acknowledged by all counsel that the MIWON Counsel

5   were the driving force in resolving the settlement. MIWON Counsel ultimately

6   negotiated with each set of non-MIWON attorneys the recovery, including

7   statutory fees, that would be assigned each attorney and his/her clients.

8       Analyzed on a per client basis, with approximately 300 clients – since the

9   MIWON Counsel were effectively co-representing the non-MIWON clients – and

10   9600 hours, it means that 32 hours were expended per client. The mean recovery

11   was over $25,000. Attorney's fees of $4,000,000 prorated (including the statutory

12   fees paid to non-MIWON counsel) prorated among 297 clients comes to slightly

13   more than $13,000 per client. This is reasonable for a case that involved litigation,

14   informal discovery, extensive mediation, and a class process.

15       Accordingly, the Court finds that the hours expended in this case were

16   reasonable. The Court also notes that the actual hours being compensated, based on

17   the approved hourly rates, amounts to a 13%-14% discount from lodestar (the

18   difference between a $4,000,000 lodestar based on the approved rates and hours

19   and factoring in a modest amount of further work) and the $3,455,000 requested as

20   MIWON fees.

21       Accordingly, whether using the lodestar or the percentage of the fund

22   method, the fee requested is reasonable.

23   **V.   ALLOCATION OF LIEN REDUCTIONS.**

24       The Court has been advised that MIWON counsel has successfully

25   negotiated some liens and expects to reduce the size of the MIWON liens

26   somewhere between $50,000 and $100,000. These lien funds are part of the total

27   $3,753,000 requested by MWION counsel. MIWON counsel have further advised

28

13

EXHIBIT 5   50

1  the Court that, under their arrangements with their clients, each client is to receive

2  a specified amount, and counsel assumed responsibility for the liens. The Court has

3  also been advised by MIWON counsel that, probably as a result of the larger than

4  expected Unrepresented Class Member claims, there is a bill of $30,617.80 to

5  cover the Class Administrator's billing to date, and the Class Administrator

6  estimates an additional $11,315 and possibly more to complete the claims

7  administration (excluding particular efforts that may be requested by the City at its

8  expense). This bill is greater than had originally been expected. Originally,

9  $50,000 in class administrative costs was anticipated, including payment of

10  $20,000 to Plaintiff organizations for outreach to Unrepresented Class Members.

11  Based on the currently anticipated Class Administrator bills, the costs of class

12  administration will be approximately $12,000 more than anticipated.

13       In light of the fact that the amount to be paid to MIWQN counsel is less than

14  their lodestar, the Court approves that any sums saved by the reduction of liens

15  shall be deemed fees to the MIWON counsel. However, from that reduction,

16  MIWON counsel shall pay the additional class administrative costs so that the

17  funds available for distribution to Unrepresented Class Members remains

18  $200,000.

19  **VI.   THE REQUESTED COSTS ARE REASONABLE.**

20       Plaintiffs seek an award of $258,000 in costs, most of which are for medical

21  liens yet to be paid. To the extent they are not, MIWON Counsel submitted an

22  itemization of costs, which the Court finds reasonable. Accordingly, those costs are

23  awarded as well.

24

25  DATED:  June 24, 2009         _____

26                                UNITED STATES DISTRICT JUDGE

27

28

14

EXHIBIT 5    51

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 58 of 76   Page ID
#:1541
Case 2:07-cv-03072-AHM-FFM     Document 111     Filed 06/24/2009     Page 15 of 15

1

2

Submitted by:

3

LITT, ESTUAR, HARRISON & KITSON, LLP

4

LAW OFFICES OF CAROL SOBEL

5

6

7

By :    _/s/  Barrett S. Litt_____

8

        BARRETT S. LITT
        Attorneys for Plaintiff Class

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

EXHIBIT 5    52

**EXHIBIT 6**



THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(c)

FILED
CLERK, U.S. DISTRICT COURT
AUG 2 7 2007
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT
AUG 2 7 2007
CENTRAL DISTRICT OF CALIFORNIA
BY ___

__ Priority
__ Send
__ Clsd
__ Enter
__ JS-5/JS-6
__ JS-2/JS-3
__ Scan Only

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HERMAN ATKINS, | Case No. CV 01-01574 DDP (Ex) |
|         Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS** |
|    v. | [Motion filed on July 9, 2007] |
| DANNY C. MILLER, |  |
|         Defendants. |  |

This matter comes before the Court on Plaintiff Herman Atkins's ("Atkins" or "Plaintiff") motion for attorneys' fees and costs. After reviewing the papers submitted by the parties, the Court grants the motion and adopts the following order.

I.  **BACKGROUND**

In 1988, Herman Atkins was convicted of a 1986 rape that he did not commit. After his wrongful conviction, he worked to establish his innocence. The Innocence Project accepted his case in 1993 and sought biological evidence to submit to DNA testing, but were opposed in their efforts by the Riverside County District

(457)

EXHIBIT 6    53

Case 2:04-cv-08572-CAS-SS  Document 117-3  Filed 07/20/10  Page 61 of 76  Page ID
Case 2:01-cv-01574-DDP-E   Document 447   Filed 08/27/2007   Page 2 of 17
#:1544

1  Attorney.  The Innocence Project was eventually able to conduct DNA

2  testing that proved Herman Atkins's actual innocence, and on

3  February 12, 2000, Atkins was released from prison.

4      In 2001, Atkins filed this 42 U.S.C. § 1983 wrongful

5  conviction action, alleging that various Riverside County

6  officials, including then-Detective Danny C. Miller ("Miller" or

7  "Defendant"), engaged in unconstitutional misconduct that caused

8  Atkins's wrongful conviction and imprisonment.  All defendants

9  moved to dismiss, and the claims were narrowed in opinions issued

10 by the Hon. Margaret Morrow.  The matter was transferred to the

11 Hon. Percy Anderson on June 12, 2002, upon his appointment to the

12 federal bench.  After discovery, the remaining defendants moved for

13 summary judgment, which Judge Anderson granted in full on May 7,

14 2003, dismissing the entire case.

15     Atkins appealed.  On September 14, 2005, the Ninth Circuit

16 reversed in relevant part and remanded for trial against Miller on

17 two theories of liability arising under the Fourteenth Amendment:

18 (1) that he deliberately fabricated evidence – a statement he

19 attributed to Eric Ingram – and; (2) that he withheld the material

20 fact of his misconduct from the prosecution, in violation of Brady

21 v. Maryland, 373 U.S. 83 (1963), and its progeny.

22     After remand, discovery was reopened.  Trial was initially set

23 to begin on May 30, 2006, but was rescheduled twice.  Pretrial

24 litigation continued from the initial trial date through to the

25 eventual trial, including eight defense and five plaintiff motions

26 in limine and three pre-trial conferences.

27     During the proceedings post-remand, Judge Anderson issued two

28 orders: the first excluding as irrelevant any evidence of Atkins's

2

EXHIBIT 6    54

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 62 of 76   Page ID
Case 2:01-cv-01574-DDP-E   Document 427   Filed 08/27/2007   Page 3 of 17
#:1545

1   actual innocence, and the second requiring Atkins to disclose to
2   Miller, before trial, work product concerning areas that would be
3   raised during his adverse examination of Miller.  In opposition to
4   these two rulings, Atkins filed an emergency motion for a writ of
5   mandamus to the Ninth Circuit, which the Ninth Circuit ultimately
6   granted on both grounds.

7       On August 25, 2006 - the Friday before trial was to begin -
8   Judge Anderson faxed a minute order inviting Miller to move for
9   summary judgment as to causation on Atkins's fabrication-of-
10  evidence theory.  Atkins immediately filed a second emergency
11  motion for a writ of mandamus on the ground that this very matter
12  had been determined by the Ninth Circuit in reversing Judge
13  Anderson's grant of summary judgment and finding a triable issue on
14  the fabrication claim.  The Ninth Circuit ordered Judge Anderson to
15  file a response, but Judge Anderson instead withdrew the August 25
16  minute order and the mandamus petition was denied as moot.

17      Atkins filed a motion to recuse Judge Anderson on Monday,
18  August 28, 2006, the day before jury selection was to begin.  The
19  motion was referred to the Hon. Florence-Marie Cooper, who found
20  the question "close" but denied the recusal request.  Atkins then
21  filed a third emergency motion to the Ninth Circuit seeking a writ
22  of mandamus the same day.  The Ninth Circuit agreed that the
23  question was close, but denied the motion without prejudice.

24      The case went to trial in front of Judge Anderson.  After a
25  two-week trial, the case was submitted to the jury.  Shortly into
26  the deliberations, the jurors sent back a note stating that they
27  did not think they would be able to reach a unanimous verdict.
28  They later sent another note inquiring whether unanimity was

3

EXHIBIT 6   55

Case 2:04-cv-08572-CAS-SS Document 117-3 Filed 07/20/10 Page 63 of 76 Page ID
#:1536
Case 2:01-cv-01574-DDP-E Document 457 Filed 08/27/2007 Page 4 of 17

1  required for all substantive questions on the verdict form.[1]  When

2  they returned the following morning, the jurors indicated that they

3  would like to continue the deliberations.  At the end of that day,

4  Judge Anderson polled the individual jurors as to their thoughts on

5  the probability of reaching an unanimous verdict; six indicated

6  that they thought it was probable, two thought it was not.  The

7  next morning, Judge Anderson stated his intent to declare a

8  mistrial, over the objections of both parties.

9       Atkins filed a fourth emergency motion for a writ of mandamus,

10 seeking to enjoin Judge Anderson from releasing the jury.  After

11 another deadlock note was received, the Ninth Circuit ordered Judge

12 Anderson to respond to the petition, but ultimately granted him

13 leave to do as he saw fit.  Judge Anderson granted a mistrial and

14 discharge the jury on September 13, 2006.  Accordingly, the

15 mandamus petition was denied as moot.  However, the Ninth Circuit

16 issued an opinion ultimately recusing Judge Anderson.

17      The case was reassigned to the Hon. Christina A. Snyder on

18 September 19, 2006.  On October 17, 2006, the Ninth Circuit sua

19 sponte issued an amended order, reiterating its findings of bias

20 but adding that it would have been preferable, before ruling on the

21 recusal motion and ordering the case be transferred to a different

22 judge for a new trial, to allow Atkins to first present his renewed

23 motion to the district judge who considered the initial motion.

24

25

26      [1]  The verdict form indicated that if the answer to Question 1
27 (whether Miller fabricated evidence) was "No," the jury need not
   answer any other question, but instead should sign and return the
28 form.  Thus, this question indicates that the jury had tentatively
   found for Atkins on the question of fabrication.

4

EXHIBIT 6    56

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 64 of 76   Page ID
Case 2:01-cv-01574-DDP-E   Document 427   Filed 08/27/2007   Page 5 of 17
#:1547

1 Thus, the Ninth Circuit permitted Atkins to make such a motion if
2 he wished to do so.

3      Accordingly, the case was reassigned back to Judge Anderson on
4 October 27, 2006 and Atkins made a renewed recusal motion to Judge
5 Cooper on October 30, 2006.  Judge Cooper granted the renewed
6 motion on November 13, 2006, and this case was transferred to this
7 Court on November 14, 2006.

8      Miller then filed a Rule 50 motion for judgment on the
9 fabrication claim and Atkins filed for reconsideration of several
10 motions in limine decided by Judge Anderson.  After further pre-
11 trial litigation and more lengthy negotiations as to the proposed
12 jury instructions, a three-week trial was conducted in April 2007.
13 At the conclusion, the jury found for Miller on the fabrication of
14 evidence claim, but found for Atkins on the <u>Brady</u> claim, finding
15 that Miller had fabricated the Ingram statement and that Miller's
16 suppression of that fabrication and other evidence favorable to
17 Atkins had caused Atkins's wrongful conviction.  The jury awarded
18 Atkins $2 million in damages.  Miller then filed a post-trial Rule
19 50 motion, which this Court denied on June 26, 2007.

20      Atkins now moves the Court for attorneys' fees and costs under
21 42 U.S.C. § 1988.

22

23 **II.   DISCUSSION**[2]

24      A.   <u>Attorneys' Fees</u>

25 _____

26      [2]  Defense counsel argues that Plaintiff's counsel failed to
comply with the meet and confer requirements of L.R. 7-3.  Although
27 the Court could deny the motion for failure to comply with this
rule, it is not clear to the Court that Plaintiff's counsel failed
28 to comply.  Accordingly, in the interest of deciding this case on
the merits, the Court will consider the motion.

5

EXHIBIT 6   57

1    Under 42 U.S.C. § 1988, the district court may, in its

2 discretion, award attorneys' fees to a prevailing party in an

3 action brought under § 1983.  To determine the appropriate

4 attorneys' fee award under § 1988, courts use the "lodestar"

5 method, which "multiplies the number of hours the prevailing party

6 reasonably expended on the litigation by a reasonable hourly rate."

7 Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006)

8 (quotation and citation omitted).  After making that computation,

9 courts then assess whether it is necessary to adjust the

10 presumptively reasonable lodestar figure on the basis of twelve

11 factors.  Cunningham v. County of Los Angeles, 879 F.2d 481, 487

12 (9th Cir. 1988).  The twelve factors are:

13          (1) the time and labor required, (2) the novelty and

14          difficulty of the questions involved, (3) the skill

15          requisite to perform the legal service properly, (4)

16          the preclusion of other employment by the attorney due

17          to acceptance of the case, (5) the customary fee, (6)

18          whether the fee is fixed or contingent, (7) time

19          limitations   imposed   by   the   client   or   the

20          circumstances, (8) the amount involved and the results

21          obtained, (9) the experience, reputation, and ability

22          of the attorneys, (10) the "undesirability" of the

23          case, (11) the nature and length of the professional

24          relationship with the client, and (12) awards in

25          similar cases.

26 Id. at 252 n. 4 (citing Kerr v. Screen Extras Guild, Inc., 526 F.2d

27 67, 70 (9th Cir. 1975)).  However, many of these factors are

28 subsumed within the initial lodestar determination, and therefore

EXHIBIT 6    58

1  it is only the rare case in which this lodestar determination

2  should be adjusted.  Cunningham v. County of Los Angeles, 879 F.2d

3  481, 487 (9th Cir. 1988).

4      Defendant concedes that Plaintiff is the prevailing party

5  under § 1988 and that fees should be awarded.  However, Defendant

6  contends that the amount Plaintiff is requesting is excessive.

7          1.   Rates

8      Plaintiff's counsel is seeking reimbursement for a total of

9  3,174 substantive hours.[3]  Plaintiff requests the following rates

10 for the work of his legal staff:

11     Peter Neufeld:      $675

12     Debi Cornwall:      $400

13     Jennifer Laurin:    $315

14     Anna Hoffman:       $300

15     Defendant argues that Plaintiff's requested rates are

16 excessive.  Defendant suggests the following rates:

17     Peter Neufeld:      $350 to $400

18     Debi Cornwall:      $200 to $250

19     Jennifer Laurin:    $150 to $200

20     Anna Hoffman:       $150 to $200

21     A reasonable hourly rate is one "in line with those prevailing

22 in the community for similar services by lawyers of reasonably

23 comparable skill, experience, and reputation."  Sorenson v. Mink,

24 239 F.3d 1140, 1145 (9th Cir. 2001).  The plaintiff bears the

25 burden of producing evidence that the requested rates are in line

26 _____

27     [3]  See Pl.'s Ex. 1, attached to Reply.  Several other
   attorneys also worked on the case over the six years it was
28 litigated.  Plaintiff is not seeking compensation for their
   efforts.

7

EXHIBIT 6   59

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 67 of 76   Page ID
Case 2:01-cv-01574-DDP-E   Document 457   Filed 08/27/2007   Page 8 of 17
#:1550

1  with those prevailing in the community for similar services by

2  lawyers of reasonably comparable skill, experience and reputation.

3  Id.  The burden is on the defendant to produce rebuttal evidence in

4  support of a lower hourly rate.  Id.

5      All four Plaintiff's counsel are lawyers at Cochran, Neufeld

6  and Scheck, LLP ("CNS"), a small civil rights firm formed nine

7  years ago by Johnnie Cochran, Peter Neufeld and Barry Scheck.  CNS

8  is a seven-attorney firm with a nationwide practice devoted

9  entirely to police misconduct § 1983 cases, and predominantly

10  wrongful conviction suits.  Plaintiff represents that CNS is the

11  only firm in the country litigating these cases full-time.

12      Peter Neufeld, a founding partner of CNS, graduated from New

13  York University Law School in 1975.  He has over 30 years of

14  experience as a trial attorney.  He is a cofounder and co-director

15  of the Innocence Project at the Benjamin N. Cardozo Law School, and

16  has written or co-authored several articles and a book on wrongful

17  convictions.  For his work in criminal justice, civil rights and

18  trial practice, he has been repeatedly honored by countless

19  reputable schools and organizations.  He represents that he has

20  probably litigated more wrongful conviction cases than any lawyer

21  in the country outside of CNS.

22      Debi Cornwall graduated from Harvard Law School in 2000.  She

23  clerked for the Hon. Robert Sweet of the Southern District of New

24  York before joining CNS, where she has worked as an associate for

25  nearly six years.  At CNS, she has successfully litigated and co-

26  chaired wrongful conviction suits in cases across the country.  In

27  2006, she became a partner at CNS.

28

8

EXHIBIT 6   60

1      Anna Hoffman graduated third in her class from New York
2  University School of Law in 2004.  She clerked for the Hon.
3  Reginald C. Lindsay of the District of Massachusetts before joining
4  CNS as an associate in 2006.

5      Jennifer Laurin graduated first in her class from Columbia Law
6  School in 2003.  She clerked for the Hon. Thomas P. Griesa of the
7  Southern District of New York and the Hon. Guido Calabresi of the
8  Second Circuit before joining CNS.

9      Plaintiff's requested rates fall at the high end of the
10 spectrum.[4]  However, as noted above, this case had a long and
11 difficult history.  It involved complex and novel issues of
12 criminal procedure, constitutional law, tort law and governmental
13 immunities.  Plaintiff's briefs and oral arguments were excellently
14 presented and, during the trial, the Court found Plaintiff's
15 attorneys exceedingly well-prepared and skilled at trial
16 litigation.  In short, the Court believes that Plaintiff's
17 attorneys did an excellent job trying this complicated, difficult
18 case.  Their experience, reputation and skill are all considerable,
19 and Defendant has not submitted any relevant evidence or cited to
20 authority that would indicate Plaintiff's counsel's proposed rates
21 are above market.[5]  Accordingly, the Court does not find that
22 Plaintiff's requested rates are so exceptionally high as to justify
23 deviating from the lodestar figure.  The Court is therefore

24

25      [4]  In support of its motion, Plaintiff submitted the
26 declarations of Carol Sobel and Barrett Litt, two experienced civil
   rights lawyers who primarily practice in Los Angeles, as well as
27 recent National Law Journal articles on billing rates.  (Pl.'s Exs.
   2-5.)

28      [5]  Most of Defendant's cases are from out of district.

9

EXHIBIT 6    61

Case 2:04-cv-08572-CAS-SS  Document 117-3  Filed 07/20/10  Page 69 of 76  Page ID
#:1552
Case 2:01-cv-01574-DDP-E  Document 457  Filed 08/27/2007  Page 10 of 17

1 inclined to apply those rates in calculating Plaintiff's attorneys'

2 fees.

3     Defendants also argue that Plaintiff's requested rate of

4 $100/hour for the work performed by Plaintiff's paralegal, Tanya

5 Koshy, is too high.  However, in Los Angeles,[6] such a rate is

6 typical, if not modest.  (See, e.g., Pl.'s Ex. 2, Declaration of

7 Barrett S. Litt ¶ 25.)  Accordingly, the Court is not inclined to

8 deviate from Plaintiff's requested paralegal fee.

9

10         2.   Hours: unsuccessful claims and degree of success

11             obtained

12     Where the prevailing party has not won every claim initially

13 brought, the reviewing court must determine the appropriate level

14 of compensation to plaintiff's counsel for time spent on claims she

15 did not win.  Webb v. Sloan, 330 F.3d 1158, 1168 (9th Cir.  2003);

16 Sorenson v. Mink, 239 F.3d 1140, 1147 (9th Cir. 2001).  In making

17 this determination, the first step is to consider whether "the

18 plaintiff fail[ed] to prevail on claims that were unrelated to the

19 claims on which he succeeded." Hensley v. Eckerhart, 461 U.S. 424,

20 434 (1983).  Claims are "unrelated" if they are "entirely distinct

21 and separate" from the claims on which the plaintiff prevailed.

22 Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1499 (9th Cir. 1995).

23 Hours expended on unrelated, unsuccessful claims should not be

24 included in an award of fees.

25

26 _____

27     [6] Defendant argues that "Inland Empire" rates should apply
because the case could have been filed in Riverside.  That,

28 however, is not the standard.  It was filed in Los Angeles, and
therefore the higher Los Angeles rates apply.

                    10

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 70 of 76   Page ID
Case 2:01-cv-01574-DDP-E   Document 455   Filed 08/27/2007   Page 11 of 17
#:1553

1    The second step is to consider whether "the plaintiff

2 achieve[d] a level of success that makes the hours reasonably

3 expended a satisfactory basis for making a fee award." <u>Hensley</u>,

4 461 U.S. at 434.  In answering that question, a district court

5 "should focus on the significance of the overall relief obtained by

6 the plaintiff in relation to the hours reasonably expended on the

7 litigation." <u>Id.</u> at 435.  "Where a plaintiff has obtained

8 excellent results, his attorney should recover a fully compensatory

9 fee." <u>Id.</u>  A plaintiff may obtain excellent results without

10 receiving all the relief requested.  <u>Id.</u> at 435 n. 11.

11    Here, there were no unrelated claims.  The fabrication of

12 evidence claim and the <u>Brady</u> claim that were litigated in the

13 second civil trial were clearly intertwined.[7]  Moreover, the claims

14 Plaintiff initially brought against all four defendants arose out

15 of the same core set of facts and legal theories, such as those

16 related to identification procedures, that prevailed at trial.

17 Finally, the forensic <u>Brady</u> and fabrication claims were important

18 to the materiality and causation elements of the <u>Brady</u> claim

19 against Miller that ultimately prevailed.  Thus, the Court is

20 inclined to find that Plaintiff's claims were all related.  <u>See</u>

21 <u>Webb v. Sloan</u>, 330 F.3d 1158, 1169 (where all claims arise out a

22 common core of facts and a common course of conduct, it is

23 reversible error for a district court to exclude such claims as

24 "entirely distinct and separate" from the successful claims).

25

26

27        [7]  Indeed, to find for Plaintiff on the <u>Brady</u> cause of action,
the jury necessarily found (as indicated on the Special Verdict
28 Form) that Defendant had fabricated the Ingram statement.

11

EXHIBIT 6   63

Case 2:04-cv-08572-CAS-SS  Document 117-3  Filed 07/20/10  Page 71 of 76  Page ID
#:1334
Case 2:01-cv-01574-DDP-E  Document 454  Filed 08/27/2007  Page 12 of 17

1      Next, the Court must determine "the significance of the

2 overall relief obtained by the plaintiff in relation to the hours

3 reasonably expended on the litigation." Defendant argues that

4 plaintiffs who have won similar wrongful conviction civil rights

5 lawsuits typically have received awards much larger than Atkins's.

6 Thus, Defendant contends, Plaintiff's $2 million verdict is not

7 "excellent." This contention, however, fails to take into account

8 the unique circumstances giving rise to this case. This case was

9 complicated factually, procedurally and substantively. Plaintiff's

10 counsel, who litigates wrongful conviction suits almost

11 exclusively, has stated that this case stood out as presenting

12 unique hurdles to success. (Declaration of Deborah L. Cornwall ¶

13 20.) Given the complexity of this action, a two million award is

14 an excellent result.[8] Moreover, as Plaintiff explains, the number

15 of hours spent in litigating this case was exceptionally low, given

16 its long history and its difficulty. In short, there is no support

17 for reducing Plaintiff's fees based on the size of the verdict.

18

19          3.  Travel time

20      Defendant argues that Plaintiff is not entitled to

21 compensation for substantive work completed during travel. In the

22 Ninth Circuit, courts determine whether the travel time was

23 reasonably incurred. See Davis v. City of San Francisco, 976 F.2d

24 1536, 1543 (9th Cir. 1992), diff't potion vacated by 984 F.2d 345

25

---

26      [8] Significantly, even if Plaintiff had prevailed under his
   fabrication of evidence theory, the jury could not have awarded him
27 any further damages; Plaintiff prevailed against Defendant for the
   full extent of his loss.
28

12

EXHIBIT 6    64

1 (9th Cir. 1993). Here, Plaintiff billed travel time at 50% of the

2 proposed substantive rates. Plaintiff has provided evidence that

3 its firm has a unique expertise in this area of law, as the only

4 firm nationally handling wrongful conviction cases full time.

5 Moreover, Plaintiff's lead counsel, Peter Neufeld, had a

6 longstanding relationship with Plaintiff from his years of pro bono

7 representation resulting in Plaintiff's exoneration and release.

8 Given these circumstances, the Court finds that Plaintiff's

9 counsel's travel work was necessary and reasonable.

10

11          4.   <u>Administrative work</u>

12     In the Ninth Circuit, "even purely clerical or secretarial

13 work is compensable if it is customary to bill such work

14 separately." <u>Trustees of Const. Industry & Laborers Health &</u>

15 <u>Welfare Trust v. Redland Ins. Co.</u>, 460 F.3d 1253, 1257 (9th Cir.

16 2006) (citation omitted). In Los Angeles, it is customary to bill

17 administrative tasks separately. Here, Plaintiff's counsel has

18 separated out the administrative tasks and billed them at 50% of

19 the proposed substantive rates. Thus, the Court is inclined to

20 grant this portion of the fee request.

21

22          5.   <u>Fees on fees</u>

23     The Ninth Circuit has repeatedly held that time spent by

24 counsel in establishing the right to a fee award is compensable.

25 <u>See, e.g.</u>, <u>D'Emanuele v. Montgomery Ward & Co.</u>, 904 F.2d 1379,

26 1387-88 (9th Cir. 1990). Plaintiff has requested "fees on fees" in

27 the total amount of $6,500 for the work done in preparing this

28 motion. Plaintiff has calculated this rate as follows: For the

13

EXHIBIT 6     65

1  work of Debi Cornwall, 10 hours x $200/hr (proposed 50% discounted

2  rate); for the work of Anna Hoffman, 30 hours X $150/hr (proposed

3  50% discounted rate). Defendant argues that because Plaintiff's

4  substantive fee request is unreasonable, Plaintiff's fees on fees

5  request should be reduced. Because the Court finds Plaintiff's

6  substantive request reasonable, however, it is also inclined to

7  grant Plaintiff's fees on fees request.

8

9      B.   Expenses and Costs[9]

10     Federal Rule of Civil Procedure 54(d)(1) provides generally

11 that "costs other than attorney's fees shall be allowed as of

12 course to the prevailing party unless the court otherwise directs."

13 Fed. R. Civ. P. 54(d)(1). "Under § 1988, the prevailing party may

14 recover as part of the award of attorney's fees those out-of-pocket

15 expenses that would normally be charged to a fee paying client."

16 Dang v. Cross, 422 F.3d 800, 814 (9th Cir. 2005). Such out-of-

17 pocket expenses are recoverable when reasonable. Id.

18

19        1.   Jury Consultant Fees

20     Courts in the Ninth Circuit will award prevailing parties the

21 expenses and fees of jury consultants who ran focus groups and

22 assisted in jury selection at trial. See, e.g., Confederated

23

24        [9] Plaintiff's counsel is not seeking reimbursement for
   approximately $22,000 of costs incurred before 2003, when
25 Plaintiff's counsel shifted to a new book-keeping system. This
   includes the costs of the 11 depositions taken before summary
26 judgment, and travel expenses associated with taking those
   depositions.
27        Plaintiff's counsel also withdrew its request for $1,000 in
   mediation costs, and its request for compensation for $1,228.58
28 incurred to bring Plaintiff to New York for his second deposition.

14

EXHIBIT 6   66

Case 2:04-cv-08572-CAS-SS Document 117-3 Filed 07/20/10 Page 74 of 76 Page ID
#:1557
Case 2:01-cv-01574-DDP-E Document 457 Filed 08/27/2007 Page 15 of 17

1 <u>Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.</u>, No. CV 00-

2 1693-A, 2003 WL 23715982, at *8-9 (D. Or. Oct. 27, 2003) (allowing

3 $60,000 in costs for trial consulting service to conduct a mock

4 trial), <u>aff'd</u> 411 F.3d 1030 (9th Cir. 2005), <u>vacated and remanded</u>

5 <u>on other grounds sub nom Weyerhauser Co. v. Ross-Simmons Hardwood</u>

6 <u>Lumber Co., Inc.</u>, 127 S.Ct. 1069 (2007). Plaintiff's counsel used

7 Josh Dubin Consulting Services for their jury consultant needs and

8 negotiated a discounted rate. Given the complexity of the issues

9 in this case and the discounted rate, the Court is inclined to find

10 Plaintiff's total jury consultant expenses of $20,935.32

11 reasonable.

12

13      2.   <u>Travel expenses</u>

14     Travel costs are compensable so long as they are reasonable.

15 <u>See</u> <u>Lasha v. Tharp</u>, 907 F.2d 154 (mem. op.) at *2 (9th Cir. 1990).

16 Here, Plaintiff's counsel attempted to minimize the number of

17 flights to Los Angeles, appearing telephonically when possible. At

18 times, however, Plaintiff's counsel and witnesses were required to

19 travel to Los Angeles on a week's notice or less, which increased

20 the costs of travel. During both three-week trials, lead counsel

21 Peter Neufeld stayed with a friend rather than in a hotel. The

22 total cost of travel, lodging and meals over five years of

23 litigation is $40,363.35. The Court is inclined to find this

24 amount reasonable.

25

26      3.   <u>Shipping expenses</u>

27     Defendant argues that Plaintiff's shipping expenses should not

28 be reimbursed. However, most of Plaintiff's shipping expenses are

15

EXHIBIT 6   67

Case 2:04-cv-08572-CAS-SS  Document 117-3  Filed 07/20/10  Page 75 of 76  Page ID
#:1556
Case 2:01-cv-01574-DDP-E  Document 456  Filed 08/27/2007  Page 16 of 17

1 | for filings to this Court, which does not have civil e-filing.
2 | Thus, even local counsel must use a shipping carrier, send a
3 | runner, or bill paralegal time and travel costs to file documents.
4 | Plaintiff's other major shipping expense was sending boxes of
5 | documents to Los Angeles for the two trials.  The Court is inclined
6 | to find these shipping expenses reasonable and compensable.
7 |
8 |          4.   Investigator expenses
9 |      Defendant appears to argue that Plaintiff's investigation
10 | expenses of $54,995.48 were unreasonable.  However, Plaintiff
11 | incurred many of these expenses in his efforts to locate Riverside
12 | Deputy Chris Taylor, a witness whose identity and location
13 | Defendant did not reveal to Plaintiff before trial.  Plaintiff also
14 | used an investigator to locate and initiate contact with Eric
15 | Ingram, whose testimony was critical to Plaintiff's claims, as well
16 | as the three eyewitnesses, so that their testimony could be taken
17 | by deposition.  Given the length of time that had passed between
18 | Plaintiff's wrongful conviction and his release, this work required
19 | an extremely skilled investigator.  Accordingly, the Court is
20 | inclined to find Plaintiff's request for investigation expenses
21 | reasonable.
22 |
23 | III. CONCLUSION
24 |      For the foregoing reasons, the Court finds that no reduction
25 | to the lodestar is warranted.  Accordingly, the Court is inclined
26 | to grant the motion and award Atkins § 1988 attorneys' fees in the
27 | amount of $1,368,834, fees on fees in the amount of $6,500, and
28 |

EXHIBIT 6    68

Case 2:04-cv-08572-CAS-SS   Document 117-3   Filed 07/20/10   Page 76 of 76   Page ID
Case 2:01-cv-01574-DDP-E   Document 457   Filed 08/27/2007   Page 17 of 17
#:1535

1  costs in the amount of $165,067.22.[10]  The Court is also inclined to

2  award post-judgment interest under 28 U.S.C. § 1961(a).

3

4

5  IT IS SO ORDERED.

6

7

8  Dated:   8·27-07

9                                              DEAN D. PREGERSON
                                               United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  _____

28      [10]   This figure does not include the $4,763.50 requested
    separately in a Bill of Costs under § 1920.

                            17

EXHIBIT 6    69